**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | :    CIVIL ACTION NO. _____ |
| PLAINTIFF, | :    JURY DEMANDED |
| v. | : |
| DAVID SKUDDER, GLOBAL AG LLC, and NESVICK TRADING GROUP LLC, | : |
| DEFENDANTS. | : |

**COMPLAINT FOR INJUNCTIVE RELIEF,**
**CIVIL MONETARY PENALTIES, AND OTHER RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") alleges as follows:

## I.    SUMMARY

1.   From at least September 2014 through at least March 2019 (the "Relevant Period"), Defendant David Skudder ("Skudder"), while employed by Defendant Global Ag, LLC ("Global") and Nesvick Trading Group, LLC ("Nesvick") (collectively, "Defendants"), engaged in manipulative and deceptive schemes while placing orders for, and trading, soybean futures contracts and options on soybean futures contracts on a registered entity. In furtherance of his schemes, Skudder repeatedly engaged in manipulative or deceptive acts and practices by "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution). On hundreds of occasions, Skudder entered large orders for soybean futures that he intended to cancel before execution while placing orders on the opposite side of the soybean futures market

or on the side of the options on soybeans futures market that would benefit from market participants' reaction to his spoof orders.  In placing the spoof orders, Skudder intentionally or recklessly sent false signals of increased supply or demand designed to trick market participants into executing against the orders he wanted filled in soybean futures or options on soybean futures.

2.    By virtue of this conduct, as further described herein, Skudder has engaged in acts and practices that violate Sections 4c(a)(5)(C) and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2021).

3.    Skudder committed the acts and practices described herein while acting within the scope of his respective agency, employment, and office with both Global and Nesvick. Accordingly, Global and Nesvick are liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principals for Skudder's acts, omissions, or failures in violation of the Act and Regulations.

4.    Skudder is the President of Global and owns over ten percent of the company. During the Relevant Period, Skudder was a controlling person of Global and did not act in good faith or knowingly induced Global's violations of the Act and Regulations described herein. Therefore, Skudder is liable for Global's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

5.    The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' violative acts and practices and to compel Defendants' compliance with the Act and Regulation.  In addition, the CFTC seeks civil monetary penalties and such other relief,

including but not limited to disgorgement and trading and registration prohibitions, as the Court deems necessary and appropriate.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

7. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief in any proper district court of the United States against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

8. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, because Skudder transacts business in the Northern District of Illinois, and the acts and practices in violation of the Act and Regulation have occurred within this District.

## III. THE PARTIES

9. Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder. One of its core responsibilities is to protect the public interest by ensuring the financial integrity of all transactions subject to the Act and Regulations and protecting market participants from fraudulent practices. Section 3(b) of the Act, 7 U.S.C. § 5(b). The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, DC 20581.

10. Defendant **David Skudder** is a resident of Tennessee. Skudder is a founder, principal, and has been registered with the Commission as an associated person of Global since 2008. Skudder also has been registered with the Commission as an associated person of Nesvick, an introducing broker, since 2005.

11. Defendant **Global Ag, LLC** is a commodity trading advisor based in Germantown, Tennessee. Global has been registered with the Commission as a commodity trading advisor since 2008. Skudder was the primary trader for Global during the Relevant Period.

12. Defendant **Nesvick Trading Group, LLC** is an introducing broker based in Germantown, Tennessee. Nesvick has been registered with the Commission as an IB since 2005. Skudder has been registered as an associated person of Nesvick since 2005 as well. Nesvick introduced all of the accounts advised by Global to Firm 1, a registered futures commission merchant.

### IV. OTHER RELEVANT ENTITIES

13. The **Chicago Board of Trade** ("CBOT") is a commodity exchange that is registered with the CFTC as a designated contract market under Section 5 of the Act, 7 U.S.C. § 7, and defined as a "registered entity" under Section 1a of the Act, 7 U.S.C. § 1a(40). Among other commodities, CBOT lists soybean futures and options on soybean futures for trading. CBOT is located in Chicago, Illinois.

14. **CME Group Inc.** ("CME Group") is a Delaware corporation with its principal place of business in Chicago, Illinois. CME is the holding company that owns CBOT and operates (including during the Relevant Period) an electronic trading platform known as Globex located in Aurora, Illinois.

## V. FACTS

### A. Soybean Futures and Options Trading Background

15. A futures contract is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a specified price.

16. A futures contract traded on an exchange has standard, non-negotiable contract specifications, such as the quality, quantity, and physical delivery time and location for the given product. The CBOT Soybean futures contract is traded on CBOT. The standard contract unit for a soybean futures contract (one "lot," in trading terminology) equals 5,000 bushels of soybeans.

17. The price of the soybean contract is quoted in cents per bushel, and the minimum price change allowed during a trading session is one-quarter of one cent per bushel; thus, if a trader wished to place an order above the last traded soybean contract price of 1010 cents, that trader would have to place the order at 1010.25 cents or higher. This minimum price change is commonly called a "tick" and the full value of a tick per contract is $12.50 (0.25 cents x 5,000 bushels).

18. There are seven soybean contract delivery months: January, March, May, July, August, September, and November. The soybean contract is settled through delivery of soybean stocks that make up the underlying contract, with premiums or discounts applied to grade and quality differences.

19. The soybean futures contract trades Monday through Friday between 8:30 a.m. and 1:20 p.m. Central; and Sunday through Friday between 7:00 p.m. and 7:45 a.m. The soybean contract is traded electronically on the CME Globex trading system ("Globex"). Globex employs a matching algorithm to match bids and offers for execution, described in detail below.

20. Options on soybean futures are traded in much the same way as the soybean contract—through Globex during the same trading hours. One option on soybean futures is

5

deliverable by one futures contract. The price of an option on soybean futures may fluctuate one-eighth of one cent per bushel, or $6.25 per "tick." Options on soybean futures contracts are listed for expiration for the next three consecutive months, and monthly contracts of Jan, Mar, May, Jul, Aug, Sep, Nov.

21. An option on futures contract trade can be made in one of four ways. A trader may buy a Put Option or a Call Option by paying a premium to a seller of a Put Option or Call Option. A trader may also sell a Put Option or Call Option. A buyer of a Put Option has the option, but not the obligation, to sell a soybean futures contract at the "strike price" of the option contract. A buyer of a Call Option has the option, but not the obligation, to buy a soybean futures contract at the "strike price" of the option contract. A seller of either a Put Option or a Call Option is required to buy or sell, respectively, a soybean contract at the "strike price" when a buyer of the option exercises that option.

22. An option is "in the money" if the price of the underlying contract is at a better price than the strike price, in which case exercising the option would be profitable (not including the premium paid). The "strike price" of soybean options is listed in integral multiples of ten cents per bushel.

23. An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain number of a specified futures contracts or options contracts. An order is for one or more contracts. Contracts may also be called "lots," among other things. Orders are entered into the exchange's order book. When there exists both a willing buyer and seller for a contract at a given price, a transaction occurs and is referred to as a "fill" (or a "trade" or "execution"). At any time before

the order is fully filled, the trader can "cancel" the order. When an order is canceled, the contracts that have not yet been bought or sold are pulled from the order book.

24. Traders often consider information in the order book when making trading decisions. Each trader can view the aggregate number of contracts and orders that all traders are actively bidding or offering at a given price level. Only the total numbers of orders and contracts at various price levels are visible, not the identities of the traders who placed the orders. The best-bid level, or first-bid level, is the highest price at which someone is willing to buy. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between those two prices.

25. An "aggressive" order is an order that crosses the bid-ask spread. On the buy side of the market, an aggressive buy order is placed at the best-ask price or higher so, put simply, it is an offer to buy at a price that another trader is currently willing to sell. On the sell side of the market, an aggressive sell order is placed at the best-bid price or lower so, put simply, it is an offer to sell at a price that another trader is currently willing to buy. Accordingly, aggressive orders are guaranteed to execute, at least partially, immediately after being placed.

26. A "passive" or "resting" order, on the other hand, does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-bid price or lower so, put simply, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. On the sell side of the market, a passive sell order is placed at the best-ask price or higher, so, put simply, it is an offer to sell at a price that is higher than the price that other traders are currently willing to buy. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

27. An iceberg order is an order in which the size of the order is not fully visible to other market participants. For example, a trader may place an iceberg order for 100 soybean contracts or soybean options with the quantity visible in the order book set at one lot.

28. The soybean futures contract is traded electronically on Globex. The matching algorithm CME employs for the soybean futures market is known as the K-Algo, which is a split FIFO (first-in-first-out) and pro-rata matching algorithm. Under the K-Algo, orders are divided into tiers of priority. First, as relevant here, orders that establish a new price level in the order book are granted priority for the order entered at that price level as long as the order remains in the order book. That order will be filled before all other orders that later join at that price level. Second, forty percent of remaining contracts that must be filled are filled through FIFO (first-in-first-out) method, that is orders on the same side of the market (i.e., the buy side or sell side) and at the same price are filled based on time priority basis. Thus, the order that was placed first trades first, irrespective of the order's size for forty percent of the contracts to be traded or matched (rounded up to the nearest whole lot) in the FIFO round. Third, sixty percent of the remaining contracts that must be filled are filled using a pro-rata formula, meaning that each order receives a pro-rata portion of its order size in comparison to the remaining orders at that price level (rounded down to the nearest whole lot). Finally, any remaining contracts to be filled are done so through a leveling mechanism that allocates whole lots after the pro-rata step is completed.

29. Iceberg orders are treated differently in different rounds of the matching algorithm. In the FIFO round, the hidden quantity of iceberg orders is filled based on the time priority of the visible quantity. In other words, if an order for soybean futures enters the market and a resting iceberg order is filled during the FIFO round, the K-Algo matching algorithm will fill the visible

quantity, refresh the iceberg order based on the set visible quantity of the iceberg order, and fill the remaining hidden quantity until the iceberg order is fully depleted or the FIFO round is completed. The hidden quantity of an iceberg order, however, is not considered at the pro-rata distribution step for the K-Algo for soybean futures.

30. The soybean options contract is also traded electronically on Globex. Globex employs a slightly different matching algorithm for soybean options, known as the O-Algo. Like the K-Algo, orders that establish a new price level in the order book are granted priority for the order entered at that price level as long as the order remains in the order book. Next, orders are filled on a pro-rata distribution basis (with exceptions not relevant here), with any pro-rata calculations rounded down to the nearest whole number. Any remaining contracts to be filled are then done so on a FIFO basis. The hidden quantity of an iceberg order is not considered at the pro-rata distribution step for the O-Algo.

31. All else being equal, in futures markets—including the soybean futures and options markets—prices will generally rise when there is more interest in buying a particular contract (i.e., the demand side) than there is in selling (i.e., the supply side); conversely, prices will generally fall when supply exceeds demand (i.e., there is more interest in selling than buying).

32. Many market participants incorporate these general supply and demand concepts into their trading decisions. Market participants consider, for example, liquidity and market depth—i.e., the volume of lots and orders at various prices of the visible order book—to determine whether there is generally more interest to buy or to sell in the market at any given time, and thus whether a corresponding price change is likely. Market participants also consider "order book balance" or "order book pressure"—i.e., the ratio of lots and orders on the bid side of the market to the lots and orders on the offer side of the market. Many market participants use automated

trading systems that analyze the market for imbalances in the order book and use that information to inform trading decisions. Similarly, many market participants look to the price of correlated products. In soybean markets for example, the soybean options contract is correlated to soybean futures markets because the option contract is deliverable through one soybean futures contract. The price of the soybean futures contract, therefore, directly determines whether the option contract is "in the money."

33. For instance, if there are substantially more lots or orders on the bid side than on the offer side, market participants may reasonably believe that there is more interest to buy than to sell, and thus infer that a price increase is likely. These market participants may then trade accordingly, and some may attempt to buy lots before the expected price increase. In such a case, these market participants would place aggressive buy orders (i.e., at a higher price than the currently resting buy orders in the market), making execution of resting sell orders more likely. Likewise, a price change in soybean futures may cause market participants to enter orders to trade soybean options at a different price.

34. Spoofing and related manipulative or deceptive trading strategies seek to take advantage of these market fundamentals and market participants' reactions to them. This might be done, for example, by placing one or more resting orders (which the trader intends to execute) on the sell side of the market, and then placing one large order or a series of relatively large orders (which the trader intends to cancel before execution) on the buy side. The large orders on the buy side would create an order book imbalance and convey a false appearance that there is more interest to buy than to sell in the market. This might deceive other market participants into trading at a time, price, or quantity they otherwise would not have, in a way that benefits the trader. In this example, the trader's large buy orders could deceive other market participants into

placing aggressive orders to buy, thus moving the price higher and allowing the trader's sell orders to be executed sooner, at a better price, or in larger quantities than they otherwise would have been executed. Once the trader executes his desired sell orders, the trader would cancel the larger orders on the other side of the market.

**B.**     **Skudder's Manipulative and Deceptive Scheme**

35. Global is a registered commodity trading advisor. Global trades on behalf of clients that have executed written powers of attorney granting Global, and Skudder, the authority to trade commodity interests for clients. Skudder also trades on behalf of his own accounts that he opened with Global. Skudder is a registered associated person of Global and solicited clients' discretionary accounts on behalf of Global.

36. All of Global's accounts were introduced by Nesvick. In other words, Nesvick has an intermediary relationship between the clearing firm (a registered futures commission merchant) and Global. Skudder is a registered associated person of Nesvick and solicited or accepted customers' orders on behalf of Nesvick. Nesvick earns commissions for trades Global enters on behalf of customers.

37. During the Relevant Period, while acting on behalf of Global Ag and Nesvick, Skudder engaged in two separate manipulative and deceptive schemes. In the first scheme, Skudder engaged in a manipulative and deceptive scheme in soybean futures contracts with the intention to be filled in the same soybean futures contract (the "Futures Scheme"). In the second scheme, Skudder engaged in a manipulative and deceptive scheme in soybean futures contracts with the intention to be filled in the correlated options on soybean futures contract, (the "Options Scheme").

38. The Futures Scheme followed a general pattern: (1) placement of one or more small orders on one side of the market, which Skudder intended to execute ("Genuine Orders");

(2) before or after placing the Genuine Order, but overlapping in time, placing one or more large orders (that is, 100 contracts or more and at least twice as large as the visible quantity of the small order(s)), which he intended to cancel ("Spoof Orders"), on the opposite side of the market and within ten ticks of the Genuine Order; and (3) canceling the Spoof Orders within thirty seconds after they were placed. Each instance of this pattern comprises a single "Spoof Event." Collectively, "Genuine Orders" and "Spoof Orders" are referred to as "Spoof Event Orders."

39. Skudder's Genuine Orders and Spoof Orders were active simultaneously on opposite sides of the market, but, as noted above, the Spoof Orders encompassed a far greater total volume than the visible Genuine Orders. The imbalance between Skudder's Spoof Orders to his Genuine Orders was as high as 880 to 1 during Spoof Events, and the median imbalance was 100 to 1. Thus, Skudder intended his spoofing activity to put pressure on the price in the direction of his Genuine Orders and to deceive or trick market participants into filling his Genuine Orders at his desired price.

40. The Options Scheme followed a similar general pattern: (1) placement of a Genuine Order for options on soybean futures contracts; (2) before or after placing the Genuine Order, but overlapping in time, placing one or more Spoof Orders in the soybean futures contract market, which he intended to cancel, on the side of the futures market that would benefit his resting Genuine Order in the options market; and (3) canceling the Spoof Orders within thirty seconds after they were placed. For the Genuine Order in the Options Scheme, there is no requirement that the Spoof Order and Genuine Order create an imbalance between the futures market and the options market, but in every instance Skudder created an imbalance in the soybean futures market with an intent to put pressure in the direction of Skudder's Genuine Order for soybean options. Namely, the Spoof Order was at least 100 soybean futures contracts and at least twice

as large as orders Skudder placed on the opposite side of the soybean futures market, which put pressure on the options market in the direction of Skudder's Genuine Orders.

41. For the Options Scheme, in determining whether Skudder placed his Spoof Order in the futures market on the side that would benefit his Genuine Order in the options market, it is necessary to consider the objective of the type of option order that Skudder placed. The following chart shows order-type requirements of Spoof Orders and Genuine Orders that would qualify as a Spoof Event under the above parameters:

| | Option Side (Genuine Order) | |
|---|---|---|
| Buy/Sell Future (Spoof Order) | Buy/Sell | Put/Call |
| Buy | Buy | Put |
| Buy | Sell | Call |
| Sell | Buy | Call |
| Sell | Sell | Put |

For example, a buy order placed in the futures market (rows one and two) may qualify as a Spoof Order if the corresponding order for options is either an order to buy a put or sell a call, assuming the other parameters are also met.

42. Skudder's schemes were designed to benefit financially from market participants' reactions to his Spoof Orders. By entering orders that he intended to cancel, Skudder deceived other traders about supply and demand, misleading market participants about the likely direction of the commodity's price. As a result of Skudder's false signals of supply and demand, his Genuine Orders appeared more attractive to market participants and allowed Skudder to execute his Genuine Orders in larger quantities and at better prices than he otherwise would have absent the Spoof Orders.

43. Skudder carried out his schemes on the soybean futures contract and options on futures contract markets traded on CBOT. For all of the Relevant Period, Skudder traded manually, by submitting orders, cancelations, and modifications using a computer mouse or keyboard.

44. During the Relevant Period, as part of the Futures Scheme, Skudder engaged in 276 Spoof Events, using 479 Genuine Orders and 293 Spoof Orders. As part of the Futures Scheme, approximately sixty-seven percent of Skudder's Genuine Orders were placed as iceberg orders, which allowed Skudder to obscure the true supply and demand of his orders and convey greater imbalance to the market while receiving larger fills on his Genuine Orders with smaller Spoof Orders than would have been otherwise necessary in the soybean futures contract. In other words, market participants would typically see one or two lots from Skudder's Genuine Orders while seeing much larger Spoof Orders. As part of the Futures Scheme, Skudder's trading resulted in 202 successful Spoof Events and executions on 8,026 futures contracts in his Genuine Orders.

45. During the Relevant Period, as part of the Options Scheme, Skudder engaged in 279 Spoof Events, using 598 Genuine Orders and 299 Spoof Orders. During the Options Scheme, Skudder's trading resulted in eighty-seven successful Spoof Events and executions on 6,355 options on futures contracts in his Genuine Orders.

46. As part of both schemes, Skudder canceled over ninety-nine percent of all of the contracts he placed as part of Spoof Orders according to the pattern described.

47. By engaging in the Schemes as described herein, Skudder entered Spoof Orders either intentionally to send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or while recklessly disregarding the fact that

14

entering his Spoof Orders would send such a false signal to other market participants—a signal that injected false information about supply and demand into the market that could affect market activity. He knew that his Spoof Orders would appear in the order book and that traders often consider order-book information in making trading decisions. The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Skudder's Spoof Orders was so obvious that Skudder must have been aware of it. Skudder engaged in the Futures Scheme and Options Scheme to trick other market participants into executing against his Genuine Orders on the opposite side of the market.

48. Although Skudder's Spoof Orders were visible to the rest of the market, his identity as the originator of those orders was not. Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or identities of the traders who placed the orders. Accordingly, Skudder knew that other market participants could not see that the same trader had placed both the Spoof Orders and the Genuine Orders, which might have tipped off market participants that he intended to cancel his Spoof Orders. Skudder also knew that other market participants could not see that, in many cases, his Genuine Orders were iceberg orders and only displayed a small portion of the full order.

49. Skudder's intent to cancel his Spoof Orders is further demonstrated by his execution rates of similarly-sized orders that were not part of Spoof Events. When not placed as part of a Spoof Event, his large orders (100 or greater contracts) had a fill ratio of 10.6 percent compared to a fill ratio below one percent for similarly sized Spoof Orders within each Scheme. As shown in the chart below, Skudder's large orders were executed over ten times as frequently when not part of a Spoof Event, thus evidencing his intent to cancel the Spoof Orders.

| Comparison of Large Order Fill Ratios (Orders of 100 or Greater Contracts) | |
| --- | --- |
| | **Percentage of Contracts Filled (approximate)** |
| **Spoof Orders (Futures Scheme)** | 0.22% |
| **Spoof Orders (Options Scheme)** | 0.79% |
| **Large, Non-Spoof Event, Orders** | 10.6% |

50. Further, CME's K-Algo used in soybean futures makes large orders, like Skudder's Spoof Orders, more likely to receive partial fills during the pro-rata distribution step. Skudder's low fill ratio on his large Spoof Orders compared to similar sized orders that were not part of Spoof Events demonstrates Skudder's ability to avoid being filled on orders he intended to cancel.

51. Within Spoof Events, Skudder's ability to avoid executions of his Spoof Orders is striking when comparing his Genuine Orders to his Spoof Orders. Here, the stark contrast in fill ratios results from differences in Skudder's intent to cancel the Spoof Orders. As detailed in the following chart, Skudder was able to obtain executions at a much higher rate for his Genuine Orders than in his Spoof Orders during Spoof Events in each scheme:

| Orders Filled in Futures Scheme Spoof Events (percentages are approximate) | | | | |
|---|---|---|---|---|
| | **Total Orders in Spoof Events** | **Total Number of Contracts in Orders** | **Total Number of Contracts Filled** | **Percentage of Contracts Filled** |
| **Genuine Orders (Futures Scheme)** | 479 | 38,077 | 8,026 | 21.1% |
| **Genuine Orders (Options Scheme)** | 598 | 85,974 | 6,355 | 7.39% |
| **Spoof Orders (Futures Scheme)** | 293 | 64,103 | 138 | 0.22% |
| **Spoof Orders (Options Scheme)** | 299 | 63,462 | 500 | 0.79% |

52. As noted above, whether orders for soybean futures or soybean options are filled is also dependent on the orders' size—with larger orders receiving priority at the pro-rata step in CME's matching algorithms—which makes the difference in fill ratios of the smaller Genuine Orders and larger Spoof Orders even more striking.

53. Skudder took additional steps to protect his Spoof Orders from execution. For example, he canceled the Spoof Orders quickly after placing them; with a median cancelation time of 10.38 seconds in the Futures Scheme and 11.71 seconds in the Options Scheme. In contrast, Skudder's median cancelation time for large orders that were not Spoof Orders was much longer. For non-Spoof Orders of 100 contracts or more, Skudder's median cancellation

time was three minutes and zero seconds. As these large orders are similarly sized to his Spoof Orders, the difference in cancelation times is further proof that Skudder intended to cancel his Spoof Orders. He left his Spoof Orders exposed to the market for a much shorter period of time to reduce the chance that the Spoof Orders would execute.

**C.** **Examples of Skudder's Schemes**

54. Skudder's schemes are illustrated in the four Spoof Events set forth below—two Spoof Events from his Futures Scheme and two Spoof Events from his Options Scheme. A graphical display of Skudder's trading activity during the four Spoof Events below is provided in Exhibit A to this Complaint.

### 1. *Spoof Event Example 1 (Futures Scheme): August 31, 2017*

55. Skudder's trading in the morning of August 31, 2017, constitutes a Spoof Event pursuant to his Futures Scheme. At 11:15:05.843 AM Central Time (denoted in hours, minutes, seconds, and milliseconds), Skudder placed an iceberg order to sell thirty soybean contracts with one contract visible to the market at a price level of 945 cents per bushel (Genuine Order). At 11:15:21.655 AM Central, Skudder placed a fully visible order to buy 100 soybean contracts at 943.5 cents per bushel (Spoof Order) at the sixth best-bid price level. Skudder's Spoof Order increased the volume of the top six book levels on the bid side by over thirty-five percent. Approximately three seconds later, Skudder's Genuine Order is completely filled—between 11:15:24.486 and 11:15:24.490 AM Central. At 11:15:46.217 AM Central, Skudder canceled the Spoof Order.

### 2. *Spoof Event Example 2 (Futures Scheme): December 5, 2017*

56. Skudder's trading in the morning of December 5, 2017, constitutes a Spoof Event pursuant to his Futures Scheme. At approximately 8:47:20 AM Central Time, Skudder placed an iceberg order to sell 100 soybean contracts with one contract visible to the market at a price level

of 1011.5 cents per bushel. Over the next five seconds, Skudder placed two more iceberg orders to sell 100 soybean contracts each with a visible order quantity of one contract each at 1012.5 (Genuine Order) and 1013.5 cents per bushel. Skudder's first order (at 1011.5 cents) was completely filled between about 8:47:28 and 8:47:31. At 8:48:37.041 AM Central, Skudder placed a fully visible order to buy 500 soybean contracts at 1010.25 cents per bushel (Spoof Order) at the sixth best-bid price level and within ten ticks of the Genuine Order. Skudder's Spoof Order increased the number of contracts at the first six book levels on the bid side of the market by seventy-five percent, increasing the total number of contracts visible to the market at the top six levels from 672 to 1,172. By placing the Spoof Order in such a large quantity, but at the sixth best-bid price level, Skudder was able to trick market participants that there was greater buying interest in the market while his Spoof Orders remained at a lower risk of being filled immediately. Nine seconds later, at 8:48:45.769 AM Central, Skudder's Genuine Order to sell at 1012.5 cents per bushel begins trading and is completely filled by 8:48:56.091 AM Central. Skudder canceled his Spoof Order at 8:49:01.603 AM Central. Between the time Skudder placed and canceled his Spoof Order, the best offered price had moved up four price levels.

### 3. *Spoof Event Example 3 (Options Scheme)*: *July 1, 2016*

57. Skudder's trading in the morning of July 1, 2016, constitutes a Spoof Event pursuant to his Options Scheme. At 11:29:14.696 AM Central Time, Skudder had two existing orders to buy ten soybean call options contracts (Genuine Orders), when he placed an order to sell 100 soybean futures contracts at 1167.25 cents per bushel (Spoof Order). At the time Skudder placed his Spoof Order, there were no orders (buy or sell) at 1167.25 cents per bushel leaving a price spread of one level between the best bid and the best offered prices. Skudder's Spoof Order established the new best-ask price and more than doubled the number of contracts offered at the top ten ask levels—from 89 to 189 contracts. Skudder's Genuine Orders, twenty contracts in

total, were filled almost instantly (one millisecond later) at 11:29:14.697 AM Central.  Less than three seconds later, Skudder canceled his Spoof Order, at 11:29:17.309 AM Central.

### 4. *Spoof Event Example 4 (Options Scheme): July 11, 2016*

58. Skudder's trading in the morning of July 11, 2016, constitutes a Spoof Event pursuant to his Options Scheme.  At 10:35:58.647 AM Central Time, Skudder had an existing order to buy two soybean call options contracts (Genuine Order), when he placed an order to sell 100 soybean futures contracts at 1063.5 cents per bushel at the best bid-ask level (Spoof Order).  At the time Skudder placed his Spoof Order, there were no orders (buy or sell) at 1063.25 cents per bushel leaving a price spread of one level between the best bid and the best offered prices.  Skudder's Spoof Order more than doubled the number of contracts being offered in the first five best-ask price levels—from 95 to 195.  When the Spoof Order did not cause market participants to fill his existing Genuine Order, and other market participants placed sell orders to improve the best offered price, Skudder modified his Spoof Order at 10:36:00.514 AM Central to join the now-best-ask price, offering to sell 100 soybean futures contracts at 1063.25 cents per bushel.  Skudder's Genuine Order was filled almost instantly, at 10:36:00.579 AM Central.  One second later, at 10:36:01.696 AM Central, Skudder modified his Spoof Order away from the market to 1063.75 cents per bushel.  About three seconds later, at 10:36:05.050 AM Central, Skudder modified his Spoof Order away from the market again to 1064.25 cents per bushel.  At 10:36:09.541 AM Central, Skudder canceled his Spoof Order.  By twice modifying his Spoof Order to place it at a lower risk of being executed—all after his Genuine Order traded—Skudder demonstrated his intent to avoid execution of the Spoof Order.

## VI.  VIOLATIONS OF THE ACT

## COUNT I

## VIOLATIONS OF SECTION 4c(a)(5)(C) OF THE ACT, 7 U.S.C. § 6c(a)(5)(C)

### Spoofing

59.  Paragraphs 1 to 58 are re-alleged and incorporated herein by reference.

60.  By reason of the conduct described above, Skudder engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

61.  In placing each Spoof Order, Skudder acted with the intent to cancel the bid or offer before execution.

62.  By reason of the foregoing, Skudder violated  7 U.S.C. § 6c(a)(5).

63.  Skudder engaged in the acts, practices, or conduct described above while acting within the scope of his respective agency, employment, and office at both Global and Nesvick. Accordingly, Global and Nesvick are liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principals for Skudder's acts, omissions, or failures in violation of 7 U.S.C. § 6c(a)(5)(C).

64.  At all times relevant to this Complaint, Skudder controlled Global, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Global's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Skudder is liable for Global's violations of 7 U.S.C. § 6c(a)(5)(C).

65.  Each Spoof Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6c(a)(5)(C); or in the alternative, each Scheme constitutes a separate distinct violation of 7 U.S.C. § 6c(a)(5)(C).

21

**VIOLATIONS OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1),
AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3)**

**Use of a Manipulative and Deceptive Device, Scheme, or Artifice**

66.  Paragraphs 1 to 58 are re-alleged and incorporated herein by reference.

67.  By reason of the conduct described above, Skudder, in connection with a contract for future delivery on a registered entity, intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

68.  In the conduct described above, Skudder acted intentionally or recklessly.

69.  By reason of the foregoing, Skudder violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

70.  Skudder engaged in the acts, practices, or conduct described above while acting within the scope of his respective agency, employment, and office at both Global and Nesvick. Accordingly, Global and Nesvick are liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. § 1.2, as principals for Skudder's acts, omissions, or failures in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

71.  At all times relevant to this Complaint, Skudder controlled Global, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Global's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Skudder is liable for Global's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

72.  Each Spoof Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and

(3); or in the alternative, each Scheme constitutes a separate distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

## VII.  RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.      Find that Defendants violated Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2021);

B.      Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. §§ 6c(a)(5)(C), 9(1) and 17 C.F.R. § 180.1(a)(1) and (3);

C.      Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)) for their own personal account or for any account in which he has a direct or indirect interest;

3. Having any commodity interests traded on their behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021).

D. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E. Enter an order requiring Defendants, jointly and severally, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F. Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

G. Enter an order requiring Defendants to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

H. Enter an order providing for such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: <u>April 14, 2022</u>

Respectfully submitted,

PLAINTIFF COMMODITY FUTURES
TRADING COMMISSION

<u>s/Clemon D. Ashley</u>
Jeffery C. Le Riche (MO Bar # 46557)
Nicholas S. Sloey (VA Bar #75438)
Clemon D. Ashley (IL Bar #6294839)
Commodity Futures Trading Commission
2600 Grand Boulevard, Suite 210
Kansas City, Missouri 64108
Telephone: (Le Riche) (816) 960-7746
Telephone: (Sloey) (816) 960-7728
Telephone: (Ashley) (816) 960-7748
Facsimile:  (816) 960-7751
jleriche@cftc.gov
nsloey@cftc.gov
cashley@cftc.gov

Attorneys for Plaintiff