UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | No. 22 CV 1925 |
| v. | Judge Manish S. Shah |
| DAVID SKUDDER, GLOBAL AG LLC, and NESVICK TRADING GROUP LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Defendant David Skudder traded commodity interests for himself and defendant Global Ag LLC. Defendant Nesvick Trading Group, LLC introduced all of Global's accounts to a futures commission merchant and earned commissions on Global's trades. The Commodity Futures Trading Commission alleges that for nearly five years, Skudder, acting on behalf of Global and Nesvick, orchestrated two schemes designed to manipulate and deceive the soybean futures market. In both schemes, Skudder allegedly engaged in spoofing: placing orders that he intended to cancel while simultaneously placing orders on the opposite side of the market that he hoped to execute. The agency brings claims against Skudder for violations of the Commodity Exchange Act and a related regulation, and alleges that Global and Nesvick are vicariously liable. Defendants move to dismiss under Rule 12(b)(6). For the reasons discussed below, the motion is granted in part and denied in part.

## I.     Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018) (citing *Deppe v. NCAA*, 893 F.3d 498, 499 (7th Cir. 2018)).

A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (Claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreens Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

## II.    Background

David Skudder was founder, president, principal trader, and an associated person for Global Ag LLC, a commodity trading advisor. [1] ¶¶ 4, 10–11.[1] Global and Skudder traded commodity interests on behalf of clients, and Skudder also traded on his own accounts. *Id.* ¶ 35. Nesvick Trading Group LLC, an introducing broker, introduced Global's accounts to a clearing firm. *Id.* ¶¶ 12, 36.[2] Skudder was an associated person of Nesvick, and solicited or accepted customer orders on behalf of Nesvick. *Id.* ¶¶ 10, 36. Nesvick earned commissions for trades that Global entered on behalf of customers. *Id.* ¶ 36.

According to the complaint (filed in April 2022), between at least September 2014 and March 2019, Skudder engaged in two fraudulent schemes to manipulate the commodities market. [1] ¶ 1. The first involved soybean futures contracts, while the second targeted the market for options on soybean futures contracts. *Id.* ¶¶ 37–

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint. [1].

[2] The clearing organization processed or completed the transaction. *See* Commodity Futures Trading Commission, *CFTC Glossary*, "Clearing Organization," https://www.cftc.gov/LearnAndProtect/EducationCenter/CFTCGlossary/glossary_c.html (last visited Dec. 12, 2022).

41.[3] Both schemes followed a similar pattern. *Id.* Skudder placed one or more orders[4] on one side of the market, intending to execute (or fill) these genuine orders. *See id.* ¶¶ 23, 38, 40. At the same time, he placed one or more orders on the other side of the market, intending to cancel these spoof orders. *See id.*[5] The complaint alleges that Skudder committed these spoofing schemes while acting within the scope of his agency, employment, and office with both Global and Nesvick. *Id.* ¶¶ 1, 63, 70.

Skudder's schemes were designed to make money by manipulating market fundamentals. [1] ¶¶ 34, 42. In futures markets, prices generally went up when there was more interest in buying a particular contract than there was in selling, and, conversely, prices went down when supply exceeded demand. *Id.* ¶ 31. Market participants incorporated those general concepts into their trading decisions by considering the visible interest in buying or selling, along with the ratio of lots and orders on the bid side of the market as compared to the lots and orders on the offer

---

[3] A futures contract was an agreement to buy or sell a commodity in the future at a specified price. [1] ¶ 15. An option on a futures contract could be made in one of four ways. *Id.* ¶ 21. A put option gave the buyer the option to sell a futures contract at the strike price of the option contract, while the seller agreed to buy the futures contract at that price if the option was exercised. *Id.* The buyer of a call option could buy a futures contract at the strike price of the option contract, while the seller agreed to sell the futures contract at the strike price, if the option was exercised. *Id.*

[4] An order was a request submitted to an electronic exchange to buy a certain number of contracts. [1] ¶ 23.

[5] At any time before an order was fully filled, a trader could cancel the order, meaning that contracts that had not yet been bought or sold were pulled back from the order book and could not be executed. *See* [1] ¶ 23. A trader who spoofs the market bids or offers with the intent to cancel the bid or offer before execution. 7 U.S.C. § 6c(a)(5)(C). In practice, spoofing utilizes "extremely fast trading strategies" to "artificially move the market price of a stock or commodity up and down, instead of taking advantage of natural market events." *United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017). One way to generate this artificial movement is to place large and small orders on opposite sides of the market, with the smaller order placed at a desired price. *Id.*

4

side. *Id.* ¶ 32.[6] Automated tools provided traders with analyses of market imbalances (periods when there were substantially more lots or orders on one side of the market), which would imply that a price was headed up or down. *Id.* ¶¶ 32–33. Market participants also considered the price of correlated products, meaning that a trader would look to (for instance) the price of soybean futures to determine a trading strategy for soybean options. *Id.* ¶ 32. Traders acted on this information by buying or selling based on expected price changes. *Id.* ¶¶ 33–34.

By entering orders that he intended to cancel, Skudder allegedly deceived other traders about the state of the market, misleading market participants about the direction of commodity prices. *See* [1] ¶¶ 34, 42. As a result, Skudder's genuine orders appeared more attractive and Skudder was able to execute those orders in larger quantities and at better prices than he would have without misleading other market participants. *Id.* ¶ 42.

During the nearly five-year period in question, Skudder engaged in more than 500 spoof events. [1] ¶¶ 44–45.[7] Skudder successfully engaged in 202 spoof events as part of his futures scheme, and eighty-seven spoof events as part of the options scheme. *Id.* Skudder's median futures spoof order was 100 times the size of his genuine futures orders,[8] while the spoof options orders were at least twice as large as

---

[6] A bid was a request to buy, while an offer was a request to sell. [1] ¶ 23. A lot was a contract. *Id.*

[7] The complaint refers to each instance of the pattern of trading—placement of a genuine order overlapping with a spoof order and cancelation of the spoof order—as a spoof event. *See* [1] ¶ 38.

[8] The algorithm used by the trading system on which soybean futures contracts were sold made large orders more likely to be partially filled. [1] ¶¶ 28, 50, 52.

the genuine options orders. *Id.* ¶¶ 39–40. By placing orders of different sizes, Skudder created imbalance in the market intending to put pressure in the direction of his genuine orders. *Id.* As part of spoof events, Skudder's genuine orders were executed at a higher rate than his spoof orders. *Id.* ¶ 51. Genuine orders in the futures scheme were filled at a rate of 21.1 percent, while related spoof orders were filled just .22 percent of the time. *Id.* Genuine orders in the options scheme were filled 7.39 percent of the time, while the corresponding spoof orders were filled at a rate of .79 percent. *Id.*

In both schemes, Skudder canceled more than ninety-nine percent of all of the spoof order contracts that he placed. [1] ¶ 46. From the time they were placed, spoof orders were canceled within a median time of 10.38 seconds in the futures scheme and 11.71 seconds in the options scheme. *Id.* ¶ 53. Skudder left large orders (100 contracts or more) that weren't part of spoof events exposed to the market for a much longer period, with a median cancelation time of three minutes. *Id.* Skudder's large orders were filled at a rate of 10.6 percent when not part of a spoof event, but were executed less than one percent of the time when they were part of a spoof event. *Id.* ¶ 49.

As part of the futures scheme, sixty-seven percent of Skudder's genuine orders were icebergs, meaning that the size of the orders wasn't fully visible to other market participants. [1] ¶¶ 27, 44.[9] Skudder knew that other market participants couldn't

---

[9] Traders in the soybean futures or futures options market could view the aggregate number of contracts and orders that all traders were actively bidding or offering at a given price level, but could not see the identities of the traders who placed the orders. [1] ¶ 24.

see that his genuine orders were iceberg orders. *Id.* ¶ 48. While Skudder's spoof orders were visible to the market, his identity as the originator of those orders was hidden (the identities of traders who placed orders wasn't visible), which meant that market participants couldn't tell that Skudder had placed orders on both sides of the market. *Id.* ¶¶ 24, 48.

The complaint includes four examples of spoof events drawn from Skudder's trading in 2016 and 2017. *See* [1] ¶¶ 54–58. In the first, Skudder placed an iceberg order to sell thirty soybean contracts, with one contract visible to the market at a price of 945 cents per bushel. *Id.* ¶ 55. Sixteen seconds later, Skudder placed a fully visible order to buy 100 contracts at 943.5 cents, the sixth best-bid price level. *Id.*[10] This second order increased the volume of the top six book levels on the bid side of the market by over thirty-five percent. *Id.* Three seconds after the second order was placed, Skudder's initial order was completely filled. *Id.* About twenty-two seconds later, Skudder canceled the order to buy. *Id.*

In the second example, Skudder placed an iceberg order to sell 100 contracts with one visible to the market at 1011.5 cents per bushel at 8:47:20 a.m. [1] ¶ 56. Over the next five seconds, Skudder placed two more iceberg orders to sell 100 contracts each with a visible quantity of one contract at 1012.5 and 1013.5 cents. *Id.* Skudder's first order to sell (at the lowest price point) was filled between eight and

---

[10] Orders entered into the soybean contract trading system were entered into the exchange's order book. [1] ¶ 23. Orders were placed at various price levels, and the best-bid level was the highest price at which someone was willing to buy. *Id.* ¶ 24. The best-ask level was the lowest price at which someone was willing to sell. *Id.*

eleven seconds after it was placed. *Id.* At 8:48:37.041 a.m., Skudder placed a fully visible order to buy 500 soybean contracts at 1010.25 cents, the sixth best-bid price level and within ten ticks[11] of his genuine order (the order to sell 100 contracts at 1012.5 cents). *Id.* This visible order to buy increased the total number of visible contracts at the first six book levels on the bid side of the market by seventy-five percent. *Id.* Nine seconds later, Skudder's order to sell at 1012.5 cents began trading and was completely filled by 8:48:56.091 a.m. Skudder canceled the order to buy about six seconds later. *Id.*

In the third example, Skudder had two active orders to buy ten soybean call options contracts when he placed an order to sell 100 soybean futures contracts at 1167.25 cents per bushel. [1] ¶ 57. At the time Skudder placed his offer to sell, there were no orders at 1167.25 cents per bushel, leaving a price spread of one level between the best bid and the best offered prices. *Id.* Skudder's sell offer established the new best-ask price and more than doubled the number of contracts at the top ten ask levels. *Id.* Skudder's smaller orders to buy were filled one millisecond later. *Id.* Three seconds after that, Skudder canceled his order to sell. *Id.*

In the fourth and final example, Skudder had an existing order to buy two soybean call options contracts when (at 10:35:58.647 a.m.) he placed an order to sell 100 futures contracts at 1063.5 cents per bushel, which was the best bid-ask level. [1] ¶ 58. When Skudder placed his order to sell, there were no orders at 1063.25 cents, leaving a price spread of one level between the best bid and the best offered prices.

---

[11] A tick was the minimum price change allowed during a trading session. [1] ¶ 17.

*Id.* Skudder's offer to sell more than doubled the number of contracts being offered in the first five best-ask price levels. *Id.* With his order to buy unfilled, Skudder modified his order to sell at 10:36:00.514 to join the new best-ask price. *Id.* Less than a second later, Skudder's order to buy was filled. *Id.* A second later, Skudder moved his order to sell away from the best-ask price, and three seconds later moved his order to sell again to a higher price. *Id.* At 10:36:09.541 a.m., some nine seconds after his small buy order was filled, Skudder canceled the sell order. *Id.*

## III.  Analysis

### A.  Statute of Limitations

The CFTC seeks civil monetary penalties related to defendants' alleged violations of the Act. *See* [1] ¶ 5, at 24 ¶ F; *see also* 7 U.S.C. § 13a-1(d)(1) (The Commodity Exchange Act authorizes the agency to seek civil penalties for each violation). There's an allegation that defendants violated two sections of the Act, neither of which includes a limitations period. *See* 7 U.S.C. §§ 6c, 9. The catchall limitations provision for civil penalty actions—18 U.S.C. § 2462—applies. *See United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 348 (7th Cir. 2019). That statute, 18 U.S.C. § 2462, says:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued.

Defendants argue that the CFTC's claims for civil penalties accrued on the day each alleged spoof order was placed. *See* [11] at 9–13. Defendants reason that, because each alleged spoof order was an individual violation, claims for civil penalties

9

based on violations that occurred more than five years before the CFTC filed its complaint must be dismissed. *See id.* Because the parties agreed to toll the limitations period for a few months in 2021, the limitations dividing line was on December 12, 2016. [16] at 22 n.5; [17] at 20 n.10. The CFTC responds that either the continuing violation doctrine or the scheme-offense doctrine should apply, such that its complaint is timely so long as some executions of Skudder's schemes occurred within the five-year period. [16] at 23–27.

The continuing violation doctrine isn't a good fit for spoofing claims. The statutory text doesn't speak in terms of continuing offenses. *See* 7 U.S.C. §§ 6c(a)(5)(C), 9(1); 17 C.F.R. § 180.1(a)(1), (3). And spoofing and manipulation aren't by nature the kinds of offenses that Congress must have intended to be continuing offenses. *See United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 350–53 (7th Cir. 2019) (quoting *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999)) ("The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that 'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred."); *United States v. Smith*, 555 F.Supp.3d 563, 587–88 (N.D. Ill. 2021). Each day after one spoof does not bring a new threat of harm from spoofing or price-manipulation.

The complaint alleges that Skudder's trading strategy was a scheme. [1] ¶ 65. In criminal law, scheme crimes can be prosecuted so long an execution of the scheme occurred within the statute of limitations. *United States v. Longfellow*, 43 F.3d 318, 322–325 (7th Cir. 1994). Civil complaints are not criminal indictments (where the

unit of prosecution is one execution of the scheme, not the overall scheme, and concerns about double jeopardy require more specificity in pleading than Federal Rule of Civil Procedure 8 demands of civil complaints). Here the complaint does not allege specific counts tied to executions of a scheme and does not seek a specific financial penalty tied to conduct identifiable by date. As a result, it's not necessary to decide how the scheme-offense doctrine and the statute of limitations apply at this point in the case. Skudder executed at least some of the trades at issue after December 12, 2016. *See* [1] ¶¶ 1, 55–56 (two of the trading sequences cited by the CFTC as examples of Skudder's spoofing occurred within the limitations period). And conduct outside the statute of limitations period is relevant to the CFTC's requests for equitable relief.[12] The complaint therefore was filed within the statute of limitations.

Whether a court can assess financial penalties based on conduct occurring before December 12, 2016, will not change how discovery proceeds and is unlikely to materially affect the admissibility of evidence at trial. The issue here is whether to dismiss some or all of the CFTC's complaint, but the CFTC isn't necessarily seeking monetary penalties related to trades that occurred before December 12, 2016. *See* [1] ¶¶ 1, 5, 37, 54–58, at 24 ¶ F (Beyond a general time frame and a few examples, the complaint doesn't identify the dates of the trading at issue, or tie the requests for penalties to specific trades.). Given that discovery doesn't depend on the answer and

---

[12] The complaint includes a request for equitable relief, *see* [1] ¶ 5, at 23–24 ¶¶ A–H, which the parties agree can be based on conduct outside the statute of limitations period. *See* [17] at 20 n.11.

the complaint isn't clearly raising the question, at this point I decline to decide how the scheme-offense doctrine should apply to requests for civil monetary penalties. With the benefit of a better-developed record, at summary judgment or trial the parties may renew the argument as to the scheme-offense doctrine[13] and its application to the CFTC's claims for civil penalties under 7 U.S.C. § 13a-1(d)(1). At this point, however, when the complaint does not identify specific claims by date, the statute of limitations isn't a reason to dismiss undated claims.

## B. Nesvick's Vicarious Liability

Section 2 of the Commodity Exchange Act makes a principal liable for its agent's violations of the Act committed within the scope of the agency relationship. 7 U.S.C. § 2(a)(1)(B); *see* 17 C.F.R. § 1.2. The provision "enacts a variant of the common law principle of respondeat superior," and imposes strict liability on a principal for its agent's acts (1) if the principal authorized or ratified the acts or (2) created an appearance that the acts were authorized. *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *see Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir. 1987). Whether an agency relationship exists depends on the totality of the circumstances. *Stotler and Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) (citations omitted).

The complaint includes allegations—tracking the language of § 2(a)(1)(B)— that Skudder was acting as Nesvick's agent when he violated the Act. *See* [1] ¶¶ 3,

---

[13] It may be the case (as defendants argue) that each separate spoofing event is a separate claim for civil penalties, and penalties cannot be assessed for trading outside the statute of limitations. *See McCool v. Strata Oil*, 972 F.2d 1452, 1465–66 (7th Cir. 1992) (discussing claims for civil violations of the RICO statute and applying the principle of separate accrual). But neither party has addressed how the scheme-offense doctrine would apply to requests for civil penalties associated with trades outside the five-year period.

63, 70. The CFTC argues that these allegations are sufficient to state a claim for vicarious liability against Nesvick. *See* [16] at 29 (citing *Stotler*, 855 F.2d at 1292 and *Rosenthal*, 802 F.2d at 966). But after *Iqbal*,[14] under either Rules 8 or 9, a conclusory allegation of an agency relationship isn't enough. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) (applying Rule 8 and affirming dismissal of a claim for vicarious liability under the Telephone Consumer Protection Act because a complaint lacked sufficient facts to state a claim for relief); *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586–89 (7th Cir. 2021) (applying Rule 8 and holding that a complaint adequately alleged an agency relationship under the TCPA when the allegations included enough detail to make plausible an actual-authority theory of agency liability).[15]

The complaint adds that Skudder was an associated person of Nesvick, that Nesvick introduced all of Global's accounts and earned commissions on each trade

[14] While "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations" such that the complaint states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The court in *Stotler* reviewed an order from the CFTC, and didn't consider Rule 12(b)(6). *See Stotler and Co. v. CFTC*, 855 F.2d 1288, 1290–92 (7th Cir. 1988). Insofar as that case suggests that a conclusory allegation of an agency relationship is sufficient to state a claim in federal court under § 2(a)(1)(B), *Stotler* is no longer good law. *Rosenthal* was also a review of an order from the CFTC, and the court didn't decide whether a complaint had adequately stated (under Federal Rule of Civil Procedure 8 or 9(b)) a claim for vicarious liability. *See Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966–69 (7th Cir. 1986).

[15] The parties do not address which pleading standard applies to the CFTC's claims for vicarious liability. *See* [16] at 28–30; [11] at 28–30; [17] at 25–26. That Rule 9(b) applies to the CFTC's claims against Skudder isn't decisive: the question turns instead on whether the agency relies on the same circumstances to establish both the alleged fraud and the agency relationship. *See Lachmund v. ADM Inv. Services, Inc.*, 191 F.3d 777, 783 (7th Cir. 1999); *Lane v. Money Masters, Inc.*, Case No.: 14-cv-1715, 2015 WL 225427, at *8 (N.D. Ill. Jan. 15, 2015).

that Global executed, that Skudder was a principal of Global and handled its trades, and that Skudder's spoofing increased executions of his genuine orders. [1] ¶¶ 10–12, 35–36, 42, 47. But these facts don't notify Nesvick of the CFTC's theory of vicarious liability. *See Warciak*, 949 F.3d at 357. *Cf. Bilek*, 8 F.4th at 587. That Skudder was a registered associated person of Nesvick supports the proposition that the parties had some kind of agency relationship. *See* 7 U.S.C. § 6k (requiring partners, officers, employees, agents, or any person occupying a similar status or performing similar functions to register as an associated person with the Commission). But the CFTC hasn't alleged any facts showing that Skudder was acting within the scope of that relationship when he made the trades at issue. *See* [1] ¶¶ 3, 12, 35–36. That Nesvick benefitted from Skudder's trades (made on behalf of Global) doesn't show that Skudder's trading was within the Nesvick–Skudder relationship. *See Rosenthal*, 802 F.2d at 969 (that a party benefits from another's activities doesn't show an agency relationship). The complaint says that Nesvick was an introducing broker, [1] ¶ 12, and that Skudder traded on behalf of Global and his own accounts. *Id.* ¶ 35. There's no allegation that Skudder traded for Nesvick, and the few facts about Nesvick's relationship with Skudder do not give rise to an inference that Skudder was acting within the scope of that relationship when he allegedly violated the Act. *See* 7 U.S.C. § 2(a)(1)(B); *Warciak*, 949 F.3d at 357.

The claims against Nesvick are dismissed.

### C.    Fraudulent Intent

It's undisputed that Rule 9(b) applies to Count II—manipulation. *See* [16] at 11–12; 9 U.S.C. § 9(1); 17 C.F.R. § 180.1(a)(1), (3). Count I—spoofing—may also implicate Rule 9(b)'s heightened standard. *See* 7 U.S.C. § 6c(a)(5)(C). Because defendants only challenge the complaint on the allegations of intent, however,[16] there is no need to decide the correct pleading standard for the spoofing claim here.

To state a claim for spoofing, the CFTC must allege that Skudder bid or offered "with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C); *see United States v. Coscia*, 866 F.3d 782, 794–95 (7th Cir. 2017); *CFTC v. Oystacher*, 203 F.Supp.3d 934, 943 (N.D. Ill. 2016). The CFTC's second claim—use of a manipulative or deceptive device in connection with the sale or future sale of commodities— requires an allegation that Skudder acted "intentionally or recklessly." 17 C.F.R. § 180.1(a)(1), (3); 7 U.S.C. § 9(1); *see Oystacher*, 203 F.Supp.3d at 949; *CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1325–1327 (11th Cir. 2018) (applying 17 C.F.R. § 180.1(a)).

Even under Rule 9(b), intent may be alleged generally. *See* Fed. R. Civ. P. 9(b). Beyond conclusory allegations, however, the complaint must provide some basis for believing that the CFTC can prove Skudder's intent. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (citing *Tricontinental Industries, Ltd. v.*

---

[16] Defendants waived the undeveloped point (made in a footnote bereft of any argument) that the CFTC failed to allege the substance of Skudder's fraudulent conduct. *See* [11] at 14 n.9; *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (citations omitted) ("[A] party can waive an argument by presenting it only in an undeveloped footnote.").

15

*PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841–42 (7th Cir. 2007)); *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018) (quoting *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013)) (Allegations of a state of mind must be supported with "subsidiary facts."). In the absence of direct evidence, fraudulent intent can be alleged with circumstantial facts about the nature of the alleged scheme. *See Fidlar Technologies v. LPS Real Est. Data Solutions, Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (quoting *United States v. Pust*, 798 F.3d 597, 600 (7th Cir. 2015)).

In this case, there's an allegation that Skudder placed orders that he intended to cancel and that he intentionally or recklessly used (or attempted to use) manipulative devices, schemes, or artifices to defraud. *See* [1] ¶¶ 60–61, 67–68. Beyond these bare assertions of Skudder's state of mind, however, the complaint also details the structure, aim, and results of the alleged schemes.

For instance, describing the structure of the futures scheme, the CFTC alleges that Skudder placed overlapping orders on both sides of the soybean futures market, and that the spoof orders were large (100 contracts or more), were within ten ticks of the genuine order, and that Skudder canceled the spoof orders within thirty seconds after they had been placed. [1] ¶ 38. The complaint spells out similar details about the alleged options scheme. *Id.* ¶ 40. The CFTC alleges that by placing spoof orders that were larger than the visible genuine orders, Skudder created imbalance in the market and put pressure in the direction of his genuine orders. *Id.* ¶¶ 39–40.

There are allegations about the total number of spoof events as part of both schemes, [1] ¶¶ 44–45, and four specific examples of Skudder's alleged spoofing. *Id.*

16

¶¶ 54–58. When not part of a spoof event, a much higher proportion of Skudder's large orders (100 or more contracts) was filled as compared to the rate of execution for similarly sized spoof orders (10.6 percent compared to less than 1 percent). *Id.* ¶ 49. There's an allegation that Skudder's genuine orders were filled at much higher rates than the spoof orders. *Id.* ¶ 51. And the complaint says that Skudder canceled his spoof orders much faster than large orders not part of spoof events. *Id.* ¶ 53. Finally, the complaint explains the results of the alleged spoofing: how Skudder deceived the market about supply and demand and made his genuine orders more attractive. *Id.* ¶¶ 42, 47.

Defendants object that the thirty-second period before Skudder canceled his alleged spoof orders isn't consistent with an intention to cancel. [11] at 16–20. An initial problem with this argument is that the median cancelation time for Skudder's spoof orders was shorter: 10.38 seconds (futures scheme) and 11.71 seconds (options scheme). [1] ¶ 53.[17] More generally, though, that Skudder left the alleged spoof orders

---

[17] Other complaints filed by the CFTC alleged that spoof orders were canceled more quickly, or that cancelations were made immediately before or after the execution of genuine orders. *See CFTC v. Zhao*, No. 18-cv-00620, Dkt. 1, at ¶ 21 (N.D. Ill. Jan. 28, 2018) (orders were canceled within two seconds); *CFTC v. Vorley et al.*, No. 18-cv-00603, Dkt. 1, at ¶ 26 (N.D. Ill. Jan. 26, 2018) (orders were often placed and canceled within five seconds); *CFTC v. Mohan*, No. 4:18-cv-00260, Dkt. 1, at ¶ 43 (S.D. Tex. Jan. 28, 2018) (median duration of spoof orders was under two seconds); *CFTC v. Nav Sarao Futures Ltd PLC, et al.*, No. 15-cv-03398, Dkt. 1, at ¶¶ 66, 69, 70 (N.D. Ill. April 17, 2015) (spoof orders were canceled within one second); *CFTC v. Oystacher et al.*, No. 15-cv-09196, Dkt. 1, at ¶ 54 (N.D. Ill. Oct. 19, 2015) (same); *CFTC v. Nowak et al.*, No. 19-cv-06163, Dkt. 1, at ¶ 41 (N.D. Ill. Sept. 16, 2019) (orders were canceled within a few seconds); *CFTC v. Banoczay et al.*, No. 20-cv-05777, Dkt. 1, at ¶ 46 (N.D. Ill. Sept. 29, 2020) (orders were canceled within a median time of seven seconds); *CFTC v. Khara et al.*, No. 15-cv-03497, Dkt. 1, at ¶¶ 19, 29, 32 (S.D.N.Y. May 5, 2015) (spoof orders were canceled immediately after receiving fill on genuine orders); *CFTC v. Flotron*, No. 3:18-cv-00158, Dkt. 1, at ¶¶ 30, 32–85 (D. Conn. Jan. 26, 2018) (spoof orders were canceled either immediately after receiving a fill on genuine orders or as soon as the market moved closer to the spoof orders). In *Thakkar*, however, the CFTC alleged that defendants placed spoof orders

exposed to the market for some length of time isn't necessarily inconsistent with an intent to cancel. Traders in the commodities market move very quickly,[18] but the complaint doesn't say how fast the market for soybean futures and options contracts was moving during the period in question, and the CFTC alleged that Skudder canceled a large number of orders within seconds, a subsidiary fact that suggests the CFTC can prove Skudder's intent to deceive and cancel.[19]

Defendants argue that the CFTC needed to allege more or different facts, because the complaint merely alleges lawful trading activity. *See* [17] at 9–20. In particular, defendants point to the absence of allegations that Skudder placed his spoof orders at or near the best bid/ask price (where the orders would have had the most impact on the market) or that he parked the spoof orders behind existing orders to minimize the risk of execution. *See* [11] at 21–24. But the complaint spells out how Skudder's spoof orders sent false market signals, *see* [1] ¶ 42, and the CFTC's

---

that remained exposed to the market for up to two minutes. *CFTC v. Thakkar et al.*, No. 18-cv-00619, Dkt. 1, at ¶¶ 37–39 (N.D. Ill. Jan. 28, 2018).

[18] *See CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *39 (N.D. Ill. July 12, 2016) (In a case involving alleged spoofing, a compliance officer at a proprietary figures trading company testified that one second was "an eternity" in the commodity futures trading market.).

[19] There are times when a trader may cancel an order for "totally legitimate reasons." *United States v. Chanu*, 40 F.4th 528, 534 (7th Cir. 2022). But evidence of a series of cancelations made in close connection to orders placed on the opposite side of the market still provides a factual basis to infer an intent to cancel. The court in *Kessev Tov* found that allegations of quickly entering and canceling orders weren't sufficient to allege manipulative acts under § 10(b) of the Exchange Act, but didn't assess whether plaintiffs had adequately plead scienter. *Kessev Tov, LLC v. Doe(s)*, Case No. 20-cv-04947, Case No. 20-cv-04948, 2022 WL 2356626, at *6–10 (N.D. Ill. June 30, 2022). *Stone Fort I* is distinguishable because the plaintiffs in that case were required to plead intent under the heightened standard of the Private Securities Litigation Reform Act. *CP Stone Fort Holdings, LLC v. John Doe(s)*, Case No. 16 C 4991, 2016 WL 5934096, at *4–5 (N.D. Ill. Oct. 11, 2016).

examples show that (at least in four cases) Skudder's spoof orders had an impact on the market. *See id.* ¶¶ 55–58.[20] While allegations that Skudder placed his alleged spoof orders to maximize impact on the market and to avoid execution would have made an inference of intent more obvious,[21] the complaint shows that Skudder placed his orders in such a way as to move the market in favor of his smaller, genuine orders, consistent with a deceptive intent.[22] That the pattern of trading alleged in this

[20] The examples are consistent with an intent to cancel or deceive. The complaint alleges that these alleged spoof orders were placed so as to move the market in favor of Skudder's genuine orders, specifies the amount of resulting market pressure, and alleges that Skudder filled his related genuine orders while canceling his spoof orders. *See* [1] ¶¶ 55–58.

[21] In other cases, plaintiffs have alleged that defendants entered alleged spoof orders at or near the best bid or ask prices or took steps to avoid execution of spoof orders. *See CP Stone Fort Holdings, LLC v. John Doe(s)*, Case No. 16 C 4991, 2017 WL 1093166, at *1, 4 (N.D. Ill. Mar. 22, 2017) (a trader placed orders at the best available price and parked orders so as to minimize the possibility that deceptive orders would be executed); *CFTC v. Oystacher et al.*, 203 F.Supp.3d 934, 942 (N.D. Ill. 2016) (defendants placed orders at or near the best bid or offer price behind existing orders and an used automated function to cancel and place orders simultaneously); *CFTC v. Nowak et al.*, No. 19-cv-06163, Dkt. 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (spoof orders were placed close to the best bid or ask and were canceled immediately after receiving a fill on genuine orders); *CFTC v. Zhao*, No. 18-cv-00620, Dkt. 1, at ¶¶ 36–38 (N.D. Ill. Jan. 28, 2018) (alleged spoof orders were placed at the best bid or ask and spoof events occurred overnight); *CFTC v. Mohan*, No. 4:18-cv-00260, Dkt. 1, at ¶¶ 39, 43 (S.D. Tex. Jan. 28, 2018) (spoof orders were placed behind existing orders close to the best bid or ask and overnight); *CFTC v. Banoczay et al.*, No. 20-cv-05777, Dkt. 1, at ¶¶ 51–75 (N.D. Ill. Sept. 29, 2020) (spoof orders were placed near the best bid or ask); *CFTC v. Flotron*, No. 3:18-cv-00158, Dkt. 1, at ¶¶ 29–30 (D. Conn. Jan. 26, 2018) (spoof orders were canceled as soon as the market moved close to those orders); *CFTC v. Thakkar et al.*, No. 18-cv-00619, Dkt. 1, at ¶ 2 (N.D. Ill. Jan. 28, 2018) (trader used automated function to modify orders so as to avoid execution); *CFTC v. Nav Sarao Futures Ltd PLC, et al.*, No. 15-cv-03398, Dkt. 1, at ¶ 2 (N.D. Ill. April 17, 2015) (same).

[22] Defendant argues that the CFTC only looked for large spoof orders, and so comparisons between Skudder's alleged spoof orders and other orders are meaningless. [11] at 25. But the complaint describes Skudder's alleged conduct, and doesn't say that the agency limited its search using specific parameters. *See* [1] ¶¶ 38, 40. The fact that larger orders were more at risk of execution in the soybean futures marketplace, combined with the lower proportion of Skudder's large orders made as part of alleged spoof events that were filled, supports the agency's allegation that Skudder's fill rates are suspicious, and in turn, could support an inference of deceptive intent. *See id.* ¶¶ 49–50.

complaint is different than that at issue in other cases isn't a reason to dismiss the CFTC's claims. The CFTC wasn't required to allege incriminating communications, witnesses to the alleged fraud, layering,[23] or the use of automated tools.[24] Neither was the agency required to allege how long Skudder left his orders exposed to the market after the genuine orders were filled, whether or how long the alleged spoof orders were entered before the genuine orders were entered, or whether Skudder modified his spoof orders so as to make them more or less likely to be executed. Maybe the CFTC's case is weak when compared to other cases, but that's not the issue at this stage.

The CFTC has done enough to suggest the requisite intent. The agency was permitted to allege Skudder's intent generally. *See* Fed. R. Civ. P. 8, 9(b). Beyond a conclusory allegation, the complaint describes the features, aims, and results of

---

[23] Layering refers to the placement of multiple limit orders on one side of the market at various price levels to manipulate market conditions. *See United States v. Coscia*, 100 F.Supp.3d 653, 655 (N.D. Ill. 2015); *United States v. Vorley*, No. 18 CR 00035, 2021 WL 1057903, at *14 (N.D. Ill. Mar. 18, 2021); Self-Regulatory Organizations, Exchange Act Release No. 34-79361, 115 S.E.C. Docket 2623, 2016 WL 6872613, at *2, 6 and n.11 (Nov. 21, 2016).

[24] In other cases involving spoofing, the CTFC alleged that defendants made incriminating statements, layered orders, used automated tools, and that there were witnesses to the alleged fraudulent conduct. *See CFTC v. Vorley et al.*, No. 18-cv-00603, Dkt. 1, at ¶¶ 32–37 (N.D. Ill. Jan. 26, 2018) (incriminating communications and the existence of a witness); *CFTC v. Mohan*, No. 4:18-cv-00260, Dkt. 1, at ¶ 46 (S.D. Tex. Jan. 28, 2018) (incriminating communications); *CFTC v. Thakkar et al.*, No. 18-cv-00619, Dkt. 1, at ¶¶ 1, 29–31 (N.D. Ill. Jan. 28, 2018) (incriminating communications and use of automated tools); *CFTC v. Flotron*, No. 3:18-cv-00158, Dkt. 1, at ¶¶ 28–29 (D. Conn. Jan. 26, 2018) (defendant trained other traders how to spoof); *CFTC v. Oystacher*, 203 F.Supp.3d 934, 942 (N.D. Ill. 2016) (use of automated tools); *CFTC v. Nav Sarao Futures Ltd PLC, et al.*, No. 15-cv-03398, Dkt. 1, at ¶ 2 (N.D. Ill. April 17, 2015) (layering and use of automated tools); *CFTC v. Banoczay et al.*, No. 20-cv-05777, Dkt. 1, at ¶ 41 (N.D. Ill. Sept. 29, 2020) (layering); *CFTC v. Nowak et al.*, No. 19-cv-06163, Dkt. 1, at ¶ 41 (N.D. Ill. Sept. 16, 2019) (same); *CTFC v. Khara et al.*, No. 15-cv-03497, Dkt. 1, at ¶ 18 (S.D.N.Y. May 5, 2015) (same).

Skudder's alleged schemes, subsidiary facts that provide some basis to believe the agency can prove that Skudder acted with the required intent. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). The complaint adequately notifies defendants of the nature of the claims against them, and nothing more is required.

## IV. Conclusion

Defendants' motion to dismiss, [10], is granted in part and denied in part. Defendant Nesvick is dismissed from the case without prejudice.[25] The claims are not dismissed against defendants Skudder and Global. Those defendants shall answer the complaint by January 10, 2023. The stay on discovery is lifted. The parties shall propose a schedule for the completion of discovery and a deadline for any amendment of the pleadings in a joint status report, due January 18, 2023.

ENTER:

Manish S. Shah
United States District Judge

Date:

---

[25] Ordinarily a plaintiff should be given at least one opportunity to amend a complaint. *See Saint Anthony Hospital v. Eagleson*, 40 F.4th 492, 517 (7th Cir. 2022) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015)).