**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 22-CV-01925 |
| vs. | ) | |
| | ) | Hon. Jeffrey I. Cummings |
| DAVID SKUDDER and GLOBAL AG LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF LISA PINHEIRO**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. Introduction ..... 1

II. Background ..... 3

A. Skudder's Trading Activity ..... 3

B. The CFTC's Complaint ..... 4

C. Pinheiro's Report and Testimony ..... 5

III. Argument ..... 7

A. Pinheiro Is Not Qualified and Should Not Be Permitted to Opine on Skudder's Intent. ..... 8

B. Pinheiro's Report Is Based on an Invalid and Unreliable Assumption. ..... 12

C. Pinheiro's Analysis of the CFTC-Identified Orders Is Not Reliable. ..... 16

1. Pinheiro Draws Conclusions and Infers Intent from an Admittedly Statistically Insignificant "Pattern." ..... 16

2. The CFTC's Methodology – Adopted by Pinheiro – Is Not Reliable. ..... 17

a. There is No Support for the 30-Second Window ..... 18

b. There Is No Basis for Pinheiro's Assumed Link Between Futures Orders and Options Trades. ..... 19

c. The CFTC's Methodology Was Unreliably Applied. ..... 20

D. Pinheiro's "Broader" Analysis Is Not Reliable. ..... 21

E. Pinheiro's Calculation of Gains and Losses Is Not the Result of a Reliable Methodology and Should be Excluded. ..... 24

IV. Conclusion ..... 25

# TABLE OF AUTHORITIES

## CASES

*Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433 (7th Cir. 2001) .......... 26

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011) .......... 8

*C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015) .......... 22

*City of Rockford v. Mallinckrodt Ard, Inc., et al.*, No. 17-cv-50107, 2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) .......... 14

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) .......... 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......... 8, 9

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715 (7th Cir. 1998) .......... 26

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......... 8, 18, 19

*Holden Metal & Alum. Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2003 WL 1797844 (N.D. Ill. Apr. 3, 2003) .......... 26

*In re Paraquat Pros. Liab. Litig.*, 730 F. Supp. 3d 793 (S.D. Ill. 2024) .......... 19

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 449 (E.D. Pa. 2014). 19

*Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567 (N.D. Ill. May 31, 2017) 8, 9

*LK Nutrition, LLC v. Premier Research Labs, LP*, No. 12-cv-7905, 2016 WL 4987429 (N.D. Ill. Sept. 19, 2016) .......... 13

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528 (7th Cir. 1997)... 28

*Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561 (N.D. Ill. 2022) .......... 9

*United States v. Flotron*, No. 17-cv-220, 2018 WL 1790828 (D. Conn. Apr. 15, 2018) .......... 11

*Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 WL 4278787 (N.D. Ill. Sept. 25, 2017) .......... 25

## STATUTES

Fed. R. Evid. 702 .......... 7, 8

## OTHER AUTHORITIES

*CFTC v. Skudder*, No. 22-CV-1925, ECF No. 1, Complaint (N.D. Ill.) .......... passim

*CFTC v. Skudder*, No. 22-CV-1925, ECF No. 16, Plaintiff's Opposition to Defendants' Motion to Dismiss (N.D. Ill.)........................................................................................................ 5

*United States v. Andre Flotron*, No. 17-cr-00220, ECF No. 138 (D. Conn.) ........................... 9, 10

*United States v. Thakkar*, No. 18-cr-00036, ECF Nos. 87, 90 (N.D. Ill)....................................... 9

## I. INTRODUCTION

The Commodity Futures Trading Commission's ("CFTC") claim that Defendants David Skudder ("Skudder") and Global Ag LLC ("Global Ag") (collectively, "Defendants") engaged in spoofing of futures contracts for soybeans on the Chicago Board of Trade ("CBOT") rests entirely on its identification of two so-called "patterns" that it claims to have identified in Skudder's trading activity. The CFTC alleges that these "patterns" support an inference that Skudder entered 512 futures orders over the course of four-and-a-half years, not because he intended those orders to be executed, but to create pressure on the market that would increase the chance that his orders resting on the opposite side of the options or futures market would be filled. The CFTC retained an economist, Lisa Pinheiro, to opine on whether the "patterns" it identified were consistent with an intent to obtain executions.

Pinheiro, however, is unqualified to provide expert testimony as to Skudder's intent or whether his trading was consistent with a rational strategy to fill orders. She is not a trader and has no expertise that qualifies her to opine on trading strategy, what motivates a trader to enter or cancel any order, how those orders are entered, or how other market participants react to those orders. As such, she should be precluded from testifying as an expert, including opining on Skudder's intent.

Pinheiro, however, is qualified to run a test for statistical significance regarding Skudder's trading activity and she concluded that the "patterns" identified by the CFTC were ***not*** statistically significant. In other words, Pinheiro could not rule out, with any degree of probability, that the "patterns" identified by the CFTC were the result of random chance. For this reason alone, Pinheiro's testimony should be excluded. Despite acknowledging that she could not draw any conclusions just from the orders identified by the CFTC, Pinheiro does exactly that – opining that the characteristics of the CFTC-identified orders are not consistent with an intent

to execute. She also opines on the alleged gains and losses associated with the trading activity. There is no question that these opinions are the result of an unreliable methodology. Pinheiro admitted as much when she conceded that the patterns are not statistically significant.

Pinheiro, however, attempts to salvage the CFTC's analysis by employing a new, untested, unsupported, and patently unreliable methodology. She compares the characteristics of large, visible orders entered by Skudder with the characteristics of small and/or hidden orders entered by Skudder and concludes, because the large, visible orders were in the market for shorter periods and more likely to be canceled, that Skudder must not have intended that any of those orders be filled. There are two primary flaws in this analysis.

First, Pinheiro's analysis rests on a demonstrably false assumption that entering large, visible orders is inconsistent with an intent to execute. The CFTC's own allegations and studies that Pinheiro cites acknowledge that large, visible orders receive execution priority and informed traders such as Skudder are likely to enter such orders to increase the chance their orders will be executed quickly and fully.

Second, comparing characteristics of small and large orders is, simply put, the wrong comparison. Traders have different purposes, employ different strategies, and face dramatically different risks when entering an order for one futures contract versus entering an order for 100 futures contracts. A better comparison – and one the CFTC attempted to do in its Complaint – is to compare the characteristics of large orders where there is an order on the opposite side of the market that could benefit from market pressure created by the large order, with the characteristics of large orders where there is *no* such opposite-side order. This comparison reveals that Skudder's large orders were canceled and filled at generally the same rate regardless of whether there was an opposite-side order, indicating that Skudder's entering (or canceling) of

large orders has nothing to do with trying to secure fills of orders on the opposite side of the market. Pinheiro's attempt to explain away this compelling contradictory evidence further demonstrates the unreliability of her methodology and her lack of understanding of trading and how futures markets work. For these, and the other reasons set forth herein, this Court should exclude Pinheiro's testimony and opinions.

## II. BACKGROUND

### A. Skudder's Trading Activity

Skudder is the principal trader at Global Ag, where he trades in agricultural products, including soybeans, corn, and wheat, at the CBOT, a commodity exchange operated by CME Group Inc. ("CME"), as well as other futures and options products. Skudder Tr. 38:6-39:1, 39:11-14, 40:2-4, 121:19-122:7.[1] Skudder trades for his own account and a small number of clients. *Id*. at 13:8-19. He has been trading for more than 35 years, employing a fundamentals-based strategy. *Id*. at 20:4-10, 24:23-24, 59:2-18. In other words, rather than trading based on "charts" or movement in the futures market, he relies on product-related information to inform his trading decisions, such as the supply of the particular commodity, demand, weather, crop forecasts, availability of barges, geopolitical events, and other factors. *Id*. at 24:23-28:2, 34:7-36:10, 87:14-91:10, 93:4-94:2. The information he most relies on is an ongoing stream of proprietary weather reports and updates. *Id.* at 29:2-31:23, 32:17-34:6, 46:5-47:6, 51:16-59:2, 60:14-62:10. He retains a full-time weather analyst who provides him with multiple reports a day beginning as early as 3:30 am. *Id*. This information provides an opportunity to take advantage of perceived mispricing in the market – both long and short term – and he trades futures and options

[1] A copy of the transcript of David Skudder's deposition is attached as Ex. 1 to the Declaration of Ellen Wheeler in Support of Defendants' Motions for Summary Judgment and to Exclude Testimony and Opinions of Lisa Pinheiro ("Wheeler Decl.").

on futures accordingly. *Id*. Because Skudder is trading on this information, he is considered an "informed trader." Pinheiro Tr. (Vol. 1), Ex. 3 to Wheeler Decl., at 25:8-25.

**B. The CFTC's Complaint**

The CFTC's Complaint alleges that Skudder engaged in "spoofing" in the soybean futures market between September 2014 and March 2019. ECF 1, Compl. ¶ 1. The Complaint defines "spoofing" as "bidding or offering with the intent to cancel the bid or offer before execution." *Id*. The CFTC identified 512 orders for 100 or more soybean futures contracts that it alleges were part of so-called "Spoof Events." ECF 1, Compl. ¶¶ 44-45; *see also* n.4, *infra*. The CFTC claims that these "Large-Side Orders" were entered without the intent to be filled, but rather to push the market toward futures orders or options orders on the opposite side of the market ("Small-Side Orders"). *Id*. ¶¶ 39-40.[2]

The Complaint identifies 276 "Spoof Events" where Skudder allegedly entered Large-Side Orders in an attempt to increase his fills of Small-Side Orders in the futures market. *Id*. ¶ 44. According to the CFTC, each of these instances exhibited the following characteristics:

(1) "placement of one or more small orders on one side of the market, which Skudder intended to execute;"

(2) "before or after placing the [Small-Side Order,] but overlapping in time, placing one of more large orders (that is, 100 contracts of more and at least twice as large as the visible quantity of the small order(s)), … on the opposite side of the market and within ten ticks of the [Small-Side Order]"; and

(3) "canceling the [Large-Side Orders] within thirty seconds after they were placed."

*Id*. ¶ 38. The Complaint identifies 279 "Spoof Events" where Skudder allegedly entered Large-Side Orders in an attempt to increase his fills on Small-Side Orders for options contracts. *Id*. ¶ 45. According to the CFTC, each of these instances shared the following characteristics:

[2] Pinheiro uses the terms "Large-Side Orders" and "Small-Side Orders," while the CFTC uses the terms "Spoof Orders" and "Genuine Orders." For this Motion, Defendants use Pinheiro's terminology.

(1) "placement of a [Small-Side Order] for options on soybean futures contracts";[3]

(2) "before or after placing the [Small-Side Order], but overlapping in time, placing one or more [Large-Side Orders for 100 contracts or more] in the soybean futures contract market … on the side of the futures market that would benefit his resting [Small-Side Order] in the options market"; and

(3) "canceling the [Large-Side Orders] within thirty seconds after they were placed."

*Id.* ¶ 40.[4]

The Complaint cites no direct evidence demonstrating that Skudder intended to cancel the Large-Side Orders, much less that the purpose of the Large-Side orders was to push the market toward the Small-Side Orders. Instead, the CFTC compared the execution rates and median cancelation time for the Large-Side Orders to other large orders that were not part of so-called "Spoof Events." *Id.* ¶¶ 49-53.[5] The CFTC alleged that the Large-Side Orders were more likely to be canceled and were exposed to the market for shorter periods than other large orders. According to the CFTC, the alleged difference in cancelation rates and duration between these two data sets is "proof" that Skudder intended to cancel the "Spoof Orders." *Id.* ¶¶ 49, 53.

**C. Pinheiro's Report and Testimony**

On January 12, 2024, the CFTC disclosed Pinheiro, an economist, as its expert witness. Rather than conduct her own, independent review of Skudder's trading, Pinheiro [redacted]

[3] Despite Pinheiro characterizing these orders as "Small-Side Orders," the CFTC's criteria contain no size requirement or limitation on opposite-side options orders. ECF 1, ¶ 40.

[4] According to the CFTC, 80 Large-Side Orders were entered in order to induce fills of both futures *and* options orders on the opposite side. *See* Exs. 8-9 to Wheeler Decl., Plaintiff's Objections and Answers to Defendants' First Set of Interrogatories, Resp. to Interrogatory No. 3 and Attachment A.

[5] The CFTC focused on these allegations in its response to Defendants' motion to dismiss, arguing that differences between large orders that were part of the CFTC's "Spoof Events" and large orders that were not part of "Spoof Events" are evidence of Skudder's intent to cancel the "Spoof Orders." ECF 16, at 11.

[redacted] Rep., Ex. 2 to Wheeler Decl., at 21 n.39. [redacted] *Id.* ¶ 18. Unlike the CFTC, however, Pinheiro did not compare the Large-Side Orders with other large orders that did not otherwise meet the CFTC's criteria. [redacted] *Id.* ¶ 39.

Pinheiro's findings are hardly surprising given that the Large-Side Orders are, by definition, large orders that were canceled within 30 seconds. Pinheiro nonetheless opined that [redacted] *Id.* ¶ 16.

But during her deposition Pinheiro conceded that this so-called "pattern" was not [redacted] Pinheiro Tr. (Vol. 1) 34:15-21, 89:1-19. In other words, Pinheiro could not reliably conclude that the CFTC-identified orders [redacted] *Id.*[6]

In an attempt to salvage the CFTC's claims, Pinheiro tried to see if she could [redacted] First, [redacted][7] [redacted]

---

[6] Pinheiro attempted to obfuscate this fundamental problem in her Report, falsely claiming that [redacted] Rep. ¶ 16.

[7] According to the Complaint, "[a]n iceberg order is an order in which the size of the order is not fully visible to other market participants. For example, a trader may place an iceberg order for 100 soybean contracts or soybean options with the quantity visible in the order book set at one lot." ECF 1, ¶ 27. If and when the one lot is filled, the order book repopulates with another one lot. That process continues until all 100 lots are filled or the order is canceled or expires. *See id.* ¶ 29.

[redacted] Second, [redacted] *Id.* Pinheiro did not, however, compare the characteristics of large orders that created an imbalance with large orders that did not create an imbalance – a puzzling oversight given the emphasis she places on [redacted] *See id.* ¶ 17.

Despite not doing the one analysis that would isolate the most important factor – *i.e.*, whether a Small-Side Order could benefit by the placement of the Large-Side Order – Pinheiro concluded that the [redacted] *Id.* ¶ 16.

Finally, Pinheiro [redacted] *Id.* ¶ 18. [redacted] *Id.* ¶ 19.

## III. ARGUMENT

Federal Rule of Evidence Rule 702 imposes a duty upon the Court to act as the "gatekeeper" for the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S.

136, 142 (1997). "[B]efore it may admit any expert's testimony, [a] Court 'must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, at *2 (N.D. Ill. May 31, 2017) (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) and Fed. R. Civ. P. 702)); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Importantly, "even evidence that meets this standard may be excluded under other rules of evidence, most notably Rule 403's weighing of the probative value of the evidence against the danger of the expert misleading or confusing the jury." *Kleen Prods.*, 2017 WL 2362567, at *2; *Daubert*, 509 U.S. at 595. "Ultimately, it is the proponents of the evidence who must persuade the Court by the preponderance of the evidence that the expert testimony should be admitted." *Kleen Prods.*, 2017 WL 2362567, at *2. Here, the CFTC cannot establish that Pinheiro is qualified or that her methodology is reliable, and thus, her opinions should be excluded.

### A. Pinheiro Is Not Qualified and Should Not Be Permitted to Opine on Skudder's Intent.

"Experts' assertions about another person's intent frequently are neither helpful nor admissible under Rule 702." *Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 574 (N.D. Ill. 2022) (brackets removed) (citation and internal quotation marks omitted). With respect to an expert's opinion on someone's state of mind, "[w]here the expert lacks the requisite qualifications, the expert's testimony will almost always be unhelpful because he or she is in no better position than the jury to assess [the party's] subjective intent." *Id.* at 575 (citation and internal quotation marks omitted). Pinheiro is not qualified to opine on whether Skudder's trading activity was consistent with an intent to cancel orders or a rational trading strategy, because she lacks the expertise to opine on a trader's state of mind.

Pinheiro is an economist, not a trader. In fact, [redacted] Pinheiro Tr. (Vol. 1) 17:2-9. Moreover, she has not authored any publications regarding futures trading or options trading, has not authored any publications on market manipulation, has never worked for a firm in the business of trading futures or options on futures, and has never been employed by the CFTC, the CME, or the National Futures Association. *Id.* at 17:11-18:1, 20:3-9, 18-21. And, contrary to Pinheiro's assertions, no federal court has ever admitted Pinheiro as an expert witness in connection with futures trading, let alone found that she is qualified to opine on a trader's intent.

Pinheiro claims she testified as an expert in two criminal cases involving allegations of spoofing.[8] Not so. In *United States v. Thakkar*, No. 18-cr-00036 (N.D. Ill), after defense counsel moved to bar Pinheiro's testimony on the grounds that she was not qualified to opine as to what constituted a bona fide trading strategy, the government changed course and only presented Pinheiro to provide summary witness testimony. *Thakkar*, No. 18-cr-00036, EFC No. 87 (N.D. Ill. Mar. 8, 2019) (motion to bar) and ECF 90, Ex. 21 to Wheeler Decl., at 59, 60 (N.D. Ill. Mar. 13, 2019) (transcript in which government attorney stated that "the government … has made the strategic decision to narrow the focus of Ms. Pinheiro's testimony to squarely and only focus on summary testimony" … "And this would just be … sort of the number-crunching analytical testimony as opposed to expert testimony."). Similarly, in *United States v. Andre Flotron*, No. 17-cr-00220 (D. Conn.), there was a dispute about Pinheiro's testimony prior to trial and the government chose not to call Pinheiro as an expert, and instead presented her only as a summary witness pursuant to Rule 1006. *Flotron*, No. 17-cr-00220, ECF 138, Ex. 22 to Wheeler Decl., at

[8] Pinheiro not only misrepresented her role in these two cases in her deposition, claiming that [redacted] Pinheiro Tr. (Vol. 1) 14:7-12, 15:6-21, 16:7-18.

15-16 (D. Conn. Mar. 15, 2018) ("Ms. Pinheiro will not offer any expert opinions or conclusions during her direct testimony."). The court agreed that Pinheiro was not testifying as an expert, noting that it was "not convinced that the numbers-crunching testimony of Lisa Pinheiro is expert testimony[.]" *United States v. Flotron*, No. 17-cv-220, 2018 WL 1790828, at *2 (D. Conn. Apr. 15, 2018).

As in *Flotron* and *Thakkar*, Pinheiro is not qualified here to opine on what is or is not a rational trading strategy, much less the intent behind Skudder's orders. Her lack of expertise was reflected in her deposition, in which Pinheiro demonstrated unfamiliarity with industry terms,[9] and was unable to answer basic questions regarding the composition of the marketplace for agricultural commodities:

[redacted]

Pinheiro Tr. (Vol. 1) 21:6-22:6.

[9] *See* Pinheiro Tr. (Vol. 1) 77:24-78:1 [redacted]

Notwithstanding her lack of expertise, Pinheiro opines at length about what motivates traders, what information they review, and why. For example, despite knowing so little about the composition of the marketplace, Pinheiro makes blanket statements about [redacted][10] Similarly, when asked about the impact of imbalances in the futures markets, Pinheiro testified that imbalances are [redacted] Pinheiro Tr. (Vol. 1) 42:11-15. Pinheiro has no experience to back up this statement – a statement that incorrectly ignores whole segments of traders that base their decisions, not on imbalances, but on a need to hedge physical inventory or on their view of the physical commodity market, traders that only place spread trades and pay little to no attention to the prices of the different future legs, and the large number of traders who have no access to information regarding the depth of the order book.

In short, Pinheiro has no experience or expertise that qualifies her to speak to what motivates different market participants, including how a trader chooses the size of an order, where in the order book to place the order, or whether to enter the order as an iceberg order or expose the full volume to the market. Yet, as discussed below, her methodology for assessing Skudder's intent is dependent on assumptions about trading that she is not qualified to make and, unsurprisingly, are often wrong. Because Pinheiro is no more qualified than the jury to reach a

---

[10] *See, e.g.*, CME Group, *Understanding the Role of Speculators*, https://www.cmegroup.com/education/courses/introduction-to-futures/understanding-the-role-of-speculators.html, Ex. 18 to Wheeler Decl. (describing role and motive of different categories of speculators including individual traders, proprietary trading firms, portfolio or investment managers, hedge funds, and market makers, and differentiating these market participants from hedgers, who use future markets to manage and offset risk).

conclusion as to Skudder's intent, her opinions as to Skudder's intent and whether his trading activity is consistent with a rational trading strategy should be excluded.

**B. Pinheiro's Report Is Based on an Invalid and Unreliable Assumption.**

Pinheiro's opinions should also be excluded because her entire report is based on an unreliable (and demonstrably incorrect) assumption. "When an expert premises his opinions on an assumption, the assumption must be reliable." *LK Nutrition, LLC v. Premier Research Labs, LP*, No. 12-cv-7905, 2016 WL 4987429, at *9 (N.D. Ill. Sept. 19, 2016). Here, all of Pinheiro's opinions rest on a single critical assumption – that the [redacted] Reply Rep., Ex. 6 to Wheeler Decl., ¶ 32. She makes this assertion again and again.[11] But repetition does not make it true, much less appropriate expert testimony. Courts routinely reject such *ipse dixit* from experts. *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 (7th Cir. 1999) (excluding as *ipse dixit* expert's "bare assertion" which was "based solely on his belief and assumption without any scientific testing data or supporting research material in the record"); *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17-cv-50107, 2024 WL 1363544, at *7-9 (N.D. Ill. Mar. 29, 2024) (excluding expert's *ipse dixit* opinions based on conclusory assumptions rather than data).

In fact, Pinheiro's assumption is contradicted by the very studies that she cites, most notably Hendrick Bessembinder, Marios Panayides & Kumar Venkataram, *Hidden liquidity: An analysis of order exposure strategies in electronic stock markets*, 94 J. Fin. Econ. 361 (Aug. 13,

---

[11] *See, e.g.*, Rep. ¶ 17 [redacted] *id.* ¶ 33 [redacted]; *id.* ¶ 52 [redacted]

2009) ("Bessembinder"), Ex. 14 to Wheeler Decl. [redacted] Rep. ¶ 27. In fact, Bessembinder reaches the exact opposite conclusion.

Bessembinder "use[d] data drawn from the Euronext-Paris market[12] to investigate how traders use the option to hide order size and to study the various costs and benefits of order exposure." Bessembinder, at 362. Bessembinder sought to measure the impact of exposing an order on the likelihood that the order would execute and the amount of time it would take the order to execute. *Id*. Bessembinder noted that there are both costs and benefits to exposing the full size of orders. On the cost side, Bessembinder acknowledged that exposing the full size of an order could cause other traders to withdraw liquidity or trade ahead of the order. *Id*.

On the benefit side, Bessembinder noted that many stock exchanges give priority to displayed orders, meaning the hidden liquidity will only be executed after the displayed liquidity is exhausted. *Id*. The CME's matching algorithm similarly favors entering large, visible orders, as opposed to entering them as iceberg orders or breaking them up into smaller orders. The CFTC itself alleged that larger orders gain a larger share of the pro-rata allocation, and that the "CME's K-Algo used in soybean futures makes large orders, like Skudder's [Large-Side] Orders, more likely to receive partial fills during the pro-rata distribution step." ECF 1, ¶¶ 28, 50. The CFTC also concedes that, all else being equal, fully visible orders benefit from time priority compared to iceberg orders or orders placed over a span of time. *Id*. ¶ 29 ("The hidden quantity

[12] It is important to note that the Bessembinder study, like every other study cited by Pinheiro, did not analyze orders in the futures market, but rather stocks in the equities market. *See* Pinheiro Tr. (Vol. 2), Ex. 7 to Wheeler Decl., at 53:21-54:6; *see also* Pinheiro Tr. (Vol. 1) 41:19-42:10. This is not simply an academic distinction. Futures markets have many critical differences from the stock markets including the fact that futures markets "have an unlimited supply of contracts, unlike the equities markets with a fixed number of shares." Cusimano Rep., Ex. 4 to Wheeler Decl., ¶ 52.

of an iceberg order … is not considered at the pro-rata distribution step for the K-Algo for soybean futures.”). Defendants’ expert, Jeremy Cusimano, documented the impact of this priority in his report, detailing how four orders all placed at the same price – (1) a fully visible 50-lot order entered by Trader A, (2) a fully visible 20-lot order entered by Trader B, (3) a fully visible 238-lot order placed by Skudder, and (4) a 75-lot iceberg order placed by Trader C – received fills. Cusimano Rep. ¶ 54. When the market moved to the price at which these orders were entered, Skudder received larger allocations earlier than the other three participants, including Traders A and B who entered their orders before Skudder. *Id*. Notably, Trader C – whose iceberg order was the second largest in size – received the smallest allocations and was the last to be fully filled. *Id*.

During her deposition, Pinheiro acknowledged that large, fully visible orders [redacted] Pinheiro Tr. (Vol. 1) 55:22-56:2 [redacted] *id*. at 53:18-22 [redacted] *Id*. at 174:20-175:3.

But size and time priority are not the only benefits to exposing the full size of an order. Bessembinder found that “[e]xposing an order increases the chance that it attracts a counterparty who is sufficiently interested in trading to monitor the market, but who has not yet revealed herself [‘reactive’ traders …].” Bessembinder, at 362. He also found that “some traders follow a passive strategy, where they wait for other traders to indicate their interest in trading on

favorable terms. The presence of these passive or 'reactive' traders increases the attractiveness of publicly displaying one's own interest in trading, in order to draw out the passive traders." *Id*. at 364. Skudder considered the likelihood that he could draw out this type of interest when deciding how to enter his trades. Skudder Tr. at 219:15-19 ("I try to get orders filled by showing it to the market, hoping that there's some other large trader on the other side that says, Oh, I can fill my 500-lot sell right now just fast, bam….").

Bessembinder concluded that exposing the full size of orders *increases* the likelihood of full execution and reduces the time to execution. Bessembinder, at 362. Hidden orders, on the other hand, "even after controlling for price aggressiveness, *order size*, and market conditions, … take longer to execute and have larger non-execution rates." *Id*. at 382 (emphasis added).

Bessembinder did not stop there. He cited earlier academic studies finding that informed traders, like Skudder, "are likely to submit larger and more aggressive orders, because they typically have an interest in assuming large positions before their information becomes public." *Id*. at 365. He also found that such informed traders are less likely to use hidden orders than uninformed traders. *Id*. at 362. In other words, contrary to Pinheiro's claim that traders typically iceberg (or break up) large orders, informed traders who enter large and aggressive orders, such as Skudder, are much less likely to place hidden orders than uninformed traders.

Ultimately, Bessembinder concluded that "traders select the optimal exposure strategies on the basis of both their private trading motives and the tradeoffs involved in selecting more aggressive prices and exposing their orders." *Id*. at 382. Skudder described this tradeoff in his deposition, stating that "it all depends upon what – kind of how the market is trading" and that, for example, if he wants to buy 500 soybean futures, he may submit the order as an iceberg order if he is comfortable with a series of piecemeal fills that move the price upwards. Skudder Tr. at

83:17-84:14. "But sometimes if you want to buy it, you show it because there's somebody on the other side that says, I can sell 500 at a number, bam, and they sell it to you. So it really its – it's kind of a crap shoot, right? Do I show it? Don't I show it? Sometimes you show it, and then you're wrong, and like the market starts what I call pegging off of you." *Id.* at 84:15-24.

In short, Pinheiro's blanket claim that traders "typically" enter iceberg orders or break up large orders – and that not doing so is inconsistent with an intent to execute – is not only unsupported by any studies, it is directly contradicted by Bessembinder's finding that fully exposed orders, *even controlling for order size*, were more likely to be filled in full and executed more quickly. Pinheiro's failure to factor in the benefits of entering large, fully visible orders into her analysis or the costs of entering iceberg orders demonstrates her lack of expertise which renders her methodology entirely unreliable. Because Pinheiro's opinion that large, visible orders are inconsistent with an intent to execute is not supported by, and in fact is contradicted by the studies that she cites in her Report[13] and Reply Report, it should be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (finding district court did not abuse its discretion in excluding experts' opinions because the studies relied upon "did not support the experts' conclusion[s]" and thus "were not a sufficient basis for the experts' opinions").

### C. Pinheiro's Analysis of the CFTC-Identified Orders Is Not Reliable.

#### 1. Pinheiro Draws Conclusions and Infers Intent from an Admittedly Statistically Insignificant "Pattern."

Pinheiro admits that the "patterns" that the CFTC identified in its Complaint are not statistically significant:

13 [redacted] Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*, 94 J. Econ. Dynamics & Control 502, at 518 (2009)). But this study only addressed limit orders placed in the top three levels of the order book, finding that "[f]or less aggressive orders, virtually no effects can be quantified." Hautsch, Ex. 15 to Wheeler Decl., at 502.

[redacted]

Pinheiro Tr. (Vol. 1) 89:1-19 (emphasis added). She could not conclude that the CFTC-identified orders [redacted] *Id* at. 34:15-21; *see also* Rep. ¶ 53 [redacted]

For this reason alone, Pinheiro's Report should be stricken. Her comparison of the characteristics of Large-Side and Small-Side Orders (Rep. ¶¶ 40-53) and attempt to calculate gains and losses (*id.* ¶¶ 66-84) are based on a set of orders that do not exhibit a statistically significant pattern. As such, her analysis is unreliable and of no help to the trier of fact. Worse, her analysis creates a substantial risk of confusion. *See Joiner*, 522 U.S. at 145-47 (holding that experts could not support opinions based on study with statistically insignificant findings and excluding experts' opinions); *In re Paraquat Prod. Liab. Litig.*, 730 F. Supp. 3d 793, 846-48 (S.D. Ill. 2024) (criticizing expert's reliance on several studies that yielded statistically insignificant results); *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 449, 457 (E.D. Pa. 2014) (criticizing expert's "fail[ure] to demonstrate that her reliance on non-statistically significant findings is accepted within her scientific community").

**2. The CFTC's Methodology – Adopted by Pinheiro – Is Not Reliable.**

Even if Pinheiro had not concluded that the CFTC's "pattern" was not statistically significant, her opinions regarding the pattern and the characteristics of the Large-Side Orders

should be excluded because the CFTC's methodology for identifying alleged "Spoof Events" – adopted wholesale by Pinheiro – suffers from multiple flaws that render it wholly unreliable.

**a. There is No Support for the 30-Second Window.**

The 30-second window used by the CFTC and Pinheiro to identify Large-Side Orders is overbroad and unprecedented. As a threshold matter, most futures orders are in the market for far less time. During the six months containing the most alleged "Spoof Events," the median order life for all limit[14] orders for soybeans futures was just 3.16 seconds. Cusimano Rep. ¶ 37.[15] And any reaction to the Large-Side Orders would have happened almost instantaneously. Pinheiro acknowledges that the [redacted] Pinheiro Tr. (Vol. 2) 17:14-18:16; *see also* Joel Hasbrouck & Gideon Saar, *Low-Latency Trading*, 16 J. FIN. MKTS. 646 (2013), Ex. 16 to Wheeler Decl., at 647 ("[T]oday's markets experience intense activity in the 'millisecond environment,' where computer algorithms respond to each other at a pace 100 times faster than it would take for a human trader to blink."). In other words, if a spoofer is trying to move the market via a large order, the algorithms are going to react immediately – not ten, twenty, or up to 30 seconds later.

Not surprisingly, Pinheiro cannot cite to any study supporting the use of a 30-second window to assess whether a trader intended to cancel an order. Pinheiro Tr. (Vol. 1) 133:9-16. The overbreadth of this window is demonstrated by the alleged "Spoof Events" themselves. Using such a large window results in so-called "Spoof Events" where the Small-Side Order was

[14] Limit orders are orders placed with a limit price (for bid orders, the limit price is the highest price at which the buyer is willing to pay; for ask orders, the limit price is the lowest price the seller is willing to accept). Both Pinheiro and Cusimano exclude market orders – *i.e.*, orders entered at the current market price – from their analyses.

[15] Even looking at just manually entered large orders, the median duration is [redacted] Reply Rep. ¶ 33.

placed long after the Large-Side Order was placed and well after any possible price impact had dissipated. Cusimano Rep. ¶¶ 79, 80. For example, in one of the "Spoof Events," the Small-Side Order was entered 28.6 seconds after Large-Side Order. *Id.* ¶ 36. One cannot possibly infer that Skudder entered the Large-Side Order to push prices toward a Small-Side Order that he did not even enter until *after* any conceivable price impact had dissipated.[16] This is especially problematic for Large-Side Orders that the CFTC alleges were intended to push prices toward options orders because, as Cusimano's analysis reveals, any pressure on the options market created by the Large-Side Orders was fleeting at best, dissipating in less than half a second. *Id.* ¶ 80.

#### b. There Is No Basis for Pinheiro's Assumed Link Between Futures Orders and Options Trades.

Pinheiro assumes, without any support, that the mere entry of a large order in the futures market will cause market participants to trade in the options market. She notes that [redacted], Rep. ¶ 31, but it is a huge leap from point A – that there is a correlation between the futures price and the option price – to Point B – that the mere entry of an *order* (not a trade) in the futures market will cause market participants to enter orders in the options market. Pinheiro provides no support for making this leap, other than her own say so.

[16] There are numerous other examples of Large-Side Orders that no reasonable person could claim were entered to spoof the market. These include Large-Side Orders that were entered when the market was not even open, and it was literally impossible to push the market into a Small-Side Order. Cusimano Rep. ¶ 39. Similarly, more than a hundred of the Large-Side Orders were canceled and quickly replaced by a similarly-sized order on the same side of the market either at a better price or placed as an iceberg order – *i.e.*, conduct consistent with an intent to execute. *Id.* ¶¶ 41-43. That the CFTC's methodology, adopted by Pinheiro, resulted in so many such instances demonstrates its unreliability, especially the criteria used to identify the Large-Side Orders.

Moreover, this unprecedented leap is contradicted by Cusimano's finding, which Pinheiro does not challenge,[17] that there is minimal connection at best between imbalances in the futures book and activity in related options order books. Cusimano Rep. ¶ 80. In fact, in the majority of the events in the so-called "Options Scheme," the rate of spread crossing[18] actually *decreased* after the placement of the Large-Side Order. *Id.* ¶ 82(b). Cusimano's findings are consistent with the CFTC's findings that 69% of alleged "Spoof Events" involving options were unsuccessful, meaning that, most of the time, the Large-Side Order undeniably did not push the options market toward the Small-Side Order. ECF 1, ¶ 45.

In short, there is no basis to reliably infer that Skudder entered orders in the futures market in an attempt to influence activity in the options order book. "When a district court 'conclude[s] that there is simply too great an analytical gap between the data and opinion proffered' such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (quoting *Joiner*, 522 U.S. at 146). As such, Pinheiro's unreliable opinions regarding the "Options Scheme" should be excluded.

**c. The CFTC's Methodology Was Unreliably Applied.**

Not only are the criteria used by the CFTC and Pinheiro overinclusive and based on unreasonable assumptions, but they also did not even apply the criteria consistently. Pinheiro identified some of the inconsistencies [redacted] but she by no means identified all the problems. Cusimano identified 100 large orders

---

[17] Pinheiro Tr. (Vol. 2) 110:12-111:12 [redacted]

[18] Pinheiro concedes the only way the Small-Side Orders would get fills is if [redacted] Pinheiro Tr. (Vol. 2) 25:5-15.

that met the CFTC's criteria but were not flagged. Cusimano Rep. ¶ 44. Pinheiro speculated that [redacted] Pinheiro Tr. (Vol. 2) 10:6-11:14. But that is simply not the case. All of the 100 excluded Large-Side Orders were aggressive orders and all the Small-Side Orders were options orders (for which the CFTC's criteria had no requirement that the orders be within ten ticks of each other) or a futures order within ten ticks.[19] Notably, these excluded Small-Side Orders had, on average, higher fill rates than the CFTC-identified Small-Side Orders, meaning that Pinheiro artificially inflated the difference in fill rates between the Large-Side and Small-Side Orders – a critical metric in her analysis. Cusimano Rep. ¶ 44. The fact that the CFTC and Pinheiro applied their criteria inconsistently, resulting in the exclusion of approximately twenty percent of the orders that fit their criteria, renders Pinheiro's opinions unreliable.

**D. Pinheiro's "Broader" Analysis Is Not Reliable.**

Having found that the CFTC's identification of orders was not statistically significant, Pinheiro should have concluded that the CFTC failed to provide reliable evidence of Skudder's intent. Instead, Pinheiro attempts to salvage the CFTC's analysis by seeing if [redacted] Rep. ¶ 54. Once again, Pinheiro [redacted] *Id.* ¶¶ 53-65. But such comparison is not a reliable way of inferring intent. Traders have different purposes, employ different strategies, and face dramatically different risks when entering an order for one futures contract versus entering an

[19] *See* Rule 1006 Summary List of Orders Meeting CFTC Criteria but Were Not Identified by the CFTC, Ex. 12 to Wheeler Decl.

order for 100 futures contracts. Cusimano Rep. ¶¶ 13(e), 59-61. [redacted] Rep. ¶¶ 26-27; *see also* Cusimano Rep. ¶ 59. As such, comparing the fill ratios, cancelation rates, and duration of two very different types of orders is not a reliable measure or indicator of Skudder's intent when placing those large orders.

As Cusimano explained, "it is more fitting to compare large orders with opposite depth to similarly sized ones without (i.e., in situations where the assumed spoofing opportunity is absent)." Cusimano Rep. ¶ 60. Cusimano found that, of the 4,063 large orders entered by Skudder, 2,296 (57%) were placed with no futures or options order resting in the top five levels on the opposite side of the market. *Id.* ¶ 48. "[T]his means that despite Ms. Pinheiro's contention that Mr. Skudder is only using large orders to engage in spoofing, 57% of the time he placed a 100 lot or larger order where he did not have an order resting in the market that could benefit." *Id.* In other words, Skudder is just as likely – indeed, *more* likely – to place a large, visible order when he has no motive or opportunity to spoof.

Cusimano then compared the characteristics of large orders that were placed with and without opposite orders placed in the top five levels. He performed this analysis to determine whether there were any meaningful differences – as measured by size, order duration, fill rate, and fill percentage – that could potentially be attributed to the opportunity to spoof. This is the same analysis that the CFTC tried to do in its Complaint in order to establish intent. *See* II.B, *supra*. Cusimano's analysis reveals "no meaningful differences in the relevant metrics. In other words, Mr. Skudder's large orders look generally the same whether or not there was an order on the opposite side of the market and, therefore, Mr. Skudder's large order trading strategy should not be assumed to be indicative of a motive to spoof." Cusimano Rep. ¶¶ 51, 61.

Pinheiro did not challenge Cusimano's analysis in her Reply Report and, in fact, [redacted] Pinheiro Tr. (Vol. 2) 57:18-58:12. But she claims that [redacted] Reply Rep. ¶ 31. Pinheiro's speculative assertions lack merit.

First, the CFTC's data set encompassed all soybeans futures and options orders in all accounts controlled by Skudder and Global Ag, including futures and options orders entered by other employees of Global Ag or its introducing broker. Pinheiro Tr. (Vol. 2) 64:16-65:7, 68:4-8. In other words, the CFTC and Pinheiro have already ruled out the possibility that Skudder's large orders were intended to benefit an opposite order entered by or on behalf of someone else.

Second, the CFTC's data set encompassed the correlated options and more than half of the alleged "Spoof Events" involve options orders. [redacted] *Id*. at 65:8-16, 66:2-6.

Third, Pinheiro's hypothetical scenario where Skudder waited to enter the small-side order until *after* he moved the market is based on nothing more than speculation, which is not admissible.[20] *See Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 WL 4278787, at *8 (N.D. Ill. Sept. 25, 2017) ("If it is to be admissible, Rogers' opinion cannot be based on speculation, and a qualified expert's opinion does not become scientifically reliable just because an expert utters it"); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)

[20] The CFTC might argue that the small-side order could be entered immediately after the large-side order, but [redacted]

("[E]xperts can't 'speculate'" about significant issues; they need a "scientific basis for [their] opinion[s]."). It also is nonsensical. Pinheiro agrees that algorithmic traders react within milliseconds. *See* III.C.2.a, *supra*. As such, in order to get any benefit from the placement of a large order, the small-side order would have to be resting in the market at the time of placement.

Pinheiro's deliberate ignorance of thousands of large orders placed by Skudder, her selective comparisons, and exclusion of critical variables amounts to cherry-picking of favorable evidence to support her opinions, and thus her opinions must be excluded as unreliable and unhelpful. *See Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (excluding expert testimony where expert "did not adequately explain why he ignored certain facts and data," and where he "accepted some of the … data that suited his theory and ignored other portions of it that did not"); *Holden Metal & Alum. Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2003 WL 1797844, at *2 (N.D. Ill. Apr. 3, 2003) (excluding expert testimony where "expert 'cherry-picked' the facts he considered to render his opinion").

**E. Pinheiro's Calculation of Gains and Losses Is Not the Result of a Reliable Methodology and Should be Excluded.**

Pinheiro's calculation of Skudder's trading gains and the purported market losses is also not the result of a reliable methodology. As discussed above, it is not appropriate to calculate gains and losses associated with trading activity that is not part of a statistically significant pattern. Indeed, even if one accepts Pinheiro's convoluted theory that the CFTC-identified events are consistent with Skudder's overall pattern of trading and that the overall pattern of trading is inconsistent with an intent to execute, such theory does not somehow imbue the CFTC-identified events with statistical significance, much less make them a reliable indicator of Skudder's intent.

In addition, when calculating the impact of the Large-Side Orders, [redacted] Rep. Ex.

14, n.1 and Ex. 15, n.2. She assumed that any order entered on the opposite side of the market while the Large-Side Order was pending was entered *because* of the Large-Side Order. Using a window of up to 30 seconds is not appropriate. Any possible impact dissipated, on average, within 9.7 seconds for futures orders and within 0.4 seconds for options orders. Cusimano Rep. ¶¶ 79, 80. Any subsequent activity cannot reliably be attributed to the Large-Side Orders. *Id.*

Pinheiro's use of [redacted] also renders her methodology unreliable. [redacted] Rep. ¶¶ 76, 80. That only works if trading activity during the control period has any comparative value. It does not. Trading in the soybean futures and options market is extremely sporadic.[21] As such, comparing trading activity in the short period just before and after the placement of a Large-Side Order is not a reliable comparison and Pinheiro should not attribute the difference to the Large-Side Order. *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court.").

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court exclude the opinions and testimony of the CFTC's proposed expert, Lisa Pinheiro.

[21] During the relevant period, a futures trade occurred in any given second only about 10% of the time and, of those seconds where a trade occurred, an equal volume traded in the consecutive second only four percent of the time. Cusimano Rep. ¶ 82. The numbers are even more stark in the options market, where an options trade occurred in any given second about 0.1% of the time and, of those seconds where an options trade occurred, an equal volume traded in the consecutive second only two percent of the time. *Id.*

Dated: January 17, 2025

Respectfully submitted,

*/s/ Ellen M. Wheeler*

Ellen M. Wheeler (No. 6244111)
Thomas P. Hansfield (No. 6340818)
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
312.832.4500
ewheeler@foley.com
thansfield@foley.com

*Attorneys for Defendant*
*David Skudder and Global AG LLC*

**CERTIFICATE OF SERVICE**

I, Thomas P. Hansfield, an attorney, hereby certify that on January 17, 2025, I filed on the ECF System the foregoing Memorandum in Support of Defendants' Motion to Exclude Testimony and Opinions of Lisa Pinheiro, and thereby served such filing via the Court's ECF Notification system to all attorneys of record in this matter. I further certify that an under seal version of the foregoing document was served via electronic mail on January 17, 2025 upon all counsel of record.

*/s/ Thomas P. Hansfield*
Thomas P. Hansfield