**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) | |
| Plaintiff, | ) | Civil Action No. 22-CV-01925 |
| vs. | ) | Hon. Jeffrey I. Cummings |
| DAVID SKUDDER and GLOBAL AG LLC, | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

I. Introduction .......... 1

II. Statement of Facts .......... 2

A. Skudder's Trading Activity .......... 2

B. The CFTC's Complaint .......... 4

III. Legal Standard .......... 6

IV. Argument .......... 7

A. The CFTC Cannot Prove Intent. .......... 7

1. The CFTC Has No Direct or Circumstantial Evidence Beyond Its Flawed and Unreliable Statistical Pattern. .......... 7

2. The CFTC's Analysis Does Not Support an Inference of Intent. .......... 9

3. The CFTC Cannot Rely on Pinheiro's Unreliable "Broader" Analysis .......... 11

a. Differences Between Large and Small Orders Is Not Evidence of Intent. .......... 11

b. The Entry of Large, Visible Orders Is Not Inconsistent with an Intent to Execute. .......... 13

B. Approximately 90% of the Alleged Spoof Events Occurred Outside the Statute of Limitations and Are Time-Barred. .......... 15

1. The Statute of Limitations Bars the CFTC's Claims for Monetary Relief for Events Prior to December 12, 2016. .......... 15

2. No Alleged "Scheme" Can Salvage Time-Barred Claims. .......... 18

3. The CFTC Cannot Use Criminal Cases to Save Time-Barred Claims. .......... 19

V. Conclusion .......... 20

# TABLE OF AUTHORITIES

## CASES

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 7

*CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953 (D. Colo. Sept. 26, 2018) ........ 16, 17, 19

*CFTC v. Oystacher*, 203 F. Supp. 3d 934 (N.D. Ill. 2016) ........ 7, 8

*CFTC v. Reisinger*, No. 11-CV-08567, 2013 WL 3791691 (N.D. Ill. July 18, 2013) ........ 16

*CFTC v. Shak*, No. 2:22-cv-01258-GMN-NJK, 2023 WL 5717289 (D. Nev. Sept. 5, 2023) 16, 17

*CFTC v. Worldwide Mkts., Ltd.*, 675 F. Supp. 3d 496 (D.N.J. 2023) ........ 17

*CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 C 4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ........ 13

*Gabelli v. SEC*, 568 U.S. 442 (2013) ........ 19

*Kessev Tov, LLC v. Doe(s)*, No. 20-cv-04947, 2022 WL 2356626 (N.D. Ill. June 30, 2022) ........ 12

*Kokesh v. SEC*, 581 U.S. 455 (2017) ........ 16, 17, 18

*Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013) ........ 7

*SEC v. Jankovic*, 15 Civ. 1248 (KPF), 2018 WL 301160 (S.D.N.Y. Jan. 4, 2018) ........ 19

*SEC v. Place*, No. 16-4291, 2018 WL 6727998 (E.D. Pa. Dec. 21, 2018) ........ 18

*SEC v. Straub*, No. 11 Civ. 9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ........ 18

*SEC v. Tee to Green Golf Parks, Inc.*, No. 00-CV-478S, 2011 WL 147862 (W.D.N.Y. Jan. 18, 2011) ........ 20

*U.S. v. Bases*, No. 18 CR 48, 2020 WL 2557342 (N.D. Ill. May 20, 2020) ........ 19

*U.S. v. Ellis*, 938 F.3d 757 (6th Cir. 2019) ........ 19

*U.S. v. Isaacson*, No. 08-20071-CR, 2014 WL 12279429 (S.D. Fla. Jan. 16, 2014) ........ 19

*U.S. v. Smith*, 555 F. Supp. 3d 563 (N.D. Ill. 2021) ........ 19

## STATUTES

18 U.S.C. § 3282 ........ 19

18 U.S.C. § 3301 .......... 19

28 U.S.C. § 2462 .......... passim

**OTHER AUTHORITIES**

*CFTC v. Banoczay*, No. 1:20-cv-05777, ECF 1, Complaint (N.D. Ill. Sept. 29, 2020) .......... 8

*CFTC v. Mohan*, No. 4:18-cv-00260, ECF 1, Complaint (S.D. Tex. Jan. 28, 2018) .......... 7, 8

*CFTC v. Nav Sarao Futures Ltd. PLC*, No. 1:15-cv-03398, ECF 1, Complaint (N.D. Ill. Apr. 17, 2015) .......... 8

*CFTC v. Nowak*, No. 1:19-cv-06163, ECF 1, Complaint (N.D. Ill. Sept. 16, 2019) .......... 8

*CFTC v. Oystacher*, No. 1:15-cv-09196, ECF 1, Complaint (N.D. Ill. Oct. 19, 2015) .......... 8

*CFTC v. Skudder*, No. 22-CV-1925, ECF No. 18, Order Granting and Denying in Part Defendants' Motion to Dismiss (N.D. Ill.) .......... passim

*CFTC v. Thakkar*, No. 1:18-cv-00619, ECF 1, Complaint (N.D. Ill. Jan. 28, 2018) .......... 7, 8

*CFTC v. Vorley*, No. 1:18-cv-00603, ECF 1, Complaint (N.D. Ill. Jan. 26, 2018) .......... 7, 8

*CFTC v. Zhao*, No. 1:18-cv-00620, ECF 1, Complaint (N.D. Ill. Jan. 28, 2018) .......... 8

**RULES**

Fed. R. Civ. P. 56 .......... 6

## I. INTRODUCTION

Defendants David Skudder ("Skudder") and Global Ag LLC ("Global Ag") are entitled to summary judgment on both counts of the Commodity Futures Trading Commission's ("CFTC") Complaint. The Complaint alleges that Skudder, a commodities trader who operates Global Ag, engaged in spoofing in the soybean futures market based on nothing more than what the CFTC characterized as a suspicious trading pattern. When ruling on Defendants' Motion to Dismiss, the Court opined that "[m]aybe the CFTC's case is weak when compared to other cases, but that's not the issue at this stage." ECF 18, at 20. Now, at the completion of fact and expert discovery, the CFTC's case is not just weak; it is nonexistent.

The CFTC's own expert testified that the so-called trading "pattern" is not statistically significant. Nor did the CFTC uncover any direct or circumstantial evidence supporting its case in the course of discovery. To the contrary, all the evidence shows is that Skudder often enters relatively large orders for soybean futures. The CFTC's expert asserts that the mere entry of large, visible orders in the futures market is itself inconsistent with an intent to execute. But she cannot point to evidence backing up that statement, and all the evidence points to the opposite conclusion.

First, the matching algorithm used by the CME Group, Inc. ("CME")[1] gives time and execution priority to large and visible orders. Second, academic research – cited by the CFTC's expert – and Skudder's own experience demonstrate that the entry of large, visible orders is a rational trading strategy that is indicative of an intent to execute, not cancel, such orders. Third, the CFTC's suspicion of large orders does not hold up when evaluating Skudder's trading activity. Skudder is just as likely to enter large orders when he has no order pending on the opposite side

---

[1] CME operates the Chicago Board of Trade ("CBOT"), a commodities exchange where Skudder entered all of his soybean futures and options on futures orders during the relevant time period.

of the market that could potentially benefit from the placement of the large order – and, thus, the mere entry of a large order is not indicative of a motive to spoof. Likewise, as the CFTC's expert concedes, these large orders were generally canceled at the same rate and received the same percentage of fills regardless of whether there was an order on the opposite side of the market that could benefit. Finally, to top it off, Skudder exposed his large orders to the market, on average, for *longer* periods of time than other market participants.

In short, a reasonable jury could not infer – based solely on the mere entry and subsequent cancelation of large orders – that Skudder always intended to cancel those orders. As there is no other evidence of Skudder's intent to cancel, Defendants are entitled to summary judgment in their favor. Separately, Defendants are entitled to summary judgment with respect to the almost 90% of instances of alleged spoofing identified by the CFTC that are outside the statute of limitations.

## II. STATEMENT OF FACTS

### A. Skudder's Trading Activity

Skudder is the principal trader at Global Ag, where he primarily trades in agricultural products, including soybeans, corn, and wheat at the CBOT, as well as other futures and options products. *See* Defendants' Rule 56.1 Statement of Undisputed Material Facts ("SOF") ¶ 1. Skudder trades for his own account as well as for a small number of clients.[2] SOF ¶ 1.

Skudder has been trading for more than 35 years, employing a fundamentals-based strategy. SOF ¶ 3. In other words, rather than trading based on "charts" or trends that he sees in the futures market, he relies on product-related information to inform his trading decisions, such as the supply of the particular commodity, demand, weather, crop forecasts, availability of barges,

[2] During the early part of what the CFTC has described as the "Relevant Period" (September 2014 to March 2019), Skudder was trading on behalf of institutional clients such as hedge funds. SOF ¶ 2. Due to the stress involved, he transitioned to just trading on behalf of his own accounts and a small number of friends and family members. SOF ¶ 2.

USDA reports, geopolitical events, and other factors. SOF ¶ 3. The information he most relies on is a stream of proprietary weather reports. SOF ¶ 4. He retains a full-time weather analyst who provides him with multiple reports a day beginning as early as 3:30 a.m. SOF ¶ 4. Skudder's access to this information allows him an opportunity to take advantage of perceived mispricing in the market, both long and short term, and he trades futures and options accordingly. SOF ¶ 4. Because Skudder is trading on this information, he is considered an "informed trader." SOF ¶ 5.

During the Relevant Period, Skudder entered thousands of orders for soybean futures and options on behalf of his accounts and those of his clients. He placed 23,380 limit orders[3] for soybean futures alone, SOF ¶ 6, all of which were entered manually; Skudder does not use any automated tools or algorithms when trading. SOF ¶ 7. Some orders were based on Skudder's long-term view of the soybean market which is largely based on whether he believes the supply of soybeans will increase or decrease in the long term. SOF ¶ 8. Other orders were placed because he identified information contrary to his structural position, at least in the short term:

> I mean, my primary focus is to construct a position that is – goes to my fundamental bias. Remember, I said beans are 14. If I construct a balance sheet that says they're going to 11, I want to be a seller, and my structural position will be short, but within that structural position, I like to trade what I call the wiggles. And the wiggles are – you know, nothing goes in a straight line, and what makes you either good or bad at this or profitable or unprofitable … is how well you trade those wiggles because they can be pretty ferocious sometimes.
>
> You know, something takes place – you know, you're assuming normal weather in South America, and if we assume normal weather, we are going to have 165 million tons of beans. We're going to bury the bean market. We're going to bury it, and it's going down a lot.
>
> But, guess what? Right now, it's not raining in northern Brazil, and yesterday, two days ago, beans were up 30 cents, which is kind of really against my long-term view of what's going to take place, and it's because of weather. So you have to be

[3] A limit order is "[a]n order in which the customer specifies a minimum sale price or maximum purchase price, as contrasted with a market order, which implies that the order should be filled as soon as possible at the market price." SOF ¶ 6.

> able to trade contra your long-term bias at times so that you don't get carried out in the basket because once you lose all your money, you're done.

SOF ¶ 9.

Skudder traded his personal accounts and his client accounts differently, largely due to different appetites for risk and, in particular, his hedge fund clients not wanting to see significant trading activity in their accounts. SOF ¶ 10. Balancing his long- and short-term views of the market and different trading strategies for different accounts resulted in instances where Skudder entered overlapping orders on both sides of the futures and options markets.

Skudder typically exposed his orders to the market. SOF ¶ 11. He did so because (1) he believes it is better to be transparent and not hide his trading intentions, and (2) he finds that, when he submits a large order, he sometimes gets a quick fill at the price he wants. SOF ¶ 12. Skudder places large, visible orders anticipating that a trader on the opposite side of the market also wants to fill a large order, resulting in both orders quickly executing at an ideal price. SOF ¶ 12. At times, however, he would enter an order as an "iceberg" order,[4] particularly if he did not need an immediate fill or if he believed that the high frequency algorithmic traders were "pegging off" his order. SOF ¶ 13. On occasion, after placing a large, visible order, Skudder could see the market moving away from his order, so he canceled it and resubmitted it as an iceberg order. SOF ¶ 14.

### B. The CFTC's Complaint

The CFTC's Complaint alleges that Skudder engaged in "spoofing" in the soybean futures market between September 2014 and March 2019.[5] SOF ¶ 15. The Complaint defines "spoofing"

---

[4] An "iceberg" or "hidden quantity order" is "[a]n order placed on an electronic trading system whereby only a portion of the order is visible to other market participants. As the displayed part of the order is filled, additional quantities become visible." SOF ¶ 13.

[5] Notably, although Skudder actively trades in the corn and other futures markets, the CFTC has not alleged any spoofing activity in those other markets.

as "bidding or offering with the intent to cancel the bid or offer before execution." SOF ¶ 16. The CFTC identified 512 orders for 100 or more soybean contracts ("Large-Side Orders") that it alleges were entered without the intent to be filled, but rather to push the market toward futures orders or options orders on the opposite side of the market ("Small-Side Orders").[6] SOF ¶ 17.

The CFTC identified 276 so-called "Spoof Events" where Skudder allegedly entered Large-Side Orders in an attempt to increase his fills of Small-Side Orders in the futures market. SOF ¶ 18. According to the CFTC, each of these instances exhibited the following characteristics:

> (1) "placement of one or more small orders on one side of the market, which Skudder intended to execute;"
>
> (2) "before or after placing the [Small-Side Order], but overlapping in time, placing one or more large orders (that is, 100 contracts or more and at least twice as large as the visible quantity of the small order(s)), … on the opposite side of the market and within ten ticks of the [Small-Side Order]"; and
>
> (3) "canceling the [Large-Side Orders] within thirty seconds after they were placed."

SOF ¶ 19. The CFTC refers to these events as the "Futures Scheme." SOF ¶ 19.

The CFTC identified 279 "Spoof Events" where Skudder allegedly entered Large-Side Orders in an attempt to increase his fills on Small-Side Orders for *options* contracts. SOF ¶ 20.[7] According to the CFTC, each of these instances shared the following characteristics:

> (1) "placement of a [Small-Side Order] for options on soybean futures contracts";[8]
>
> (2) "before or after placing the [Small-Side Order], but overlapping in time, placing one or more [Large-Side Orders for 100 contracts or more] in the soybean futures contract market … on the side of the futures market that would benefit his resting [Small-Side Order] in the options market"; and

---

[6] Pinheiro and the CFTC use different terminology to describe these different categories of orders. The CFTC refers to the Large-Side Orders as "Spoof Orders" and Small-Side Orders as "Genuine Orders." For purposes of this Motion, Defendants shall use Pinheiro's terminology.

[7] The CFTC identified 512 Large-Side Orders in total, asserting that 80 Large-Side Orders were apparently entered in order to induce fills of both futures and options orders on the other side. SOF ¶ 17.

[8] Notably, despite Pinheiro characterizing these orders as "Small-Side Orders," the CFTC's criteria contain no size requirement or limitation. SOF ¶ 22.

(3) "canceling the [Large-Side Orders] within thirty seconds after they were placed." SOF ¶ 21. The CFTC refers to these events as the "Options Scheme." SOF ¶ 21.

The Complaint cites no direct evidence demonstrating that Skudder intended to cancel the Large-Side Orders, much less that his purpose was to push the market toward the Small-Side Orders. Instead, the CFTC attempted to establish intent by comparing the execution rates and median cancelation times for the Large-Side Orders to the execution rates and median cancelation times for the Small-Side Orders and other large orders that were not part of so-called "Spoof Events." SOF ¶ 23. The CFTC alleged that the Large-Side Orders had lower execution rates (*i.e.*, were more likely to be canceled) and shorter durations (*i.e.*, were in the market for shorter periods prior to being canceled or filled) than other large orders. According to the CFTC, these differences constitute "proof" that Skudder intended to cancel the Large-Side Orders. SOF ¶¶ 24-26.

The CFTC did not elicit any other "proof" over the course of fact discovery. Indeed, in response to an interrogatory requiring the CFTC to identify facts supporting its allegation that Skudder intended to cancel the Large-Side Orders, the only "facts" cited were its "statistical analysis of the trading data at issue." SOF ¶ 27.[9] Following the close of fact discovery, the CFTC disclosed Lisa Pinheiro as an expert witness to opine on the trading pattern it had identified. SOF ¶ 28. Defendants disclosed Jeremy Cusimano as an expert witness. SOF ¶ 28.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the nonmovant bears the ultimate burden of persuasion on a particular issue

[9] The CFTC vaguely alluded to "facts … in documents produced to Defendants by Plaintiff and produced by Defendants to Plaintiff" but did not identify any specific documents or facts. SOF ¶ 27.

… the movant's initial burden 'may be discharged by 'showing'—that is, point[ing] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 322).

## IV. ARGUMENT

### A. The CFTC Cannot Prove Intent.

There is no evidence from which a reasonable jury could conclude that Skudder intended to cancel any orders when placing them. Both of the CFTC's claims have a scienter requirement. To prove Count I (spoofing), the CFTC must show that at the time Skudder placed the alleged Spoof Orders, he intended to cancel them. *CFTC v. Oystacher*, 203 F. Supp. 3d 934, 943 (N.D. Ill. 2016). To prove Count II (manipulation), the CFTC must show that Skudder intended to defraud other market participants. *Id.* at 949. Here, the CFTC cannot prove either.

#### 1. The CFTC Has No Direct or Circumstantial Evidence Beyond Its Flawed and Unreliable Statistical Pattern.

When ruling on Defendants' Motion to Dismiss, the Court acknowledged that the CFTC's case might appear "weak" as compared to other spoofing complaints it had filed, but allowed the CFTC's claims to proceed to discovery. ECF 18, at 20. However, discovery has not strengthened the CFTC's case. The CFTC has not discovered any direct evidence indicative of intent, including incriminating communications or witnesses to the alleged spoofing. SOF ¶ 27.[10] Nor has the

[10] *Compare CFTC v. Vorley*, No. 1:18-cv-00603, ECF 1, ¶¶ 32-37 (N.D. Ill. Jan. 26, 2018) ("*Vorley* Complaint") (citing incriminating electronic chats); *CFTC v. Mohan*, No. 4:18-cv-00260, ECF 1, ¶ 46 (S.D. Tex. Jan. 28, 2018) (citing documents referencing "bluff order[s]" or "bluffing orders"); *CFTC v. Thakkar*, No. 1:18-cv-00619, ECF 1, ¶¶ 29-31 (N.D. Ill. Jan. 28, 2018) ("*Thakkar* Complaint") (citing communications acknowledging that Trader A did not want fills).

CFTC uncovered the use of automated tools designed to facilitate spoofing,[11] or the use of common spoofing strategies such as layering[12] or repeatedly modifying orders to avoid execution.[13] SOF ¶ 27. The CFTC cannot even establish that Skudder canceled the Large-Side Orders unusually quickly.[14] To the contrary, the evidence establishes that the median duration of Skudder's Large-Side Orders was much higher than the median duration of other soybean futures orders during the Relevant Period.[15] Although many of his orders were canceled, the cancelation rate, including of large orders, is consistent with market norms. SOF ¶ 33.[16]

In other words, after fact and expert discovery, the CFTC continues to rely solely on its statistical analysis of Skudder's trading activity to try to demonstrate his intent to cancel. The CFTC's own expert, however, concluded that the CFTC's analysis was not statistically significant.

---

[11] *Compare Oystacher*, 203 F. Supp. 3d at 942 (describing CFTC allegation that defendants used "the 'avoid orders that cross' functionality" allowing them to cancel spoof orders and place genuine orders simultaneously"); *Mohan* Complaint, ¶ 38 (alleging defendant used automated order splitter to place multiple spoof orders at the same time); *Thakkar* Complaint, ¶ 2 (alleging defendant developers aided and abetted spoofing by developing automated functions that enabled spoofing).

[12] The CFTC has often alleged that layering a series of small orders at different price levels falsely signals to the market that orders are originating from multiple sources, and allows the spoofer to cancel the orders most at risk of execution first. *See, e.g.*, *CFTC v. Banoczay*, No. 1:20-cv-05777, ECF 1, ¶ 41 (N.D. Ill. Sept. 29, 2020) ("*Banoczay* Complaint"); *CFTC v. Nowak*, No. 1:19-cv-06163, ECF 1, ¶ 41 (N.D. Ill. Sept. 16, 2019) ("*Nowak* Complaint").

[13] *Compare Thakkar* Complaint, ¶¶ 1, 37-39 (alleging use of automated tool that continually modified spoof orders); *CFTC v. Nav Sarao Futures Ltd. PLC*, No. 1:15-cv-03398, ECF 1, ¶ 2 (N.D. Ill. Apr. 17, 2015) ("*Nav Sarao* Complaint") (alleging use of algorithm that automatically modified orders to remain at least three or four price levels away from the best price, and thus avoid execution).

[14] *Compare*, *CFTC v. Zhao*, No. 1:18-cv-00620, ECF 1, ¶ 21 (N.D. Ill. Jan. 28, 2018) (within two seconds); *Vorley* Complaint, ¶ 26 (within five seconds); *Nav Sarao* Complaint, ¶¶ 66, 69, 70 (within one second); *CFTC v. Oystacher*, No. 1:15-cv-09196, ECF 1, ¶ 54 (N.D. Ill. Oct. 19, 2015) (within one second); *Nowak* Complaint, ¶ 41 ("within a few seconds"); *Mohan* Complaint, ¶ 43 (median duration of two categories of spoof orders was 1.7 and 1.9 seconds).

[15] The CFTC alleged that the mediation duration of the Large-Side Orders was 10.38 seconds in the "Futures Scheme" and 11.71 seconds in the "Options Scheme." SOF ¶ 25. However, during the months where the CFTC identified the largest number of "Spoof Events," the median duration of resting soybean futures orders was only 3.16 seconds. SOF ¶ 32.

[16] A 2021 study found that 97% of orders in the U.S. stock markets are canceled before trading. SOF ¶ 33.

### 2. The CFTC's Analysis Does Not Support an Inference of Intent.

No reasonable jury could conclude from the CFTC's statistical analysis that Skudder did not intend to execute the Large-Side Orders. The CFTC's own expert, Lisa Pinheiro, concluded that the so-called "Spoof Events" did not establish a statistically significant pattern. SOF ¶ 29. Indeed, without more, Pinheiro could not rule out the possibility that the pattern was the result of random chance or cherry-picking. SOF ¶ 30. Pinheiro's conclusion that the CFTC's *only* evidence of Skudder's intent does not hold water is, on its own, reason to enter summary judgment.

Even if the lack of statistical significance could be overlooked, the CFTC's "pattern" does not satisfy its burden. Rather, the "pattern" consists simply of instances where Skudder entered and canceled a futures order for 100 or more contracts within 30 seconds and, at some point during that 30-second window, the futures order overlapped with a smaller or less visible order on the opposite side of the futures market or with an opposite options order of any size. SOF ¶¶ 19, 21. These criteria are so overbroad that a jury cannot reasonably conclude that Skudder did not intend to execute the Large-Side Orders. To the contrary, the jury can only conclude that Skudder occasionally entered large orders on one side of the market and smaller or less visible orders on the other side of the market at around the same time. This is not enough.

First, there is nothing remotely suspicious about entering orders on both sides of the market. Skudder placed 23,380 limit orders for soybean futures and 26,970 limit orders for soybean options during the relevant period. SOF ¶ 6. These include orders for his personal accounts and client accounts, often executing different strategies simultaneously across accounts, and balancing his long- and short-term views of the market. SOF ¶ 10. Indeed, Skudder testified that he often trades based on short-term "wiggles" in the market despite the structure of his long-term trading strategy at any given time. SOF ¶ 9. It is not surprising that, at times, Skudder simultaneously had orders pending on both sides of the futures market, options market, or both.

Second, the CFTC's analysis is plainly the result of cherry-picking. Its screening criteria looked for futures orders that were 100 lots or more and were canceled within 30 seconds. SOF ¶¶ 19, 21. The CFTC's finding that those orders were large, were canceled within 30 seconds, and did not receive many fills is not surprising – it was preordained. The finding that Small-Side Orders were smaller and canceled less often and less quickly than Large-Side Orders is similarly unsurprising, as the CFTC's screening did not require that Small-Side Orders be canceled and did require that Small-Side Orders be no more than half the size of Large-Side Orders. Simply put, the CFTC's statistics do nothing more than confirm that larger orders are bigger than smaller orders and that orders that are canceled within 30 seconds are more likely to be canceled quickly and in full than orders that are not canceled within 30 seconds. The CFTC's analysis is the equivalent of picking players for a basketball team and a soccer team using height as the main criteria, and then expressing surprise that the basketball players are taller than the soccer players.

Third, there is no evidence to support the CFTC's theory that the entry of the Large-Side Orders in the futures market caused market participants to trade in the options market, much less that Skudder intended to cause trades in the options market. Neither the CFTC nor Pinheiro can point to any evidence to support even an alleged link between the entry of a large futures orders and pressure on the options order book. In fact, the evidence shows the opposite. Cusimano's analysis shows that there is minimal connection at best between imbalances in the futures book and activity in related options order books. SOF ¶ 35. In fact, in the majority of events in the CFTC's "Options Scheme," the rate of spread crossing[17] actually *decreased* after placement of the Large-Side Order. SOF ¶ 36. This undercuts any linkage between the two markets. Cusimano's

[17] Spread crossing occurs when, in the case of a buy order, the buyer places an order to buy at a price that matches or exceeds the lowest price at which a seller is willing to sell. SOF ¶ 36.

conclusions are consistent with the CFTC's own findings that 192 of the 279 alleged "Spoof Events" involving options (69 percent) were unsuccessful, SOF ¶ 38, meaning that, most of the time, the Large-Side Order undeniably did not push the options market toward the Small-Side Order. In short, there is no basis to infer that Skudder's activity in the futures order book was intended to (or did) influence activity in the options order book.

### 3. The CFTC Cannot Rely on Pinheiro's Unreliable "Broader" Analysis.

The CFTC will undoubtedly argue that Pinheiro's analysis of Skudder's "broader" trading activity creates an issue of material fact. It does not. First, as discussed in Defendants' Motion to Exclude Testimony and Opinions of Lisa Pinheiro,[18] Pinheiro is not qualified to render her opinions, her analysis is wholly unreliable, and she improperly opines as to Skudder's state of mind. Second, even if the Court does not exclude Pinheiro's testimony, no reasonable jury could infer from her analysis that Skudder did not intend to execute the large orders at issue.

#### a. Differences Between Large and Small Orders Is Not Evidence of Intent.

In an attempt to salvage the CFTC's analysis, Pinheiro purports to have [redacted] A reasonable jury could not infer an intent to cancel from this finding. Traders have different purposes, employ different strategies, and face dramatically different risks when entering an order for one futures contract versus entering an order for 100 futures contracts. SOF ¶ 41. [redacted] SOF ¶

---

[18] The Motion to Exclude and Memorandum in Support thereof is being filed simultaneously with this Motion.

42. As such, comparing the fill ratios, cancelation rates, and duration of two very different types of orders is not a reliable measure or indicator of Skudder's intent when placing large orders.

A more apt comparison is to compare the characteristics of large orders where there is an order on the opposite side of the market that could potentially benefit from market pressure created by the large order with the characteristics of large orders where there is no such opposite order. SOF ¶ 41. Cusimano performed this analysis to determine whether the presence of an opposite-side order had any impact on the cancelation rates, duration, or fill ratios of Skudder's large, visible orders. SOF ¶ 43. If, for example, the Large-Side Orders were more likely to be canceled when Skudder had an order that could benefit on the opposite side of the market, then a jury could potentially infer that the reason for the higher cancelation rate was that Skudder intended to cancel those orders. But that is not what Cusimano found. Rather, he found "no meaningful differences in the relevant metrics." SOF ¶ 44. "In other words, Mr. Skudder's large orders look generally the same whether or not there was an order on the opposite side of the market and, therefore, Mr. Skudder's large order trading strategy should not be assumed to be indicative of a motive to spoof." SOF ¶ 44. This is undisputed even by Pinheiro. SOF ¶ 44.

Because Skudder's large orders were generally canceled at the same rate and received the same number of fills regardless of whether there was an opposite-side order that could benefit, all the CFTC has left is the mere fact that Skudder entered and canceled large orders. This is not enough to survive summary judgment. Courts have repeatedly held that a pattern of entering and canceling orders, even far more rapidly than Skudder, is not enough to survive a motion to dismiss. *See, e.g.*, *Kessev Tov, LLC v. Doe(s)*, No. 20-cv-04947, 2022 WL 2356626, at *9 (N.D. Ill. June 30, 2022) (granting motion to dismiss where "[t]he only 'pattern' apparent from the face of the complaints is that of rapidly placed and subsequently cancelled orders"); *CP Stone Fort Holdings,*

*LLC v. Doe(s)*, No. 16 C 4991, 2016 WL 5934096, at *5 (N.D. Ill. Oct. 11, 2016) ("[T]here is nothing improper or illegitimate about placing passive orders in the order book and then reversing position."). Moreover, Skudder's cancelation rate is not high compared to other market participants and he tends to expose his orders to the market – including his large, visible orders – much longer than other market participants. SOF ¶ 45. Pinheiro calculated [redacted] SOF ¶ 46. These durations are longer than all measures of industry norms including Cusimano's calculation of 3.16 seconds as the median duration of resting limit orders during a six-month sample period, Pinheiro's calculation of [redacted] as the median duration for manually entered large orders during that same sample period, and [redacted] a CFTC report indicating that between 2014 and 2018, the mediation duration for manually entered orders in the grains markets "varied between 25 seconds and a bit over a minute." SOF ¶ 47.

**b. The Entry of Large, Visible Orders Is Not Inconsistent with an Intent to Execute.**

Pinheiro takes the position – one that will undoubtedly be echoed by the CFTC – that the mere entry of large, visible orders is inconsistent with an intent to execute. SOF ¶ 48. It is her position that [redacted] SOF ¶ 49. But the evidence demonstrates that placing large, visible orders is *consistent* with an intent to execute.

First, it is undisputed that the CME's matching algorithm (the "K-Algo") preferences large and fully visible orders. SOF ¶ 52. The CFTC alleged as much in its Complaint, and alleged that larger orders gain a larger share of the pro-rata allocation. SOF ¶¶ 52-53. In addition, the "hidden quantity of an iceberg order … is not considered at the pro-rata distribution step for the K-Algo for soybean futures." SOF ¶ 54. In other words, large, fully visible orders benefit from both time

and size priority compared to smaller orders, iceberg orders, or orders broken into smaller orders. SOF ¶ 54. As a result, when the market moves to the desired price level, resting large, fully visible orders will receive faster and more complete fills than smaller orders, iceberg orders, or orders that are broken up into smaller pieces. SOF ¶ 55. As such, if Skudder wants to receive a quick fill of a large order, the K-Algo incentivizes him to enter and expose the full size of the order, rather than break the order up or enter it as an iceberg order.[19]

Second, a study [redacted] found that placing fully visible orders, as opposed to iceberg orders, "increases the chance that it attracts a counterparty who is sufficiently interested in trading to monitor the market, but who has not yet revealed herself ['reactive' traders …]." Hendrick Bessembinder, Marios Panayides & Kumar Venkataram, *Hidden liquidity: An analysis of order exposure strategies in electronic stock markets*, 94 J. FIN. ECON. 361, at 362 (Aug. 13, 2009) ("Bessembinder"); SOF ¶ 50. Bessembinder found that "some traders follow a passive strategy, where they wait for other traders to indicate their interest in trading on favorable terms." SOF ¶ 56. "The presence of these passive or 'reactive' traders increases the attractiveness of publicly displaying one's own interest in trading, in order to draw out the passive traders." SOF ¶ 56. Skudder considered the likelihood that he could draw out this type of interest when deciding how to enter his trades, testifying that he hopes, by entering a large order, that there is another large trader on the other side looking for a quick fill. SOF ¶ 57. Because of the execution priority and the effectiveness in drawing trading interest from reactive traders, Bessembinder concluded that "fully displayed orders are indeed more likely to execute completely and that, after controlling for other order attributes, exposed orders are associated with shorter time-to-completion." SOF ¶

[19] This is yet another reason why the CFTC's use of a 30-second window makes no sense. A trader who does not want his large, visible order filled would not leave that order exposed to the market for such a long period of time given the priority that the matching algorithm affords such orders.

58. Iceberg orders, on the other hand, "even after controlling for price aggressiveness, *order size*, and market conditions, … take longer to execute and have larger non-execution rates." SOF ¶ 59 (emphasis added). Therefore, it is hardly irrational for a trader seeking quick execution of a large order to expose the full size of the order.

Third, Skudder is precisely the type of trader that the Bessembinder found is likely to enter large, visible orders. He cited academic studies finding that informed traders like Skudder "are likely to submit larger and more aggressive orders, because they typically have an interest in assuming large positions before their information becomes public." SOF ¶ 60. He also found that informed traders are less likely to use hidden orders than uninformed traders. SOF ¶ 61. In short, Skudder's use of large, visible orders is fully consistent with an intent to execute orders.

### B. Approximately 90% of the Alleged Spoof Events Occurred Outside the Statute of Limitations and Are Time-Barred.

#### 1. The Statute of Limitations Bars the CFTC's Claims for Monetary Relief for Events Prior to December 12, 2016.

The CFTC is barred from collecting civil penalties, disgorgement, or restitution associated with alleged Spoof Events that occurred outside the statute of limitations. The applicable statute of limitations is 28 U.S.C. § 2462,[20] which states that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."

It cannot be disputed that almost 90% of the alleged Spoof Events (494 of 555) pre-date December 12, 2016 – the undisputed cutoff date for the limitations period. SOF ¶¶ 62-63. Nor can it be disputed that separate claims accrued at the time each Large-Side Order was placed because,

[20] The Court previously found that 28 U.S.C. § 2462 governs this case and that the "limitations dividing line was on December 12, 2016." ECF 18, at 10.

as the CFTC alleges, "[e]ach Spoof Order … constitutes a separate and distinct violation …." SOF ¶ 64.[21] As such, any claims arising from the alleged 494 Spoof Events that pre-date December 12, 2016 are time-barred, and the CFTC may not collect civil penalties resulting therefrom.[22] *CFTC v. Reisinger*, No. 11-CV-08567, 2013 WL 3791691, at *7 (N.D. Ill. July 18, 2013) (finding CFTC's civil penalty claims for conduct occurring before limitations period were time-barred).

The CFTC is equally barred from requesting disgorgement associated with alleged Spoof Events that occurred outside the limitations period. In *Kokesh v. SEC*, 581 U.S. 455, 462-63 (2017), the Supreme Court held that 28 U.S.C. § 2462 applies to any sanction that constitutes a "penalty." The Court defined "penalty" as a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." *Id.* at 461. A sanction is a "penalty" if (1) it is imposed "as a consequence for violating … public laws," and (2) it is sought "for the purpose of punishment, and to deter others from offending in like manner—as opposed to compensating a victim for his loss." *Id.* at 462-63 (internal quotation marks and citation omitted). Applying these principles, the Court held that disgorgement is a "penalty" and is thus subject to the five-year limitations period. *Id.* at 465 ("SEC disgorgement thus bears all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate."). Although *Kokesh* involved SEC rule violations, courts have routinely found that this rule applies equally to CEA claims governed by Section 2462. *See, e.g.*, *CFTC v. Shak*, No. 2:22-cv-01258-GMN-NJK, 2023 WL 5717289, at *5 n.5 (D. Nev. Sept. 5, 2023); *CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953, at *29 (D. Colo. Sept. 26, 2018).

---

[21] The Court previously rejected the CFTC's effort to recast its claims as alleging a continuing offense, finding "[t]he continuing violation doctrine isn't a good fit for spoofing claims." ECF 18, at 10.

[22] It is appropriate for the Court to make such a holding at the summary judgment stage. *See Reisinger*, 2013 WL 3791691, at *9 (granting summary judgment to defendant on claim "that the CFTC may not seek civil penalties for violations that occurred before [the limitations cutoff date]").

The CFTC's claim for restitution also constitutes a "penalty" under *Kokesh*. The CFTC seeks restitution for Defendants' alleged violations of certain sections of the CEA, *i.e.*, "public laws," thus satisfying the first *Kokesh* factor. *CFTC v. Worldwide Mkts., Ltd.*, 675 F. Supp. 3d 496, 508 (D.N.J. 2023) (concluding restitution is a remedy "imposed by the 'court as a consequence for violating public laws'—satisfying the first principle identified in *Kokesh*" (quoting *Kokesh*, 581 U.S. at 463)).

The CFTC seeks restitution for the purpose of punishing Skudder and deterring others from spoofing, satisfying the second *Kokesh* factor. While some courts have found that the purpose of restitution is primarily to compensate victims rather than punish defendants, the Supreme Court in *Kokesh* recognized that "sanctions frequently serve more than one purpose," and where "[a] civil sanction [] cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, [it] is punishment." *Kokesh*, 581 U.S. at 466-67 (internal quotation marks and citation omitted); *see also Gramalegui*, 2018 WL 4610953, at *30 (finding "compelling the *Kokesh* Court's observation that any remedy that serves a punitive purpose – even if punishment is not the sole or primary purpose thereof – constitutes punishment for purposes of applying section 2462," and holding that the CFTC's request for restitution of amounts predating the limitations period was time-barred under § 2462); *Shak*, 2023 WL 5717289, at *5 n.5 (finding that, where CFTC sought "injunctive relief, restitution, and disgorgement," but also sought "to suspend Defendant from trading," the CFTC sought "to impose a punishment" and therefore "§ 2462's five-year statute of limitations governs").

Here, restitution does not serve to compensate supposed victims of Skudder's alleged spoofing. To date, the CFTC has not identified a single potential victim. In fact, the CFTC sought (and was granted) an extension of fact discovery to identify "third-parties that it believes may be

considered victims for restitution purposes." SOF ¶¶ 65, 67. The CFTC explained to the Court that the identity of such third parties "is expected to be the subject of expert witness reports." SOF ¶ 66. But discovery is complete and the CFTC has yet to identify a single victim for "restitution purposes." Thus, the only possible recipient of Defendants' restitution is not the supposed victims, but the government. *See Kokesh*, 581 U.S. at 465 ("When an individual is made to pay a noncompensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty."). Because restitution here serves the same purpose as disgorgement, it constitutes a "penalty" for purposes of 28 U.S.C. § 2462 and is subject to the five-year statute of limitations.

**2. No Alleged "Scheme" Can Salvage Time-Barred Claims.**

In its order on Defendants' Motion to Dismiss, the Court observed that "neither party has addressed how the scheme-offense doctrine would apply to requests for civil penalties associated with trades outside the five-year period." ECF 18, at 12 n.13. The straightforward answer is that, even if the CFTC could somehow establish an ongoing "scheme," the analysis does not change under 28 U.S.C. § 2462. Even for cases involving fraudulent schemes, courts have consistently held that penalties may be collected *only* for claims associated with violations that occurred *within* the five-year limitations period of Section 2462. *See, e.g.*, *SEC v. Place*, No. 16-4291, 2018 WL 6727998, at *4 (E.D. Pa. Dec. 21, 2018) (holding that claims occurring outside § 2462 limitations period, including civil and disgorgement penalties, were time-barred, despite "SEC['s] argu[ment] that GTS's deceptive acts and misrepresentations over multiple transactions constitute an overarching fraudulent scheme"); *SEC v. Straub*, No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *20 (S.D.N.Y. Sept. 30, 2016) ("[R]eject[ing] the SEC's argument that it may pursue FCPA violations that occurred outside of the limitations period simply on the basis that those violations were similar in character to and part of the same alleged 'scheme' as violations that occurred within

the limitations period," and holding that "claims for civil penalties … that accrued before [the limitations period were] time-barred by Section 2462[.]"); *SEC v. Jankovic*, 15 Civ. 1248 (KPF), 2018 WL 301160, at *5 (S.D.N.Y. Jan. 4, 2018) ("[The SEC] d[id] not seek the total proceeds received from investors in this fraudulent scheme—$1.95 million—in light of a recent Supreme Court decision making clear that SEC claims for disgorgement are subject to the five-year limitations period set forth in 28 U.S.C. § 2462."); *CFTC v. Gramalegui*, 2018 WL 4610953, at *28-30. The CFTC thus cannot collect monetary penalties resulting from alleged Spoof Events that pre-date December 12, 2016, even if alleged to be part of the CFTC's so-called "schemes."

**3. The CFTC Cannot Use Criminal Cases to Save Time-Barred Claims.**

The CFTC might again rely on *U.S. v. Smith*, 555 F. Supp. 3d 563 (N.D. Ill. 2021) and *U.S. v. Bases*, No. 18 CR 48, 2020 WL 2557342 (N.D. Ill. May 20, 2020), but neither case was governed by 28 U.S.C. § 2462; both were governed instead by inapplicable criminal statutes. In *Smith*, 555 F. Supp. 3d at 20, the court applied 18 U.S.C. § 3282, which provides that the limitations period begins "after [the] offense shall have been committed." In *Bases*, 2020 WL 2557342, at *10, the court applied 18 U.S.C. § 3301, which provides that the limitations period begins "after the commission of the offense."

Courts have repeatedly rejected arguments attempting to analogize criminal statutes of limitations with 28 U.S.C. § 2462. *See U.S. v. Ellis*, 938 F.3d 757, 764-65 (6th Cir. 2019) (rejecting, in criminal case governed by 18 U.S.C. § 3282, defendant's citation to *Kokesh* and her attempt to compare § 3282 with 28 U.S.C. § 2462, emphasizing the inapplicability of § 2462 and distinguishing the statutes' plain language); *U.S. v. Isaacson*, No. 08-20071-CR, 2014 WL 12279429, at *4 (S.D. Fla. Jan. 16, 2014) ("[Defendant] provides no coherent explanation as to how [*Gabelli v. S.E.C.*, 568 U.S. 442 (2013), which concerned 28 U.S.C. § 2462] affects his case," which instead "is governed by … 18 U.S.C. § 3282"); *SEC v. Tee to Green Golf Parks, Inc.*, No.

00-CV-478S, 2011 WL 147862, at *3 (W.D.N.Y. Jan. 18, 2011) (rejecting, in case alleging fraudulent scheme governed by 28 U.S.C. § 2462, defendant's "erroneous[] reli[ance] on … 18 U.S.C. § 3282, which applies in certain criminal, not civil, cases").

This Court should similarly reject the CFTC's reliance on inapplicable criminal cases, particularly where the result would be contrary to civil cases interpreting 28 U.S.C. § 2462, and where the CFTC itself alleges that each individual alleged Spoof Event was a distinct violation. Instead, the Court should enter judgment in Defendants' favor, holding that the CFTC cannot seek monetary sanctions (including civil penalties, disgorgement, or restitution) in connection with any alleged Spoof Events that occurred prior to December 12, 2016.

## V. CONCLUSION

When stripped of its cherry-picked, statistically insignificant, and meaningless statistics, all that remains of the CFTC's case is that Skudder regularly entered relatively large orders for soybean futures which he sometimes canceled. The CFTC would ask this Court to conclude that the entry of large orders alone is enough to create an issue of material of fact. It is not. A reasonable jury cannot infer intent from such a staggeringly overbroad and unprecedented theory especially where, as here, Skudder had plausible reasons to place both large and small-sized orders while simultaneously pursuing long-term and short-term trading strategies. Just because an order was big and ultimately canceled does not mean that Skudder did not intend for it to be executed, particularly when the evidence shows the opposite – that Skudder's large orders were equally likely to be canceled and rest in the market for the same amount of time regardless of whether there was an order on the opposite side of the market that could benefit. As such, Defendants respectfully request that this Court enter summary judgment in their favor and dismiss the CFTC's claims. In the alternative, Defendants request that the Court enter summary judgment in their favor with respect to the 494 alleged "Spoof Events" that occurred prior to December 12, 2016.

Dated: January 17, 2025

Respectfully submitted,

*<u>/s/ Ellen M. Wheeler</u>*
Ellen M. Wheeler (No. 6244111)
Thomas P. Hansfield (No. 6340818)
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
312.832.4500
ewheeler@foley.com
thansfield@foley.com

*Attorneys for Defendants*
*David Skudder and Global AG LLC*

**CERTIFICATE OF SERVICE**

I, Thomas P. Hansfield, an attorney, hereby certify that on January 17, 2025, I filed on the ECF System the foregoing Memorandum in Support of Defendants' Motion for Summary Judgment, and thereby served such filing via the Court's ECF Notification system to all attorneys of record in this matter. I further certify that an under seal version of the foregoing document was served via electronic mail on January 17, 2025 upon all counsel of record.

*/s/ Thomas P. Hansfield*
Thomas P. Hansfield