# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDRE FLOTRON,<br><br>             Defendant. | S1 17 Cr. 220 (JAM)<br><br>March 8, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION**
***IN LIMINE* TO PRECLUDE UNDISCLOSED EXPERT TESTIMONY**

Defendant Andre Flotron respectfully submits this memorandum of law in support of his

motion *in limine*, pursuant to Federal Rule of Evidence 701 and 702, to exclude from evidence

any expert opinion testimony from government witnesses Lisa B. Pinheiro and Daniel Driscoll,

due to the government's failure to disclose any such expert opinions.

**BACKGROUND**

The government has disclosed that it intends to call Lisa Pinheiro to offer "fact testimony

relating to individual transactions in the trading data as well as a summary of voluminous trading

data" and Daniel Driscoll "to testify about, among other things, precious metals futures

generally, how they are traded on the COMEX exchange, and how a bid or offer can be placed,

cancelled, modified, or executed by market participants in the precious metals futures market."

*See* Ex. A, February 16, 2018 Gov't Expert Disclosures (hereinafter, the "Disclosures") at 3.

The government has named both of these individuals on its Witness List. *See* Gov't Witness List

at 1, 2 (ECF No. 94).

The government has explicitly identified these witnesses in Disclosures as lay witnesses

who "will not be offering any opinion testimony." Disclosures at 3. However, the government

explains that it named these individuals in its Disclosures "out of an abundance of caution in case

portions of the testimony are later deemed to be within the scope of Federal Rule of Evidence 702." *Id.* The government did not identify any potential expert opinions that may be offered by these individuals at trial.

## ARGUMENT

### A.     Legal Standard

Federal Rule of Evidence 701 bars fact witnesses from offering opinion testimony unless it is "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." This rule ensures that the evidentiary requirements for expert witnesses in Federal Rule of Evidence 702 will not be "evaded through the simple expedient of proffering an expert in lay witness clothing." *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010) (citing Fed. R. Evid. 701 Adv. Comm. Notes to 2000 Amendments). Rather, a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citing Fed. R. Evid. 701 Adv. Comm. Notes to 2000 Amendments).

### B.  The Government Should be Precluded From Later Offering Expert Opinions from These Witnesses.

Since the government has only proffered Ms. Pinheiro and Mr. Driscoll as lay witnesses, the government should be held to this designation. A bare reservation of rights to call these individuals at experts at some undetermined later date, without the slightest attempt to offer the opinions that they would give, is insufficient to allow the defense to adequately prepare for cross examination of these witnesses. If the government wanted to offer expert testimony from these witnesses, it was required to properly identify them pursuant to Fed. R. Crim. Pro. 16. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (precluding expert testimony due to

2

late and insufficient disclosure of expert witnesses under Rule 16). Rule 16 requires the government to provide a summary that describes "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. Pro. 16(a)(1)(G). The government cannot simply name an individual on its Disclosures, without providing any guidance as to the substance of his or her opinions, to circumvent a later objection from Mr. Flotron that these lay witnesses are straying from proper layperson testimony into expert testimony.

Allowing this improper procedure would unfairly prejudice Mr. Flotron's ability to prepare for cross examination of these witnesses. As such, the government should be precluded from calling these witnesses as experts at trial.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court grant his motion *in limine* to exclude from evidence undisclosed expert opinion testimony from government witnesses Lisa B. Pinheiro and Daniel Driscoll.

<div style="margin-left:50%;">

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/ Marc L. Mukasey
    Marc L. Mukasey (ct29885)
    Nathan J. Muyskens (phv09472)
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 801-6832
    Facsimile: (212) 801-6400
    *Attorneys for Defendant Andre Flotron*

</div>

**AFFIRMATION OF SERVICE**

I hereby certify that on March 8, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


Dated: New York, New York
       March 8, 2018

 /s/ Marc L. Mukasey
Marc L. Mukasey
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com



**U.S. Department of Justice**
Fraud Section
Criminal Division

---

*Fraud Section*

*Bond Building*
*1400 New York Ave., N.W.*
*Washington, D.C. 20530*

February 16, 2018

<u>Via E-Mail and Federal Express</u>

Marc L. Mukasey, Esq.
Greenberg Traurig, LLP
MetLife Building
200 Park Ave.
New York, N.Y. 10166

    Re:  <u>United States v. Flotron, Criminal No. 3:17 CR 220 (JAM) (D. Conn.)</u>

Dear Counsel:

   The United States provides the following disclosures regarding testimony it intends to elicit as part of its case-in-chief.

**<u>Expert Regarding Precious Metals Trading</u>**

   The United States intends to call, pursuant to Rules 702, 703, and 705 of the Federal Rules of Evidence, Special Agent Jonathan Luca, of the Federal Bureau of Investigation, as an expert witness in the field of precious metals trading. Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, we hereby provide a summary of the testimony, including the opinions and bases thereof, that we intend to elicit. In addition, we provide a summary of the witness's qualifications.

   Special Agent Luca graduated from Wagner College in 2004 with a Bachelor of Science degree in Business Administration. From 2004 to 2011, Special Agent Luca was employed with Morgan Stanley—first, in operations (futures) in New York, New York, then as a trade assistant for the capital markets fixed income desk (e.g., repurchase agreements, municipal auction rate securities, treasuries) in Purchase, New York, and then as a trader, trading precious metals futures contracts in Purchase, New York. Special Agent Luca's precious metals trading included trading futures contracts for gold, silver, platinum, and palladium. In addition, Special Agent Luca traded physical metals (bars and coins of gold, silver, platinum, and palladium).

   Special Agent Luca obtained his Series 7 in 2006 and his Series 63 in 2007. Neither is active today.

In 2011, Special Agent Luca entered the FBI. After approximately five and a half months at the FBI Academy, he has been posted to the FBI's New York Field Office, where he has investigated numerous complex securities, commodities, and financial matters, including investigations related to alleged insider trading, market manipulation, and fraud and spoofing in the precious metals futures markets.

The following is a summary of topics about which we expect Special Agent Luca will testify and render opinions, including opinions on hypothetical situations:

- The practices and methods of trading precious metals futures contracts, including the manner in which orders are placed, modified, executed, and canceled by traders over electronic trading platforms and submitted to futures markets, including COMEX.

- Market participants that trade precious metals futures contracts on COMEX through an electronic trading platform include individual traders who manually place, modify, and cancel orders; individual traders who use a computer program to assist them in placing, modifying, and canceling orders; and individual traders and firms that use computer algorithms to place, modify, and cancel orders.

- All market participants on COMEX have access to a visible order book that shows the prices and number of contracts available in the market at the best bid and offer and certain other price levels.

- When a market participant places a visible order to buy or sell futures contracts that is large in size relative to the number of contracts currently available in the market, the order increases the visible supply or demand for that futures contract. This increase in supply or demand is capable of influencing a market participant's decision to place an order that he or she otherwise may not have, but for the visible increase in supply or demand. Such an increase in the visible supply or demand is often an important factor in a market participant's decision making process.

- There is no legitimate trading strategy that would employ the conduct described in Paragraphs 14–18 of the Superseding Indictment.

- Traders often use electronic "chat" systems to communicate with one another. Traders often use shorthand terms in electronic chat systems to communicate with each other, which Special Agent Luca will describe and explain.

- Special Agent Luca will explain and describe certain trading data in evidence, including the transactions at issue in Counts 2–7 of the Superseding Indictment.

**<u>Summary Witness Testimony Regarding Trading Data</u>**

The United States also intends to introduce summary testimony regarding trading data obtained from CME Group Inc., UBS AG (including its predecessors or affiliates), and the U.S. Commodity Futures Trading Commission during the course of the government's investigation.

Such testimony constitutes lay witness testimony pursuant to Federal Rules of Evidence 601, 602, and 701, and does not constitute expert testimony pursuant to Rule 702. Nevertheless, the United States hereby notifies defense counsel of such evidence out of an abundance of caution in case portions of the testimony are later deemed to be within the scope of Federal Rule of Evidence 702.

In particular, the United States intends to call Lisa B. Pinheiro of Analysis Group, Inc., to offer summary testimony regarding the trading data. The United States will not be offering any opinion testimony from Ms. Pinheiro. Her testimony will be limited to fact testimony relating to individual transactions in the trading data as well as a summary of voluminous trading data, including through the introduction of exhibits pursuant to Federal Rule of Evidence 1006. A copy of Ms. Pinheiro's current curriculum vitae is enclosed.

## Lay Witness Testimony Regarding Precious Metals Futures Trading

The United States also intends to call a witness to describe the mechanics of precious metals futures trading on the COMEX exchange. Such testimony constitutes lay witness testimony pursuant to Federal Rules of Evidence 601, 602, and 701, and does not constitute expert testimony pursuant to Rule 702. Nevertheless, the United States hereby notifies the defendant of such evidence out of an abundance of caution in case portions of the testimony are later deemed to be within the scope of Federal Rule of Evidence 702.

In particular, the United States intends to offer Daniel Driscoll[1] of the National Futures Association, who will testify about, among other things, precious metals futures generally, how they are traded on the COMEX exchange, and how a bid or offer can be placed, canceled, modified, or executed by market participants in the precious metals futures market. The United States will not be offering any opinion testimony from Mr. Driscoll.

## Potential Rebuttal Expert

While disclosure is not required pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the United States reserves the right to call an expert in its rebuttal case to rebut any opinions provided in the defense case-in-chief. To the extent the defendant discloses expert witnesses, the United States will promptly provide notice of any experts the United States intends to potentially call as rebuttal witnesses.

---

[1] Or another similarly situated witness.

If you have any questions or concerns about these disclosures or the sufficiency thereof, please let us know, so that we may discuss and resolve any such issues.

Very truly yours,

SANDRA MOSER
ACTING CHIEF, FRAUD SECTION

NICHOLAS E. SURMACZ
MICHAEL J. RINALDI
MATTHEW F. SULLIVAN

JOHN H. DURHAM
U.S. ATTORNEY


AVI M. PERRY


encl.

cc: Daniel E. Clarkson, Esq. (via e-mail)

4

**LISA PINHEIRO**
**Managing Principal**

Phone: 514 394 4467                                    1000 De la Gauchetière Ouest, Suite 1200
Fax: 514 394 4461                                                            Montréal, Québec
lisa.pinheiro@analysisgroup.com                                        Canada, H3B 4W5

Ms. Pinheiro has an extensive background in quantitative analysis and statistical modeling, which she has applied to various practice areas, including finance, intellectual property, biostatistics, and antitrust. In finance, she focuses on cases involving allegations of market price manipulation, misleading communications, excessive mutual fund fees, and mortgage-backed securities litigation. She has also applied survey analysis and statistical modelling to various intellectual property cases, including patent disputes among smartphone manufacturers, copyright tariff setting for musical works, and patent infringement in the pharmaceutical industry. She has extensive experience analyzing clinical trial, registry, and insurance claims data for both litigation and research purposes and has published manuscripts on pharmacoeconomic issues. In the antitrust field, she has led and managed U.S. and Canadian cases and supported multiple experts in matters involving competition in the online search engine industry, class certification, and cartel and price-fixing allegations. Ms. Pinheiro has also coauthored expert reports and testified on questions relating to the modeling and calculation of royalties and damages.

Prior to joining Analysis Group, Ms. Pinheiro served as executive director of the finance group of CIRANO, where she conducted applied research projects in collaboration with private and public partners, including work on hedge funds, style analysis, credit and operational risk, and the development of integrated risk management tools for practical applications.

## EDUCATION

| 2002 | M.Fin., mathematical finance (*summa cum laude*), Princeton University |
|---|---|
| 2001 | Licence en Sciences Mathématiques (*magna cum laude*), Université Libre de Bruxelles<br>*Specialization: Statistics, probability and operations research*<br>*Research: Undergraduate thesis in applied statistics (sequential analysis)*<br>*Honors: Ruth and Joe Gani Prize in probability (best performance in probability); Prix Fleurice Mercier (best performance in the science faculty)* |

## PROFESSIONAL EXPERIENCE

| 2009–Present | Analysis Group, Inc.<br>*Managing Principal (2017–Present)*<br>*Vice President (2009–2017)*<br>*Senior Economist (2007–2009)*<br>*Economist (2005–2007)* |
|---|---|
| 2002–2005 | CIRANO<br>*Finance Group Executive Director* |
| 1998–1999 | Université Libre de Bruxelles<br>*Teaching Assistant* |
| 1997 | Bandag AG<br>*Marketing Assistant* |

**SELECTED CONSULTING EXPERIENCE**

**Finance**

- Led and managed teams to analyze high-frequency intraday data, and model market price manipulation and spoofing strategies.
- Estimated shareholder dilution caused by activities such as insider trading or excess trading from market timers.
- Applied finance theory to assess whether statements made by managers or corporations were in line with available information at the time. Evaluated the price impact of disclosures, news and/or reduced liquidity on transaction/stock prices - including *United States v. Cioffi* and *Patrinvest v. SA Ageas.*
- Analyzed and modeled loan-level RMBS data to calculate the impact of various loan-level characteristics on future cash flows and tranche valuation, in cases involving allegations of breach of fiduciary duty and misrepresentation.
- Developed simulations and analytics to illustrate the economics of 401(k) funds and their fee structure.

**Intellectual Property**

- Analyzed and supported an expert in reviewing and assessing conjoint analyses performed by opposing experts in support of the patent infringement damages estimates – including the *Apple v. Samsung* injunction ruling and trial, *ContentGuard Holdings Inc. v. Google Inc.*, and *SimpleAir v. Google.*
- Provided expert testimony on the appropriate rate base for the calculation of royalty rates for commercial radio tariffs and supported experts in determining appropriate tariffs based on economic bargaining theory.
- Analyzed online bidding data to value features associated with allegedly infringed-upon patents.

**Biostatistics & Pharmacoeconomics**

- Assessed the validity of statistical analyses used to support claims in patent application by replicating the analyses used and performed complementary analyses on clinical trial data that addressed allegations of flaws in studies.
- Analyzed clinical trial data to assess relative levels of adverse events for comparable levels of efficacy.
- Evaluated whether published studies supported claims regarding the relative efficacy and safety of a product.
- Evaluated the economic impact of common diseases such as psoriasis and atopic dermatitis from the employer-payer perspective.
- Examples include *Bone Care International v. Roxane Labs, et al.,* and *Ortho-McNeil Pharmaceutical, Inc. v. Watson Laboratories, Sandoz, Inc. and Lupin Pharmaceuticals, Inc. and Lupin Ltd.*

**Data Science**

- Used Natural Language Processing methods for feature selection, feature analysis, and as a basis for predictive modelling, with various application in IP, finance, healthcare, and antitrust.
- Experienced with real-life applications of Decision Trees, Deep Neural Networks, Support Vector Machine, and Ensemble algorithms.
- Taught internal training and seminars on machine learning for economic consulting.
- Conference speaker: Data Science for High-Stakes Economics, Litigation and Healthcare Decision Making (ODSC 2017).

### Antitrust

- Provided analytical and empirical analysis of auction pricing mechanisms underlying online search platform competition for advertising, as well as in the development of a framework to assess the effects of monopoly power on consumer surplus, output, and quality.
- Evaluated the impact of at-issue sales strategies on overall prices for consumers.
- Rebutted models used in damages calculations related to alleged anticompetitive boycotting activities, and analyzed the economic impact of price-fixing and bid-rigging activities.
- Analyzed client data and industry information in connection with class certification issues.
- Analyzed micro data on contingent commissions and broker-related conduct.
- Examples include *Advanced Micro Devices, Inc., and AMD International Sales and Service, LTD., v. Intel Corporation and Intel Kabushiki Kaisha* and *TFT-LCD Antitrust Litigation.*

### SELECTED EXPERT CASEWORK

*Hospira Healthcare Corporation v. The Kennedy Institute of Rheumatology*; **Court File No. T-396-13 (2016)**
*Federal Court of Canada*
Provided report and testimony relating to the digital transfer of study report data and replication of patent and study report tables.

**Commercial Radio Tariffs – SOCAN (2011–2013); Re:Sound (2012–2014); CSI (2012–2013); ArtistI (2012–2014); AVLA/SOPROQ (2012–2017)**
*Copyright Board of Canada*
Provided expert testimony on the appropriate rate base for the calculation of royalty rates.

*Gérald Léveillé c. Avantage Link Inc., Benoît Laliberté, et al. & Nutri-Mer c. Avantage Link Inc., Benoît Laliberté, et al.* **(2011)**
*Superior Court of Canada*
Produced an expert report on the evolution of high-tech IPO prices during the high-tech bubble, as well as a rebuttal of damages calculations related to allegations of insider trading and misleading press releases.

**Collective bargaining agreement (2008–2009)**
Coauthored an expert report on the economics and prospects of the naval industry, as part of a collective bargaining agreement negotiation.

**Goodyear Canada Inc. – Le Syndicat canadien des communications, de l'énergie et du papier – local 143 (2005–2006)**
Coauthored an expert report on the financial situation and solvency of the company for arbitration proceedings between Goodyear Canada and its union.

### ARTICLES AND PUBLICATIONS

"Practical Uses For Machine Learning In Health Care Cases," with Mihran Yenikomshian, et al. *Law360* (September 2016)

"Machine-Learning Algorithms Can Help Health Care Litigation," *Law360* (June 2016)

"Decision-Making with Machine Learning in our Modern, Data-Rich Healthcare Industry," with Nick Dadson, et al. Chapter in *Decision Making in a World of Comparative Effectiveness Research: An End-User's Practical Guide to Analysis and Interpretation*, by Howard Birnbaum and Paul Greenberg, eds. Springer (2017)

"How to Use Clinical-Trial Data in Court," with Pierre Cremieux, et al. *Law360* (2012)

"The impact of psoriasis on health care costs and patient work loss," with Joseph F. Fowler, et al. *Journal of the American Academy of Dermatology* 59.5: 772-780 (2008)

"The direct and indirect cost burden of atopic dermatitis: an employer-payer perspective," with David A. Mallett, et al. *Managed Care Interface* (2007)