**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | ) | |
| **Plaintiff,** | ) | **No. 1:22-cv-1925** |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| **DAVID SKUDDER and GLOBAL AG LLC,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Commodity Futures Trading Commission ("CFTC") brings this action against David Skudder and Global Ag LLC ("Global Ag") (collectively, "defendants") for violations of the Commodity Exchange Act (7 U.S.C. §1, *et seq.*) and Commission Regulation 180.1 (17 C.F.R. §180.1(a)). (Dckt. #1). The CFTC asserts that Skudder, acting on behalf of Global Ag, orchestrated two schemes designed to manipulate and deceive the soybean futures market. In both schemes, Skudder allegedly engaged in "spoofing": namely, placing large orders that he intended to cancel before execution to push the market price toward smaller orders that he intended to execute. (*Id.*).

Before the Court is defendants' motion for summary judgment. (Dckt. #59). Defendants argue that they are entitled to summary judgment because (1) there is no evidence from which a reasonable jury could conclude that Skudder had the requisite intent to be held liable, and (2) the vast majority of the alleged Spoof Events are outside the statute of limitations and are therefore time-barred. (Dckt. #60). Defendants have also moved to exclude the testimony and opinions of plaintiff's expert witness Lisa Pinheiro. (Dckt. #56). The CFTC opposes defendants' motions,

arguing that genuine issues of material fact preclude their motion for summary judgment and that Pinheiro's testimony and opinions are admissible.

For the reasons that follow, the Court agrees, and thus denies defendants' motions.

## I. LEGAL STANDARD

### A. Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (noting that the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met its burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party

bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

**B. Requirements of Local Rule 56.1**

Northern District of Illinois Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this District. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). To this end, Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). In turn, Local Rule 56.1(d) provides that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(2).

The non-moving party must then respond to the movant's statement of material facts. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). The response must consist of numbered paragraphs corresponding to the numbered paragraphs in the moving party's Local Rule 56.1 statement, and each response "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." LR 56.1(e)(1)–(2). "A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Instead, if the opposing party

wishes to assert facts not set forth in the moving party's Local Rule 56.1 statement, it may submit a statement of no more than forty additional material facts, which also must comply with Local Rule 56.1(d). LR 56.1(d)(2), (5). The moving party can then respond to the non-movant's statement of additional material facts, which must also comply with Local Rule 56.1(e). LR 56.1(c)(2).

The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011). Where a party fails to comply with Local Rule 56.1's requirements, the Court may exercise its discretion to accept the other party's properly supported statements of fact as undisputed. *See Curtis v. Costco Wholesale Corp.* 807 F.3d 215, 219 (7th Cir. 2015); *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014); *Daniels v. Janca*, No. 17 C 906, 2019 WL 2772525, at *2 (N.D.Ill. July 2, 2019) (collecting cases). In this matter, the Court placed the parties on notice at the pre-summary judgment conference that it would expect them "to fully comply with Local Rule 56.1," (Dckt. #52), and that the consequence of failing to do so could result in facts in the other side's statement of facts being deemed admitted.

Unfortunately, defendants' response to the CFTC's statement of additional facts, (Dckt. #97), falls short of the requirements of Local Rule 56.1(e). In particular, on fifteen occasions, defendants attempt to dispute the accuracy of the CFTC's facts by trying to shoehorn them into their narrative through their argumentative assertions that the trading orders the CFTC describes are "cherry-picked"; not "statistically significant"; or are "improperly excluded." (Dckt. #97 ¶¶1, 3–9, 11–16, 21). On thirteen other occasions, defendants attempt to dispute the CFTC's facts by asserting that the facts make "inappropriate comparisons." (*Id.* ¶¶2–11, 16–17, 19). And on four other occasions still, defendants dispute facts by asserting that the cited trade data supports

different conclusions, effectively setting forth new facts as supported by the opinion of their expert witness Jeremy Cusimano. (*Id.* ¶¶13, 14, 19, 21).

In addition, defendants respond to one of the CFTC's statements by characterizing it as "impermissible expert opinion," (*id.* ¶20); on two other occasions, defendants attempt to dispute facts with amorphous objections (*i.e.*, that the facts contain "vague," "ambiguous," "confusing," and/or "unreliable" definitions) (*id.* ¶¶10, 19); and on yet another occasion, they dispute whether the CFTC's quoted testimony "supports any assertion that Skudder's trading strategy was *solely* based on weather reports and the 'wiggles,'" (*id.* ¶22), even though the CFTC's factual statement does not assert that his strategy was based "solely" on these factors.

Finally, although the defendants claim in response to ¶18 of the CFTC's statement that the fact "is not supported by the referenced citation to Pinheiro's report," the defendants are mistaken—the report cited *does* support the CFTC's purported fact. (*See* Dckt. #97 ¶18). Moreover, the remainder of defendants' response to this fact fails to properly dispute the CFTC's statement about trade data because it puts forth other rationales for Skudder's trading practices, rather than disputing the facts shown by the trade data. (*Id.*) Therefore, this fact, too, is improperly disputed.

As such, defendants' response to the CFTC's statement of additional facts is inappropriate for multiple reasons. First, defendants attempt to dispute the CFTC's factual statements with myriad argumentative responses that mirror their *Daubert* motion to exclude the CFTC's expert, even though "it is well established that arguments belong in memoranda, not Rule 56.1 responses." *Ace Hardware Corp. v. Landen Hardware, LLC*, 883 F.Supp.2d 739, 742 (N.D.Ill. 2012); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *Sys. Dev. Integration, LLC v. Computer Sci. Corp.*, 739 F.Supp.2d 1063, 1068 (N.D.Ill. 2010). Second, defendants argue that the cited facts are inaccurate based on

Cusimano's analytical framework and conclusions, which is inappropriate because these responses introduce new facts that are not fairly responsive to the facts that the CFTC asserted. *Galfer v. Chicago Bd. of Educ.*, No. 22-CV-00571, 2025 WL 1918587, at *2 (N.D.Ill. July 11, 2025); *Jarolin-Bogert v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, No. 21 CV 552, 2023 WL 5956994, at *2 (N.D.Ill. Sept. 13, 2023). Finally, many of defendants' lengthy and redundant responses insert the same multi-paragraph argument about the exclusion of certain orders from the CFTC's analysis and span a page or more of text,[1] and only a few of their responses could reasonably be seen as "concise," as Rule 56.1(e)(3) requires.

For these reasons, the Court, in its discretion, deems admitted the properly asserted facts in the CFTC's statement of additional facts for purposes of these summary judgment proceedings. *See, e.g.*, *Scott v. Town of Cicero*, No. 09 C 6128, 2012 WL 2072972, at *1 n.1 (N.D.Ill. June 6, 2012) (deeming facts admitted where responses, among other things, objected to facts on the grounds of vagueness, tried to introduce additional facts into the process, wrongly asserted that the cited deposition did not say what the proponent asserted, and offered general denials without citing any supporting evidence).

## II. FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; defendants' statement of material facts ("DSOF") and its accompanying exhibits, (Dckt. ##62, 64, 64-1 to 64-9, 65-4 to 65-16); plaintiff's response to DSOF ("DSOF Resp."), (Dckt. #79); plaintiff's statement of additional facts ("PSAF") and its accompanying exhibits, (Dckt. ##81, 82, 82-1 to 82-8); and defendants' response to PSAF ("PSAF Resp."), (Dckt. #97), as appropriate in view of the Court's

[1] (*See* Dckt. #97 ¶¶8–11, 14, 16, 18, 19). On two other occasions, defendants' seemingly concise responses incorporated other full-page responses to different factual assertions by reference. (*Id.* ¶¶17, 21).

ruling regarding defendants' non-compliance with Local Rule 56.1. The facts that follow are undisputed unless otherwise noted.

**A. Soybean Futures and Options Trading**

A futures contract is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a specified price. (Dckt. #1 ¶15).[2] A futures contract traded on an exchange has standard specifications, including quality, quantity, and physical delivery time and location for the given product. (*Id.* ¶16). The standard contract unit for a soybean futures contract, known as a "lot," is five thousand bushels of soybeans. (Dckt. #20 ¶16). The contract price is quoted in cents per bushel, and the minimum price change allowed during a trading session (a "tick") is one-quarter of one cent per bushel. (Dckt. #1 ¶17). An option on a futures contract operates similarly, but gives buyers and sellers the option, not the obligation, to buy or sell a soybean futures contract at a certain price. (*Id.* ¶21). The tick size for an option on a soybean futures contract is one-eighth of one cent per bushel. (*Id.* ¶20).

Soybean contracts are traded electronically on the Chicago Mercantile Exchange ("CME") Globex trading system, which employs a matching algorithm to match bids and offers for execution. (Dckt. #20 ¶19). The CME matching algorithm gives size and time priority to large, fully visible orders. (DSOF ¶¶52, 54).

An "order" is a request submitted to an exchange to buy or sell a certain number of specified futures or options contracts. (Dckt. #1 ¶23). When there exists both a buyer and a seller willing to contract for a futures or option at a given price, a transaction occurs, and an "order" is "filled." (*Id.*). At any time before an order is fully filled, the trader can cancel the order. (*Id.*). When an order to buy is placed at or above the best-ask price, or an order to sell is

[2] *See also Bd. of Trade of City of Chicago v. SEC*, 187 F.3d 713, 715 (7th Cir. 1999).

placed at or below the best-bid price, it is an "aggressive" order that "crosses the bid-ask spread" and is guaranteed to execute, at least in part, immediately. (*Id.* ¶25). When an order to buy is placed below the best-ask price or an order to sell is placed above the best-bid price, on the other hand, it is a "passive" or "resting" order that is not guaranteed to execute. (*Id.* ¶26). The "rate of spread-crossing" describes the rate at which aggressive trading takes place during a certain period of time. (Dckt. #64-2 at 63).

**B. Skudder's Trading Practices**

David Skudder is the principal trader at Global Ag, where he primarily trades in agricultural products like soybeans, corn, wheat, and other futures and options products, at the Chicago Board of Trade, a commodities exchange operated by the CME Group, Inc. (DSOF ¶1). Skudder has been trading for more than thirty-five years for institutional clients like hedge funds, a small number of friends and family, and himself. (*Id.* ¶¶1–3).

Skudder testified that he is an informed trader who relies on product-related information—supply and demand, weather forecasts, barge availability, USDA reports, geopolitical events, and the like—to make his trading decisions. (*Id.* ¶¶3, 5). The information he relies on most is an "ongoing stream of proprietary weather reports and updates," which he receives from the full-time weather analyst he retains. (*Id.* ¶4). Skudder receives multiple weather reports a day, beginning as early as 3:30 a.m., that allow him to "take advantage of perceived mispricing" and trade futures and options accordingly. (*Id.*). Skudder does not use any automated tools or algorithms when trading, and all of his orders are entered manually. (*Id.* ¶7).

Between September 2014 and March 2019 (the "Relevant Period"), Skudder entered 23,380 limit orders for soybean futures and 26,970 limit orders for soybean options on behalf of

his accounts and his clients. (*Id.* ¶6). A "limit order" is an order in which "the customer specifies a minimum sale price or maximum purchase price." (*Id.*).

Skudder testified that he placed some orders during the Relevant Period based on his long-term view of the soybean market, including his beliefs about whether the supply of soybeans would increase or decrease in the long term. (*Id.* ¶8). He further testified that he placed other orders because he identified information "contrary to his structural position," which Skudder described as "the wiggles." (*Id.* ¶9). If Skudder generally believed that bean prices were falling from $14 per bushel to $11, for example, he testified that he would position himself as a seller so he could sell high. (*Id.*). But if he learned about a weather event in Brazil that would limit bean supply, sending bean prices up $0.30, he testified that effectively trading the wiggles would require him—at least temporarily—to position himself as a buyer, trading against his long-term bias. (*Id.*).

Skudder typically exposed his orders to the market, even when they were large orders for 100 or more contracts. (*Id.* ¶11). At times, however, he entered orders as "iceberg" orders, namely, orders of which only a portion of the quantity is visible until it is filled, at which point additional quantities become visible. (*Id.* ¶13). Skudder testified that on occasion, after placing a large visible order, he could see the market was moving away from his order, so he would cancel the order and replace it with an iceberg order. (*Id.* ¶14).

**C. Skudder's Alleged Spoofing**

The CFTC argues that Skudder manipulated the market through an unlawful practice called spoofing, meaning he placed deceptive orders that he intended to cancel in order to push the market price a certain direction. (*Id.* ¶¶15–16). The CFTC identifies two alleged schemes. As part of a "Futures Scheme," the CFTC argues that Skudder placed 293 "Large-Side Orders" for soybean futures contracts without the intent for them to be filled, but rather to push the

market toward smaller futures orders on the opposite side of the market. (*Id.* ¶17). As part of an "Options Scheme," the CFTC argues that Skudder placed 299 Large-Side Orders for soybean futures contracts without the intent for them to be filled, but rather to push the market toward smaller options orders on the opposite side of the market. (*Id.*). Across these two alleged schemes, the CFTC identified 512 distinct Large-Side Orders. (*Id.*).

The CFTC alleges that Skudder's Futures and Options Schemes followed a "general pattern." (DSOF Resp. ¶¶19, 21). As part of the Futures Scheme, Skudder would place one or more "Small-Side Orders" on one side of the futures market that he intended to execute. (DSOF ¶19). Then, at the same time, he placed one or more Large-Side Orders—orders for 100 or more contracts that were at least twice as large as the visible quantity of the smaller Small-Side Orders, and which Skudder intended to cancel—on the opposite side of the market and within ten ticks of his "Small-Side Orders." (*Id.*). Then, he would cancel his Large-Side Orders within thirty seconds after placing them. (*Id.*). The CFTC alleges a similar pattern in Skudder's Options Scheme, where Skudder would place his Small-Side Orders on one side of the options market and place Large-Side Orders on the side of the futures market that would benefit his options orders. (*Id.* ¶21).

In its complaint, the CFTC provided four illustrative examples of how Skudder engaged in the Futures and Options Schemes, including the following:

- On August 31, 2017 at 11:15:05.843 AM Central Time (denoted in hours, minutes, seconds, and milliseconds), Skudder placed an iceberg order to sell thirty soybean contracts with one contract visible to the market at a price level of 945 cents per bushel (Genuine/Small-Side Order).

- At 11:15:21.655 AM Central, Skudder placed a fully visible order to buy 100 soybean contracts at 943.5 cents per bushel (Spoof/Large-Side Order) at the sixth best-bid price level.

- Skudder's Spoof/Large-Side Order increased the volume of the top six book levels on the bid side by over thirty-five percent.

- Approximately three seconds later, Skudder's Genuine/Small-Side Order is completely filled—between 11:15:24.486 and 11:15:24.490 AM Central.

- At 11:15:46.217 AM Central, Skudder canceled the Spoof/Large Side Order.

(Dckt. #1 ¶55).

Spoofing is possible because of the nature of commodities futures trading. When traders like Skudder place bids to buy or sell futures—for soybeans or other commodities—on Globex, their orders affect the price of futures contracts by affecting perceived supply and demand: prices will typically rise when there is more demand than supply, and vice versa. (*Id.* ¶31).[3] By placing resting orders on the sell side of the market, opposite large orders on the buy side, a trader can convey the false appearance that there is more interest to buy than to sell in the market. (*Id.* ¶34).[4] This could potentially "deceive other market participants into placing aggressive orders to buy, thus moving the price higher and allowing the trader's sell orders to be executed sooner, at a better price, or in larger quantities than they otherwise would have been executed." (*Id.*). To put hypothetical numbers to Skudder's alleged schemes: Skudder might place a Small-Side Order to sell at $14.50 and a Large-Side Order to buy at $14, driving perceived demand up, executing his sell orders faster and higher than he might have otherwise, and then cancelling his Large-Side Orders within thirty seconds before they could fill.

In analyzing Skudder's trading activity, the CFTC's expert Lisa Pinheiro reached several conclusions about Skudder's Large-Side Orders. First, she found that Skudder's Large-Side

---

[3] *See also United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017).

[4] *See Coscia*, 866 F.3d at 787.

Orders were unusually large. (PSAF ¶¶1–5). In particular, roughly half of Skudder's Large-Side Orders had a visible order size between 200 and 300 lots, with a minimum size of 100 lots, a maximum size of 880 lots, and an average size of 214 lots. (*Id.* ¶1). In comparison, the average number of lots at the top three levels of the order book, where more than 70% of Skudder's Large-Side Orders were placed, was only 117 lots. (*Id.* ¶3). Skudder's average Large-Side Order was "as large as almost half of the average total combined quantity of all the other orders placed by all market participants across all ten levels of the order book." (*Id.* ¶4).

Pinheiro also found that Skudder's Small-Side Orders obtained more frequent fills when placed opposite Large-Side Orders. In particular, Small-Side Orders in the Futures Scheme "obtained fills at a rate . . . almost 15 times larger," when they followed rather than preceded the placement of a Large-Side Order. (*Id.* ¶6). Similarly, Small-Side Orders in the Options Scheme "obtained fills at a rate . . . roughly 11 times" larger following the placement of Large-Side Orders. (*Id.* ¶7). Cancellation rates were also higher for Skudder's Large-Side Orders than his Small-Side Orders—100% compared to 17% in the futures market, and 100% compared to 11% in the options market. (*Id.* ¶¶8–9).

Finally, Pinheiro found that Skudder's Large-Side Orders exhibited shorter order durations than his Small-Side Orders. The median durations of his Large-Side and Small-Side futures orders, respectively, were 7 seconds and 644 seconds. (*Id.* ¶8). The median durations of his Large-Side and Small-Side options orders, respectively, were 11 seconds and 5,105 seconds. (*Id.* ¶9). Pinheiro's analysis of the trade data also indicated that Skudder's Large-Side Orders were shorter in duration than large orders placed by other manual traders: 9 seconds compared to 46 seconds. (*Id.* ¶¶16–17).

Overall, across all Skudder's large futures orders that overlapped with small orders, his orders placed on or overlapping with the large side of the imbalance exhibited significantly lower

fill ratios (6% compared to 40%), shorter durations (264 seconds compared to 2,851 seconds), and higher cancellation rates (77% compared to 37%) than orders placed on the short side. (*Id.* ¶10). Ultimately, Pinheiro concluded that Skudder's trading behavior with respect to the Large-Side Orders "was not consistent with an economically rational approach to fill [them]." (DSOF Resp. ¶30).

Pinheiro also concluded that Skudder's trading behavior impacted market prices. Prices moved away from Skudder's Large-Side Orders in both soybean futures and options. (PSAF ¶13). This price dislocation persisted for the duration of his Large-Side Orders and rebounded "roughly in equal measure to its prior level" following Skudder's cancellation of his Large-Side Orders. (*Id.*). Price dislocations harmed market participants as they traded on the side of the large orders at less favorable prices, while Skudder benefitted from dislocations via his Small-Side Orders. (*Id.* ¶14).

## III. ANALYSIS

Defendants first move to exclude the testimony and opinions of plaintiff's expert witness Lisa Pinheiro. (Dckt. #56). For the following reasons, defendants' motion is denied.

### A. Motion to Exclude

#### 1. Standard for Motion to Exclude

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Pursuant to Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 598. When fulfilling this gatekeeping role, courts in the Seventh Circuit evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis added).

Regarding the first prong, a witness may be qualified to testify based on relevant knowledge, skill, experience, training, or education. Fed.R.Evid. 702 Advisory Committee's Note. "The Court 'must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them.'" *Webster Bank, N.A. v. Pierce & Assocs. P.C.*, No. 16-cv-2522, 2020 WL 616467, at *3 (N.D.Ill. Feb. 10, 2020), *quoting Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). As to the second prong, expert opinions are sufficiently reliable when they are based on sound methodology and can be properly applied to the facts. *Daubert*, 509 U.S. at 592–93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Est. of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *8 (W.D.Wisc. Feb. 13, 2017). Furthermore, the Seventh Circuit has recently reaffirmed that even "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Johnson v. Ridge Tool Mfg. Co., Inc.*, No. 25-2604, 2026 WL 2279906, at *2 (7th Cir. Aug. 7, 2026), *quoting Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, to be relevant, expert testimony

must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The proponent of the expert bears the burden of establishing the admissibility of the expert's opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019); Fed.R.Evid. 702. The Seventh Circuit has urged courts not to "subsume the jury's essential role as the arbiter of the weight and credibility of expert testimony. . . . Determinations on admissibility should not supplant the adversarial process." *Johnson*, 2026 WL 2279906, at *2 (cleaned up). Ultimately, whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

**2. Pinheiro Is Qualified as an Expert.**

Defendants first argue that Pinheiro's testimony and opinions should be excluded because she is not qualified to testify. They contend that because (1) she lacks expertise as a trader and (2) she has never testified as an expert at trial, she is not qualified to opine on what is or is not a rational trading strategy. (Dckt. ##57 at 13–14; 93 at 5–8). In addition, they argue that she is not qualified to opine on Skudder's intent to trade because that expertise falls within the purview of the jury. (Dckt. ##57 at 12; 93 at 5).

As an initial matter, and as the CFTC correctly points out, (*see* Dckt. #84 at 11–12), Pinheiro does not opine on Skudder's intent, which is typically outside the scope of expert testimony in the first place. *See United States v. Schultz*, No. 14-CR-467-3, 2016 WL 7409911, at *3 (N.D.Ill. Dec. 22, 2016) (collecting authority). Instead, she opines on whether Skudder trades "consistent with an economically rational trading strategy." (Dckt. #64-2 ¶16). "An expert's assessment of the objective information available to [her]"—including, for example, "whether a given practice is consistent with a given state of mind"—"is properly within the scope of [her] expertise." *Ploss v. Kraft Foods Grp., Inc.*, 637 F.Supp.3d 561, 575 (N.D.Ill.

2022) (cleaned up); *see also Dennis v. Andersons, Inc.*, No. 20-CV-4090, 2024 WL 4433471, at *11 (N.D.Ill. Oct. 7, 2024); *Glencore Ltd. v. Louis Dreyfus Co. B.V.*, No. 1:23-cv-11125, 2026 WL 880262, at *7 (S.D.N.Y. Mar. 31, 2026); *Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-CV-0736, 2024 WL 6969215, at *7 (M.D.Tenn. July 8, 2024); *Kane v. PaCap Aviation Fin., LLC*, No. CV 19-00574 JAO-RT, 2022 WL 3446314, at *16 (D.Haw. Aug. 17, 2022); *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020); *Untied States Commodity Futures Trading Comm'n. v. Wilson*, 13-CV-7884, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016).

Moreover, and contrary to defendants' arguments, Pinheiro is qualified to opine on what constitutes economically rational trading behavior. The Seventh Circuit has embraced a liberal standard for an expert witness's qualifications, noting that an expert needs only some "specialized knowledge that would assist the trier of fact." *Wilson v. City of Chi.*, 6 F.3d 1233, 1238 (7th Cir. 1993); *Africano v. Atrium Med. Corp.*, 561 F.Supp.3d 772, 776 (N.D.Ill. 2021). Courts may "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). An expert need not even possess "specific academic credentials. Rather, 'anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.'" *Lujano v. Town of Cicero*, No. 07-cv-4822, 2011 WL 6097719, at *2 (N.D.Ill. Dec. 6, 2011), *quoting Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *see also Tuf Racing*, 223 F.3d at 591 ("The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound."). A court should compare "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter

of the witness's testimony" to evaluate the qualifications of the expert. *Gayton*, 593 F.3d at 616 (cleaned up).

Pinheiro's qualifications as an expert clearly meet the *Daubert* threshold. Pinheiro holds a bachelor's degree in applied mathematics and a master's degree in mathematical finance. (Dckt. #64-2 at 4). Her mathematical finance master's degree is "the preferred degree" for "algorithmic trading, quantitative asset management, risk management, [and] derivatives pricing and trading." (Dckt. #84-1 ¶4). She began her career "apply[ing] academic research to real-world problems . . . including assessing the risk-reward tradeoff and performance of different trading strategies." (*Id.* ¶5). And now, she is the managing principal of an economic consulting firm, with two decades of experience analyzing trading strategies, particularly those associated with allegations of market price manipulation. (Dckt. #64-2 at 4–5). She also holds special expertise in market microstructure, which concerns, among other things, the "mechanics of intraday trading behavior." (*Id.*). This expertise qualifies Pinheiro to opine on what constitutes economically rational trading behavior—especially where, as here, defendants specifically describe that Skudder trades based on "short-term 'wiggles' in the market" while also having a "long-term trading strategy." (*See, e.g.*, Dckt. #60 at 13).

Defendants' assertions that Pinheiro is unqualified because she has never traded futures or options, authored publications about futures trading, or possessed various kinds of narrow knowledge are unavailing. (*See* Dckt. ##57 at 13; 93 at 5–7). Defendants wrongly gloss over Pinheiro's wealth of academic training and years of more general trading experience, (Dckt. #93 at 6), and ignore the Seventh Circuit pronouncement that courts "impose no requirement that an expert be a specialist in a given field" to be qualified under *Daubert* and Rule 702, *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). In sum: "It is clear that [Pinheiro] possesses certain specialized knowledge that may assist the trier of fact, and to the extent that [defendants argue]

that it is not narrowly specialized enough in the relevant field to point to the correct conclusion, the way to test [her] expertise is not at the threshold in a *Daubert* motion, but at trial though opposing evidence or cross-examination." *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 WL 6497374, at *6 (N.D.Ill. Dec. 3, 2019). Pinheiro's alleged unfamiliarity with agricultural commodities and "fundamentals-based trading" is thus inconsequential, and defendants' citations to the contrary are inapposite.[5] (*See* Dckt. ##57 at 14, 93 at 6–8).

Defendants also argue that Pinheiro is not qualified because she has "never been accepted as an expert witness by any court in any market manipulation or futures trading matter." (Dckt. #93 at 6) (cleaned up). However, the fact that "no court has ever found her qualified to offer expert testimony on market manipulation, spoofing, or future trading" and that Pinheiro has never testified that a trading strategy is inconsistent with an intent to execute, as defendants assert, (*see* Dckt. #93 at 6 n.2), is not dispositive because "neither Rule 702 nor *Daubert* requires that an expert serve as an expert witness in a prior case before being qualified to testify as an expert." *Zambrano v. Sparkplug Capital, LLC*, No. 19 CV 100, 2022 WL 2657224, at *2 (N.D.Ill. July 8, 2022); *United States v. Parra*, 402 F.3d 752, 758–59 (7th Cir. 2005) ("[T]here is a first time in court for every expert: the question is not whether [the expert] was a professional witness."). Moreover, the CFTC clarifies that Pinheiro's qualifications were not at issue in either of the cases that defendants identify, (Dckt. #84 at 12), and that "she has been retained on more than 40 cases involving allegations of market manipulation," (*id.* at 10).

[5] *See Gayton*, 593 F.3d at 617 (excluding opinion where expert "gives no basis" for it); *SEC v. Badian*, 822 F.Supp.2d 352, 363 (S.D.N.Y. 2011) ("[Experts'] extensive experience, although not specific to future-priced securities, is sufficient to provide them with the knowledge and skill necessary to evaluate the securities involved in this matter."); *CFTC v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *5–6 (S.D.N.Y. June 30, 2014) (finding that "academic credentials, teaching experience, and the publication of papers are not necessary accoutrements" to qualify as an expert witness).

In sum: "An expert need not necessarily have specific experience with a particular facet of his or her expertise in order to be competent to testify as to that facet." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1110 (N.D.Ill. 2005). Here, the Court finds in its discretion that Pinheiro's "knowledge, skill, experience, training, [and] education" in the realm of derivatives trading and market manipulation constitute more than adequate "specialized knowledge" that qualifies her to serve as an expert witness on economically rational trading behavior. Fed.R.Evid. 702. Accordingly, the Court finds that she is qualified as an expert.

**3. Pinheiro's Reasoning and Methodologies Are Reliable.**

Defendants next argue that Pinheiro's testimony is inadmissible because it depends on various unreliable assumptions or methodologies. (Dckt. #57 at 16–29). "[T]he *Daubert* framework when assessing the reliability of an expert's testimony is a flexible one," and defendants fail to show that Pinheiro's methodologies fall short of this standard. *Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004).

**a. Pinheiro's findings are not based on an "unreliable assumption."**

First, defendants argue that Pinheiro bases her report on the "invalid and unreliable" assumption that "the placement of . . . large, fully visible resting orders on one side of the market is not consistent with an economically rational strategy to execute such orders." (Dckt. #64-6 ¶32). Defendants specifically contend that Pinheiro's "assumption" is undermined by a study Pinheiro cites (the "Bessembinder study") that identifies "tradeoffs" to placing large, visible orders on the market. (*See* Dckt. #57 at 16–20).

Defendants identify four main benefits to exposing the full size of an order: size priority, time priority, quicker execution, and a higher likelihood of full execution. (*Id.*). While defendants acknowledge that Bessembinder noted "both costs and benefits" to this strategy, (*id.*

at 17), they highlight his statement "[u]ltimately . . . conclud[ing] that 'traders select the optimal exposure strategies on the basis of both their private trading motives and the tradeoffs involved in selecting more aggressive prices and exposing their orders.'" (*Id.* at 19). Because Skudder himself noted this tradeoff, and because Pinheiro's "blanket claim" about large, fully visible resting orders is "unsupported by any studies" and "directly contradicted by Bessembinder's finding[s]," defendants argue that Pinheiro's conclusions are based on an unreliable assumption and should therefore be excluded. (*Id.* at 20).

As a preliminary matter, and as the CFTC correctly points out, Pinheiro's statement that "the placement of [] large, fully visible resting orders on one side of the market is not consistent with an economically rational strategy to execute [] orders" is not a starting assumption, but part of her ultimate conclusion. (*See* Dckt. #84 at 15–16). Moreover, Pinheiro's statement on this point is supported by evidence and is thus reliable. As the CFTC points out, and defendants themselves admit, the Bessembinder study identified costs as well as benefits to using large orders. (*See* Dckt. ##57 at 17; 84 at 16). While Pinheiro acknowledges the time priority afforded large orders—a benefit noted in the Bessembinder study—she also considers and cites the broader literature describing costs to placing iceberg orders or splitting large orders in order to receive executions "at favorable prices." (Dckt. #64-2 at 18–19). Indeed, her report cites three different academic papers, including the Bessembinder study, that each support her statements about the benefits of hidden orders or costs of large, fully visible orders. (*Id.*) (citing studies by Nikolaus Hautsch and Ruihong Huang, Sabrina Buti and Barabara Rindi, and Hendrik Bessembinder *et al.*).

Defendants argue that the CFTC "ignores" Bessembinder's assertions about the benefits of using larger visible orders, especially for "informed traders, like Skudder." (Dckt. #93 at 16). But not only does this argument ignore the various ways that Pinheiro acknowledges the benefits

Bessembinder mentions, including size and time priority; it also urges the Court to draw inferences in favor of Defendants when considering the reliability of Pinheiro's reasoning and methodologies. Weighing different interpretations of the evidence relied on by an expert is not the purview of the Court on a motion to exclude. "*Daubert* . . . does not require a court to admit or exclude evidence based on its persuasiveness but rather requires a court to admit or exclude evidence based on its scientific reliability and relevance." *Srail v. Vill. of Lisle*, 249 F.R.D. 544, 563 (N.D.Ill. 2008). Where defendants fail to demonstrate the unreliability of the studies upon which Pinheiro relied, they fail to argue that her testimony should be excluded as unreliable.

In a final attempt to undermine Pinheiro's reliance on the Bessembinder study, defendants cite *CP Stone Fort Holdings, LLC v. John*, No. 16 C 4991, 2016 WL 5934096 (N.D.Ill. Oct. 11, 2016), arguing that the fact Skudder cancelled certain orders does not mean he never intended to execute them. (Dckt. #93 at 14–16). *CP Stone* is entirely inapposite, not only because it dismissed a securities fraud claim that failed to meet the heightened pleading standard imposed by Rule 9(b) and the Private Securities Litigation Reform Act, but also because that complaint (unlike here) contained no allegations about the disproportionate size or time to execution of the alleged spoof orders.

Accordingly, the Court finds that Pinheiro's findings were not based on an "invalid and unreliable assumption" and declines to exclude her testimony on this ground.

**b. Pinheiro's analysis of Skudder's trading is otherwise reliable.**

Defendants next raise several different arguments for why Pinheiro's analysis is unreliable. Specifically, they challenge: (1) several features of the methodology by which the CFTC identified Large-Side Orders in its complaint, (Dckt. #57 at 20–25); (2) Pinheiro's decision to evaluate patterns in Skudder's "broader trading," (*id.* at 25–28); and (3) the reliability

of Pinheiro's calculation of gains and losses, (*id.* at 28–29). For the reasons that follow, each of these arguments falls short.

#### i. Methodology for Identifying Large-Side Orders

Defendants argue that Pinheiro's methodology for identifying spoof orders was unreliable due to: (1) the statistical insignificance of the identified Large-Side Orders; (2) the use of a 30-second cancellation window to distinguish Large-Side Orders; (3) the exclusion of 100 orders that satisfied the CFTC's criteria but were not counted as Large-Side Orders; and (4) the link between futures orders and options trades. (*Id.* at 20–25). For the following reasons, the Court disagrees.

Defendants' argument that the identified Large-Side Orders are statistically insignificant hinges entirely on Pinheiro's alleged "conce[ssion]" that the patterns are not statistically significant. (Dckt. ##57 at 6, 20–21; 93 at 10–11). This argument fails because what Pinheiro was actually explaining is that she needed to review Skudder's broader trading patterns in order to determine whether the identified Large-Side Orders varied from them in a statistically significant way. (*See* Dckt. #64-7 at 10–11). She performed that review and determined that his Large-Side Orders varied in statistically significant ways (*i.e.*, they were larger, cancelled faster, and cancelled more frequently) from his orders more generally. This is an appropriate technique. *See, e.g., Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1399 n.8 (5th Cir. 1987) ("Tests of statistical significance . . . yield probability statements relating the numerical characteristic of a sample population with the characteristics of a larger population or 'universe' from which the sample was drawn."). Without any other argument for why the Large-Side Orders were statistically insignificant, other than a conclusory insistence that they comprised a "small, cherry-picked set," (*see* Dckt. #93 at 11), defendants fail to demonstrate that Pinheiro's opinion is unreliable for this reason.

Nor is Pinheiro's use of a 30-second window to identify Large-Side Orders a reason to find her opinion unreliable. Defendants argue that, according to their expert, Cusimano, "the median order life for all limit orders for soybean futures was just 3.16 seconds," making Pinheiro's identification of orders cancelled within 30 seconds overbroad. (Dckt. #57 at 22). They argue that Pinheiro's opinion is unreliable because she cites no "publication, court decision, study, or other precedent for using such a long window." (Dckt. #93 at 11). And they attempt to undermine Pinheiro's findings by citing the court's description of spoofing in *United States v. Coscia* as "within milliseconds . . . cancel[ling] the large orders." 866 F.3d at 787.

Each of defendants' arguments is unavailing. To begin, *Coscia* considered high-frequency trading, a subset of algorithmic trading that takes place on a far faster time scale than Skudder's manual trading, so its description of spoofing is inapt here. *See Coscia*, 866 F.3d at 786 n.5 (explaining that high-frequency trading "involves the rapid execution of high volumes of trades in which trading decisions are made by sophisticated computer programs that use complex mathematical formulae known as algorithms"). Moreover, an "expert need not . . . cite peer-reviewed studies to reliably lend [her] expertise to the trier of fact—experience is an equally valuable teacher." *Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024). And to the extent that defendants cite Cusimano's disagreements, the CFTC explains how his analysis differs: it considered orders (1) of different sizes than the alleged Large-Side Orders and (2) placed by algorithmic traders, which defendants make clear Cusimano is not. (Dckt. #84 at 19 n.8) (*see* Dckt. #93 at 6). Pinheiro adequately explains the use of a 30-second window by stating that:

> [T]he placement of Large-Side Orders creates price dislocations . . . which can harm market participants as they trade on the side of the large orders at less favorable prices, irrespective of whether their trades happened in the first few seconds . . . or later during the life of the Large-Side Orders.

(Dckt. #64-6 at 7). "That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000).

Next, defendants argue that Pinheiro's method for identifying Large-Side Orders was "unreliably applied" because "Cusimano identified 100 large orders that met the CFTC's criteria but were not flagged." (Dckt. #57 at 24–25). The CFTC contends that this was simply an exercise of its discretion not to charge those orders, and that Pinheiro reached conclusions consistent with its theory of liability that also considered the excluded orders. (Dckt. #84 at 23) (citing Dckt. #64-2 at 43–53). Specifically, in considering those orders, Pinheiro concluded that Skudder's large orders still exhibited significantly different fill ratios, durations, and cancellation rates compared to his other orders. (*Id.*)

Defendants' only retort is that certain of Pinheiro's conclusions do *not* consider the 100 excluded orders. (Dckt. #93 at 9). This is insufficient to support their argument that Pinheiro used an unreliable methodology to identify and analyze Large-Side Orders, and the case they cite is inapposite. *See Barber v. United Airlines, Inc.*, 17 Fed.Appx. 433, 437 (7th Cir. 2001). In that case, the challenged expert "did not give any additional data or information that he relied upon" to explain why he rejected certain data. *Barber*, 17 Fed.Appx. at 437. Here, on the other hand, Pinheiro considered all Skudder's orders and provided an explanation—the CFTC's exercise of its charging discretion—for why she did not include certain orders in some of her analysis of the Large-Side Orders.

Finally, defendants argue that Pinheiro's methodology for identifying Large-Side Orders is unreliable because she "assumes, without any support, that the mere entry of a large order in the futures market will cause market participants to trade in the options market." (Dckt. #57 at 23). Defendants contend that Pinheiro "provides no support" for this conclusion. (*Id.* at 24).

The CFTC, to the contrary, identifies multiple studies supporting Pinheiro's analysis linking the prices of futures orders and options. (Dckt. #84 at 20–21). While defendants argue that these studies' demonstrated correlations between futures prices and option prices are distinct from a correlation between futures orders and options pricing, (*see* Dckt. #93 at 16), the Court finds their argument unconvincing because it does not refute the CFTC's broader argument that futures valuations affect options valuations. In any event, an expert does not need to cite academic studies for her methodology or conclusions to be reliable. *Artis*, 95 F.4th at 526.

The CFTC also argues that Pinheiro's analysis itself demonstrates the impact of Skudder's large futures orders on: (1) the fill ratios of his small options orders; (2) the rate of spread-crossing in the options market; and (3) price dislocation in the options market. (Dckt. #93 at 21) (citing Dckt. ##64-2 at 39, 66; 64-6 at 20). The CFTC specifically contests defendants' contention that in the majority of events in the "Options Scheme," rates of spread-crossing decreased after the placement of the large order.[6] (Dckt. #84 at 22). Where Cusimano makes that statement, the CFTC points out, he also notes that spread-crossing occurred in only nine of the options events he considered. (*Id.*) (citing Dckt. #64-4 at 42–43). In other words, *no* spread-crossing occurred in the vast majority of events Cusimano included in his "majority." Defendants, in reply, merely cite the same portion of Cusimano's expert report to contest these conclusions. (Dckt. #93 at 16–17). The parties' disagreement here is simply another instance in which defendants seek to pit Pinheiro and Cusimano against each other in a battle of the experts, which is not a reason to exclude Pinheiro's opinions as unreliable. *See Walker*, 208 F.3d at 589.

Accordingly, the Court finds that Pinheiro properly applied a reliable methodology to identify Large-Side Orders and declines to exclude Pinheiro's testimony on that basis.

---

[6] The rate of spread-crossing is a useful metric because it captures the rate of aggressive trading that took place in response to Skudder's Large-Side Orders.

**ii. Analysis of Broader Trading Patterns**

Next, defendants challenge Pinheiro's "broader" analysis of Skudder's large and small orders beyond the CFTC-identified Spoof Events. Defendants rely on Cusimano's report to support their contention that "compar[ing] the characteristics of large and small orders . . . is not a reliable way of inferring intent." (Dckt. #57 at 25–26). By comparing the characteristics of large orders placed with and without opposite orders, Cusimano found "no meaningful differences in the relevant metrics" of Skudder's trades. (*Id.* at 26). Defendants acknowledge that Pinheiro found that Cusimano's findings do not conclusively determine a large order's market effect, but they dismiss her findings as "speculative," "merit[less]," and only reached because of the way Pinheiro selected the relevant data set. (*Id.*).

Once again, defendants' challenges boil down to a disagreement between Pinheiro and Cusimano about what metrics matter when measuring the effect of Skudder's trading activity on the soybean derivatives market. Their repetition of various reasons they believe Pinheiro incorrectly selected the relevant data set is, for the reasons described above, unconvincing. *See supra* Section III.A.3.b.i. And, contrary to defendants' contentions, Pinheiro's responses to Cusimano's conclusions are not speculative, but supported by the extensive reasoning and calculation provided in her expert and reply reports. For these reasons, defendants fail to establish that Pinheiro's "broader analysis" of Skudder's trading data is unreliable.

**iii. Gains and Losses**

Finally, defendants contend that Pinheiro used an unreliable methodology to calculate gains and losses. (Dckt. #57 at 28–29). In making this argument, they repeat certain arguments previously discussed and found unavailing (namely, that Pinheiro opines on intent, relies on a pattern that is not statistically significant, and uses a 30-second window that is too wide). Defendants also argue that Pinheiro's "use of control periods to determine how much spread

crossing would have occurred absent the Large-Side Order also renders her methodology unreliable." (*Id.* at 29). As both Pinheiro and the CFTC explain, however, "[b]efore and after comparisons are well-accepted methodologies," and, once more, the cases defendants cite are inapposite. (Dckt. #84 at 25; *see* Dckt. ##64-6 at 32; 93 at 18).; *see People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537 (7th Cir. 1997) (concerning a study that treated poverty and discrimination as the only two factors causing minority students to underperform white students on scholastic tests). Finally, for the first time on reply, defendants raise the argument that Pinheiro's calculation of gains and losses is unreliable because it considers orders outside the statute of limitations. (Dckt. #93 at 18). Even if this were a convincing argument (it is not), defendants waived it by failing to raise it until their reply brief. *See Zylstra v. DRV, LLC*, 8 F.4th 597, 609 (7th Cir. 2021).

Ultimately, in making each of their arguments, defendants fail to establish that Pinheiro applied an unreliable methodology, as opposed to reaching what defendants believe were unreliable conclusions. *Gopalratnam*, 877 F.3d at 781 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt.") (cleaned up). "[T]here is no requirement that an expert employ a certain method, so long as it is reliable." *Chi. Tchrs. Union, Local 1 v. Bd. of Educ. of City of Chi.*, No. 12 C 10311, 2020 WL 914881, at *15 (N.D.Ill. Feb. 25, 2020). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). Indeed, "[t]he crucible of cross-examination should reveal the expert's blemishes." *Johnson*, 2026 WL 2279906, at *2.

Defendants' concerns do not merit exclusion of expert testimony that is reliable and undisputedly relevant. Accordingly, the Court denies defendants' motion to exclude.

**B. Motion for Summary Judgment**

Defendants move for summary judgment for two reasons: (1) the CFTC cannot prove intent; and (2) approximately 90% of the alleged Spoof Events are time-barred. (Dckt. ##59, 60). For the reasons stated below, the Court finds that the CFTC has presented evidence that raises genuine issues of material fact sufficient to warrant denial of summary judgment based on the arguments asserted by defendants.

**1. A Reasonable Jury Could Find That Skudder Acted with the Intent to Spoof.**

Defendants argue that they are entitled to summary judgment because there is no evidence from which a reasonable jury could find that Skudder acted with the intent to spoof, an element of both of plaintiff's claims. (Dckt. #60 at 11–19). They contend that (1) the CFTC has no direct or circumstantial evidence, besides statistical evidence about Skudder's trading patterns, with which to show intent; (2) the CFTC's statistical evidence does not support an inference of intent; and (3) the CFTC's statistical evidence is unreliable. (*Id.*). The CFTC responds by asserting that there exists evidence from which a reasonable jury could infer Skudder's intent, and that defendants improperly ask the Court to weigh the evidence and decide a "battle of the experts" on summary judgment. (Dckt. #77 at 6–15). For the following reasons, the Court agrees with the CFTC.

**a. Pinheiro's testimony and analysis are sufficient to raise an issue of fact as to Skudder's intent.**

Defendants first argue that the CFTC cannot point to direct evidence, or indeed anything other than statistical evidence that "[Pinheiro] concluded . . . was not statistically significant," in support of their claims. (*See* Dckt. ##60 at 11–12; 95 at 8). This argument is unavailing.

To begin, "[d]irect evidence of an intent to defraud is rare," and it is *not* required to show an intent to defraud. *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007); *see also United States v. Filer*, 56 F.4th 421, 435 (7th Cir. 2022); *United States v. Madigan*, No. 22 CR 115, 2025 WL 2299514, at *27 n.34 (N.D.Ill. Aug. 8, 2025). As such, "[s]pecific intent to defraud is typically shown by circumstantial evidence and inferences drawn from the scheme itself." *Filer*, 56 F.4th at 435 (cleaned up); *United States v. Yoon*, 128 F.3d 515, 524 (7th Cir. 1997) ("[T]he execution of the scheme, in itself, may be relevant to establishing the defendant's specific intent to defraud."); *United States v. Vorley*, No. 18 CR 00035, 2021 WL 1057903, at *11 (N.D.Ill. Mar. 18, 2021), *aff'd sub nom. United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) (same). Moreover, "summary judgment ought to be used sparingly and with great caution . . . where subjective intent is a factor in the determination" unless "the undisputed facts make the outcome clear." *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993); *Cement-Lock v. Gas Tech. Inst.*, 523 F.Supp.2d 827, 860 (N.D.Ill. 2007) ("[S]ummary judgment on questions of fraudulent intent is rarely appropriate.").

Pinheiro's testimony regarding Skudder's schemes presents the kind of evidence that courts have found adequate to support an inference of intent. Defendants do not dispute the following facts: that "many of Skudder's orders were canceled," (DSOF Resp. ¶33); that, by certain calculations, Skudder's Large-Side Orders were large relative to orders placed by other market participants, (PSAF Resp. ¶¶1–5); or that Skudder left the Large-Side Orders on the market for a much shorter period of time than other orders of a similarly large size, (DSOF Resp. ¶25; Dckt. #1 ¶53). And based in part on these facts, Pinheiro concluded—with respect to both Skudder's futures and options trading—that Skudder's Large-Side Orders exhibited significantly lower fill ratios, shorter durations, and higher cancellation rates than his corresponding Short-Side Orders, especially after the placement of the Large-Side Orders. (PSAF Resp. ¶¶6–10).

Pinheiro also found that price dislocations occurred after Skudder placed Large-Side Orders in both soybean futures and options, persisting for the duration of the Large-Side Orders. (PSAF ¶13). Ultimately, she found that Skudder's trading of Large-Side Orders was "not consistent with an economically rational approach" for filling them at favorable prices. (Dckt. #64-2 ¶16). Moreover, Pineiro did *not* concede that the CFTC's evidence was statistically insignificant. *See supra* Section III.A.3.b.

To reiterate, "the Court does not weigh the credibility of admissible evidence." *Massey v. Hardy*, No. 1:21-CV-00560, 2023 WL 2814768, at *4 (N.D.Ill. Apr. 6, 2023). Nor, in particular, is it proper for "the Court to weigh the expert's credibility at the summary judgment stage," *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:15-CV-00551-RWS, 2019 WL 2755859, at *2 (E.D.Tex. Apr. 16, 2019). Because, for the reasons outlined above, Pinheiro's opinion is admissible, her testimony and analysis regarding the scheme Skudder allegedly executed are sufficient to raise an issue of fact regarding Skudder's intent to spoof. A reasonable jury could infer, based on her testimony, that Skudder placed his Large-Side Orders opposite Small-Side Orders, cancelling the former more quickly and more frequently, because he never intended to trade his Large-Side Orders.[7]

**b. The CFTC's statistical evidence supports an inference of intent.**

Even if Pinheiro's testimony is admissible, defendants argue, "[n]o reasonable jury could conclude from the CFTC's statistical analysis that Skudder did not intend to execute" the alleged Large-Side Orders. (Dckt. #60 at 13). While they agree that Skudder "entered large orders on

[7] The cases defendants rely upon are inapposite because the evidence at issue in those cases did not mirror the statistical analysis of Skudder's trading behavior that the CFTC presents here. (*See* Dckt. #60 at 11–12).

one side of the market and smaller or less visible orders on the other side of the market at around the same time," (*id.*), they argue that this pattern reveals "nothing remotely suspicious" because:

- Skudder testified that he often trades based on short-term "wiggles" in the market;
- The CFTC's analysis is the result of cherry-picking;
- Skudder's trades in the futures market convey nothing about his intent on the options market;
- Skudder's practice of entering large, visible orders is consistent with an intent to execute; and
- Pinheiro's "broader" analysis of Skudder's trading activity makes the wrong comparison.

(*Id.* at 13–19). Defendants further argue that, because "[t]here are many reasons why Skudder could have entered and canceled a large order," the Court should grant their motion for summary judgment. (*See* Dckt. #95 at 14).

Defendants' arguments fail because, in making them, defendants improperly ask the Court to weigh evidence, draw inferences in their favor, and make credibility findings in the face of contrary evidence. "As legions of cases teach, making credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Jones v. DuPage Cnty. Sheriff's Off.*, 529 F.Supp.3d 867, 878 (N.D.Ill. 2021) (cleaned up), *quoting Anderson*, 477 U.S. at 255. A motion for summary judgment will only be granted if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe*, 692 F.3d at 838 (cleaned up). A trier of fact *could* believe Skudder's testimony at trial about his intent to trade or cancel certain orders. But because, as outlined above, *see supra* Section III.A, Pinheiro's testimony is admissible, "alternate inferences" about Skudder's trading strategy can "be drawn from the available evidence," *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2007). "[D]rawing all reasonable inferences in favor of . . . the nonmovant" and declining to "weigh evidence or make credibility determinations," the Court finds that

genuine questions of material fact still exist as to Skudder's intent. *Edwards*, 164 F.4th at 1079; *Omnicare*, 629 F.3d at 704.

Furthermore, summary judgment is particularly inappropriate at this juncture because the evidence of record pits the parties' experts against each other. Pinheiro, on one hand, concludes that Skudder's trading behavior was not consistent with an intent to trade, and Cusimano, on the other hand, concludes that it was. In such a scenario, "it is left to the trier of fact, not the . . . court, to decide how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). Defendants' arguments amount to a classic "battle of the experts" that the Court cannot, and will not, resolve on summary judgment. *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 946 (7th Cir. 2019) (cleaned up). The cases that defendants cite to the contrary are, once again, inapposite, and fail to demonstrate that no genuine issue of material fact remains as to Skudder's intent in this case.[8]

Accordingly, the Court denies defendants' motion for summary judgment based on their "lack of intent" argument.

**2. The CFTC's Claims for Monetary Relief Are Not Time-Barred.**

Finally, defendants argue that the CFTC is not entitled to monetary relief for the majority of the alleged Spoof Events under 28 U.S.C. §2462, the catchall limitations provision for civil penalty actions. Section 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. §2462. The parties do not dispute that the five-year statute of limitations applies to the CFTC's request for civil monetary penalties

[8] *See, e.g.*, *CP Stone*, 2016 WL 5934096, at *4 (N.D.Ill. Oct. 11, 2016) (granting motion to dismiss securities fraud claim that contained no allegations about disproportionate size or time to execution of alleged spoof orders); *Coscia*, 866 F.3d at 788–89, 795–96 (affirming spoofing conviction in the context of high-frequency trading).

and disgorgement, but dispute whether it applies to restitution, which the CFTC argues is not a "penalty" within the meaning of Section 2462. (*See* Dckt. #77 at 16).

Defendants argue that each of the CFTC's claims for monetary relief separately accrued on the day each alleged Large-Side Order was placed. Because 494 of the 555 Spoof Events occurred prior to December 12, 2016, the agreed-upon cutoff date for the limitations period, defendants argue they are entitled to summary judgment on these claims. (DSOF ¶¶62–63). The CFTC argues, on the other hand, that its request for monetary relief is timely for all violations because: (1) the parties agree that some of Skudder's spoofing conduct occurred within the five-year statute of limitations; (2) spoofing is a scheme offense; and (3) since Skudder's spoofing scheme extended into the limitations period, the CFTC's lawsuit is timely as to all Spoof Events. (*See* Dckt. #77 at 16–22).

The CFTC's theory finds support in the case law. The Seventh Circuit has consistently found that spoofing constitutes a scheme to defraud within the meaning of the criminal commodities fraud statute, 18 U.S.C. §1348(1). *United States v. Smith*, 150 F.4th 832, 843 (7th Cir. 2025); *United States v. Pacilio*, 85 F.4th 450, 460 (7th Cir. 2023); *Chanu*, 40 F.4th at 541; *Coscia*, 866 F.3d at 797. In this context, courts have found that "if one instance of a spoofing or price-manipulation happens within the statute of limitations, then the defendant may be held culpable for the entire scheme." *United States v. Smith*, 555 F.Supp.3d 563, 588 (N.D.Ill. 2021) (cleaned up); *see also United States v. Bases*, No. 18 CR 48, 2020 WL 2557342, at *11 (N.D.Ill. May 20, 2020). Analogizing to the bank fraud scheme in *United States v. Longfellow*, these courts have emphasized that, like other crimes that can be prosecuted as scheme offenses, each execution of a spoofing scheme "create[s] new and different risks for other market participants, and each execution [is] chronologically and substantively independent with its own function and purpose." *Bases*, 2020 WL 2557342, at *11; *see also Smith*, 555 F.Supp.3d at 588.

Because the government here brings suit under both the Commodity Exchange Act, (specifically 7 U.S.C. §§6c(a)(5)(C), 9(1)) and Commission Regulation 180.1 (specifically 17 C.F.R. §180.1(a)(1), (3)), and because Commission Regulation 180.1(a)(1) expressly prohibits "any manipulative . . . scheme . . . to defraud," the Court finds it appropriate to treat the spoofing alleged as a scheme for statute of limitations purposes. Unlike the criminal commodities fraud statute, the Commodity Exchange Act does not explicitly state that spoofing is a scheme offense. 7 U.S.C. §6c(a)(5)(C). For this reason, there is a split in authority about whether conduct alleged to have violated the act's anti-spoofing provision constitutes a scheme offense. *Compare United States v. Pacilio*, No. 18 CR 48-2, 2020 WL 12919458, at *3 (N.D.Ill. Oct. 16, 2020), *with Smith*, 555 F.Supp.3d at 588 ("It is true that the word 'scheme' does not appear in [7 U.S.C. § 6c(a)(5)(C)], but as explained earlier, statutes may use other terms . . . to cover scheme-like conduct."). In the absence of binding authority interpreting the Commodity Exchange Act, and because the CFTC's claim under that act is joined with another claim that *does* explicitly consider a "scheme . . . to defraud," the Court treats the CFTC's spoofing allegations here as a scheme offense. Accordingly, because Skudder's trading activity straddles the five-year statute of limitations date, the Court concludes that none of the alleged Spoof Events are time-barred.

Defendants argue that the scheme-offense doctrine does not preclude summary judgment because several courts have held that the SEC is not entitled to monetary penalties for violations that fell outside the Section 2462 statute of limitations period, even when they were part of alleged "schemes." (*See* Dckt. #95 at 16–17). The cases they cite are inapposite and do not support their claims.[9]

[9] In *SEC v. Place* and *SEC v. Jankovic*, unlike here, the parties *agreed* that plaintiffs' claims for conduct outside the five-year limitations period were time-barred. No. CV 16-4291, 2018 WL 6727998, at *6 (E.D.Pa. Dec. 21, 2018); No. 15 Civ. 1248 (KPF), 2018 WL 301160, at *5 (S.D.N.Y. Jan. 4, 2018). And in *SEC v. Straub*, the court did not even consider the applicability of the scheme-offense doctrine, but

Next, defendants argue that the scheme offense doctrine cannot be "imported" from the criminal context into the civil context. But they cite no case law supporting this contention.[10] And whether charged civilly or criminally, spoofing like the kind in which Skudder allegedly engaged is "most akin to . . . a continuing course of conduct, that is, schemes." *Smith*, 555 F.Supp.3d at 588. "While the impact and profits from individual spoofing episodes may be minor, the aggregate effect can be substantial, as spoofing schemes are often repeated throughout an extended trading period and across numerous securities, leading to sustained negative impacts on security prices and significant profits for spoofers." *Mullen Automotive, Inc. v. IMC Fin. Mkts.*, No. 23 Civ. 10637 (LLS), 2025 WL 951501, at *1 (S.D.N.Y. Mar. 28, 2025). Where, as here, Skudder's alleged conduct involved multiple individual spoofing episodes that were more harmful and profitable in the aggregate than independently, the Court concludes that the CFTC adequately alleges a scheme.

Finally, defendants argue that the restitution sought by the CFTC constitutes a "penalty" under *Kokesh* that is subject to the Section 2462 statute of limitations, and is thus unavailable for

---

instead considered and rejected the application of the continuing violation doctrine. No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *20 (S.D.N.Y. Sept. 30, 2016).

Defendants also argue that "the CFTC confuses the *admissibility* of time-barred violations as evidence . . . with the issue of the *collection of monetary penalties* for time-barred violations." (Dckt. #95 at 17) (citing Dckt. #77 at 21–22). But it is defendants who are confused; that portion of plaintiff's brief makes a separate argument urging the Court to defer resolution of whether Skudder's activity is in fact part of a scheme until after all evidence is heard at trial. (Dckt. #77 at 21–22). Because a reasonable jury could find that Skudder's activity is, in fact, part of a scheme, the Court need not consider this argument.

[10] Instead, defendants cite cases in which parties attempted to apply or analogize to an incorrect statute of limitations. *See United States v. Ellis*, 938 F.3d 757, 764–65 (rejecting analogy to a case applying the statute of limitations in 28 U.S.C. §2462 rather than 18 U.S.C. §3282); *United States v. Isaacson*, No. 08-20071-CR-LENARD/O'SULLIVAN, 2014 WL 12279429, at *4 (S.D.Fla. Jan. 16, 2014) (same); *SEC v. Tee to Green Golf Parks, Inc.*, No. 00-CV-478S, 2011 WL 147862, at *3 (W.D.N.Y. Jan. 18, 2011) (rejecting motion to dismiss that relied on statute of limitations in 18 U.S.C. §3282 rather than 28 U.S.C. §2462). These cases do not support their contention that the Court cannot apply the scheme offense doctrine of claim accrual to the instant case.

the time-barred majority of the CFTC's claims. (Dckt. #60 at 21–22). "[T]he CFTC has not identified a single potential victim" of Skudder's spoofing, they argue, so any restitution damages would go to the government, not to victims. (*Id.*). The CFTC, to the contrary, contends that the restitution it seeks is not a penalty because "[t]he victims here are all those who traded opposite Skudder when he was unjustly enriched . . . all of which are revealed through an examination of the trade data." (Dckt. #77 at 20). Because the Court has already established that the scheme-offense doctrine applies to plaintiff's spoofing claims, meaning none of plaintiff's claims are time-barred, the Court need not consider whether the CFTC's request for restitution is, in fact, a penalty subject to the Section 2462 statute of limitations under *Kokesh*.[11]

Accordingly, because the parties agree that some of Skudder's conduct fell within the statute of limitations period, and because the scheme-offense doctrine applies to his claims, the Court finds that the CFTC has timely brought its claims for monetary relief.

## CONCLUSION

For the foregoing reasons, defendants' motion to exclude, (Dckt. #56), and motion for summary judgment, (Dckt. #59), are denied.

**DATE: September 8, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

[11] In any event, defendants identify no authority for the proposition that the CFTC has to identify individual victims in order to raise a genuine issue of fact about who will receive restitution (and, relatedly, whether the CFTC's claim for restitution constitutes a penalty under *Kokesh*). (*See* Dckt. ##60 at 21–22; 96 at 18–19). Thus, because a reasonable jury could find that restitution would go to individual victims identified in the trade data, as the CFTC argues, the CFTC's claim for restitution survives summary judgment regardless.